1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEBRASKA
2

3   UNITED STATES OF AMERICA,     )    Case No. 4:23CR3019
                                  )
4            Plaintiff,           )
                                  )
5   vs.                           )
                                  )
6   ANTHONY UNOCIC,               )
                                  )    Lincoln, Nebraska
7            Defendant.           )    September 26, 2023

8

9                        VOLUME II
               TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE JOHN M. GERRARD
            SENIOR UNITED STATES DISTRICT JUDGE
11

12              A-P-P-E-A-R-A-N-C-E-S

13   FOR THE PLAINTIFF:        Mr. Daniel D. Packard
                              Ms. Danielle Fliam
14                             U.S. Attorney's Office
                              100 Centennial Mall North
15                             Suite 487
                              Lincoln, NE 68508-3865
16
     FOR THE DEFENDANT:        Mr. Korey L. Reiman
17                             Federal Public Defender's Office
                              100 Centennial Mall North
18                             112 Federal Building
                              Lincoln, NE 68508
19

20

21   COURT REPORTER:          Ms. Lisa Grimminger, RDR, CRR, CRC
                              100 Centennial Mall North
22                             Room 587
                              Lincoln, NE 68508
23                             (402) 437-1908

24

25   Proceedings recorded by mechanical stenography, transcript
     produced with computer.

Tubbs - Direct (Packard)                                              96

```
 1        (At 8:44 a.m. on September 26, 2023; with counsel for the
 2   parties and the defendant present; WITHOUT the jury:)
 3        THE COURT:  Good morning, everyone.  Day two of
 4   trial, United States of America versus Anthony Unocic.  All
 5   counsel are present.  Mr. Unocic is present.
 6        Counsel, anything to take up before we bring the jury?
 7        MR. PACKARD:  Not from the government.
 8        MR. REIMAN:  No, sir.
 9        THE COURT:  All right.  Very well.  Agent Tubbs, if
10   you want to retake the stand.
11        Let's bring the jury.
12        DAVID TUBBS, PREVIOUSLY SWORN, RESUMED THE STAND
13        (Jury in at 8:46 a.m.)
14        THE COURT:  Welcome back, ladies and gentlemen of the
15   jury.  Day two of trial in the United States of America versus
16   Anthony Unocic.
17        Counsel, we were in direct examination.
18        Agent Tubbs, I'll remind you that you remain under oath
19   this morning.
20        THE WITNESS:  Yes, Your Honor.
21        THE COURT:  Counsel, you may inquire.
22        MR. PACKARD:  Thank you, Judge.
23                   DIRECT EXAMINATION RESUMED
24   BY MR. PACKARD:
25   Q.   Good morning, Agent Tubbs.
```

Tubbs - Direct (Packard)                                          97

1    A.   Good morning.

2    Q.   When we left off yesterday, we were looking at some

3    photographs that were taken on November 2, 2021, of 709

4    Cleveland Avenue.  Do you recall that testimony?

5    A.   Yes.

6    Q.   Specifically, some items that were taken out of

7    Mr. Unocic's bedroom; is that right?

8    A.   Yes.

9    Q.   And those items were taken into law enforcement custody;

10   is that correct?

11   A.   Correct.

12   Q.   And at some point in time, were you -- did you or other

13   agents check to see if the silencer that was seized fit on the

14   rifle that was seized?

15   A.   Yes, we did.

16        MR. PACKARD:  All right.  I'd like to publish

17   Exhibit 17A29.

18        THE COURT:  You may do so.

19   BY MR. PACKARD:

20   Q.   Could you describe what we're looking at here in

21   Exhibit 17A29.

22   A.   That's a photograph of the -- excuse me, the homemade

23   AR-15 rifle that was found in the defendant's bedroom with the

24   silencer or suppressor attached to it.

25   Q.   What was done to attach the silencer to the rifle?

Tubbs - Direct (Packard)                                    98

1   A.   I was able to remove the muzzle device that was currently

2   on the homemade AR-15 rifle, sometimes known as a flash hider.

3   I was able to unscrew that and basically screw on the

4   suppressor.

5   Q.   How do you spell hider?

6   A.   Just H-I-D-E-R.

7           MR. PACKARD:  I'd like to publish Exhibit 17A12 and

8   refer back to that.

9   BY MR. PACKARD:

10  Q.   Is the rifle depicted in Exhibit 17A12 the same rifle that

11  we just saw in Exhibit 17A29?

12  A.   It is.

13          MR. PACKARD:  I'd like to publish Exhibit 17A21,

14  please.

15  BY MR. PACKARD:

16  Q.   Is the silencer depicted in 17A21 the same silencer that

17  you just identified in Exhibit 17A29?

18  A.   It is.

19          MR. PACKARD:  I'd like to publish Exhibit 17A30.

20  BY MR. PACKARD:

21  Q.   Please describe what we're looking at here.

22  A.   That's just a close-up photograph of the silencer attached

23  to the rifle.

24  Q.   What's the item on top of the barrel there?

25  A.   Yeah.  Could you just specifically --

Tubbs - Direct (Packard)                                    99

1    Q.   Looks like there's two cylinders there.  What are we

2    looking at there?

3    A.   That would be an accessory attachment for a light.  So

4    that would be an accessory to mount a light, which you can see

5    is mounted there, and then there is a front sight that is

6    flipped up above that flashlight.

7           MR. PACKARD:  I'd like to publish Exhibit 17A32.

8    BY MR. PACKARD:

9    Q.   Please describe what we're looking at here.

10   A.   That's a photograph of the rear of the defendant's vehicle

11   parked at the VA where he worked.

12   Q.   Is this a true and accurate depiction of the rear of

13   Mr. Unocic's vehicle on November 2, 2021?

14   A.   It is.

15   Q.   And would this have been taken in the afternoon of that

16   day prior to the search warrant of his house -- or prior to the

17   search of his house?

18   A.   This was taken the same day, November 2nd, 2021.

19           MR. PACKARD:  Ms. Sump, could we zoom in on the

20   decals in the window, please.

21   BY MR. PACKARD:

22   Q.   There's a yellow decal that says, "Smile!  You're on

23   camera."  Do you see that?

24   A.   Yes.

25   Q.   Was there any cameras retrieved in evidence from the

1    vehicle?

2    A.   We did not find any cameras.

3    Q.   There's a decal of some sort that says, "Tactical Training

4    Center."  Do you know what that is?

5    A.   I don't specifically know where that sticker came from.

6         MR. PACKARD:  All right.  Thank you, Ms. Sump.

7    BY MR. PACKARD:

8    Q.   Let's look at Exhibit 17A33.  Please describe what we're

9    looking at here.

10   A.   This is the back of the defendant's vehicle with the trunk

11   open, and there's some -- like, a blue tub, a black toolbox

12   with a red handle, and there's -- there was something that I

13   don't recall underneath the black kind of cover there a little

14   bit more towards the front of the vehicle.

15        MR. PACKARD:  Could we zoom in on the item to the

16   right of the picture, Ms. Sump, of the gray box there with

17   wires.

18   BY MR. PACKARD:

19   Q.   There's a gray box that says R-O-V-E-R.  Do you see that?

20   A.   Yes.

21   Q.   Do you know what that is?

22   A.   I do not know.

23   Q.   Did you see a power source or did agents see a power

24   source for that item there?

25   A.   Yeah.  It appeared that there was possibly solar panels on

1    the top of the vehicle.

2    Q.    Do you know what a police scanner is?

3    A.    Yes.

4    Q.    What is a police scanner?

5    A.    There's scanners that you could possibly buy online

6    that -- depending on the frequencies and the radio

7    communication systems in the area, it may pick up first

8    responder traffic from the local dispatch and the first

9    responders.

10   Q.    You're not an expert in electronics or scanners; is that

11   correct?

12   A.    No.

13   Q.    And that is correct; is that right?

14   A.    I am not.

15   Q.    I didn't ask a good question.  I'm sorry.

16   A.    I'm not an expert.

17   Q.    And this item that's depicted here was not seized; is that

18   right?

19   A.    That's correct.

20         MR. PACKARD:  Thank you, Ms. Sump.  Let's look at

21   Exhibit 17A34.

22        And could we zoom in on the contents of the blue tub,

23   please.

24   BY MR. PACKARD:

25   Q.    Could you describe what we're looking at here.

1   A.   It's the blue tub with some miscellaneous items inside.

2   Q.   What items do you recognize?

3   A.   There was that cylinder piece that had the USPS label on

4   it addressed to the defendant at a different address.  I don't

5   recall there being anything inside that cylinder.

6           MR. PACKARD:  Could we zoom in on that address,

7   please.

8   BY MR. PACKARD:

9   Q.   So this is blurry, but it looks like a different address

10  from 937 [sic] Cleveland Avenue; is that right?

11  A.   I think it may have been 901 Warren.

12  Q.   And what did you find about that address?

13  A.   That was a previous address listed to the defendant.

14  Q.   And is Tony Mr. Unocic's middle name?

15  A.   Yes.

16  Q.   It's Anthony, I believe, or his -- let's see.  His full

17  name is Anthony Unocic?

18  A.   That's correct.

19  Q.   So it could be a part of his first name; is that right?

20  A.   That's correct.

21          MR. PACKARD:  All right.  Thank you, Ms. Sump.

22      And then let's zoom in on the red item in the middle of

23  the box there, please.

24  BY MR. PACKARD:

25  Q.   What is that item in the middle of the box with the red?

Tubbs - Direct (Packard)                                                103

1    A.    That appears to be a saw with a saw blade attached to it.

2    Q.    And how about the cylindrical item there behind it?

3    A.    Those are -- are you referring to the yellow or the --

4    Q.    It appears there's a white label with a black item on it

5    and the letters NCH.  What is that item?

6    A.    Those appear to be zip ties.

7            MR. PACKARD:  Thank you.  If you could zoom back out,

8    Ms. Sump.

9    BY MR. PACKARD:

10   Q.    And then to the left of the picture as you look at it,

11   there's a black box with a label and some white lettering.

12           MR. PACKARD:  Could you zoom on that please,

13   Ms. Sump.

14   BY MR. PACKARD:

15   Q.    Are you familiar with the company, eRapta?

16   A.    Yeah, based on just a Internet search.

17   Q.    Okay.  What is eRapta?

18   A.    It appears to be a company that may sell, like, cameras or

19   in-car vehicle-type cameras.

20   Q.    You're not a expert in cameras or this company.  You just

21   essentially Googled that label; is that fair?

22   A.    Yes.

23   Q.    Thank you.  Did you seize any items in the -- excuse me.

24   Did you seize -- did you or other agents seize any items from

25   the GMC Yukon?

1    A.    We did not.

2    Q.    All right.  Thank you.  So a majority of the items that

3    were -- well, all of the items that you seized were from

4    Mr. Unocic's residence, 709 Cleveland; correct?

5    A.    Yes.  In addition we did seize his cell phone which was on

6    his person.

7    Q.    With respect to the residence, you learned that there were

8    three people that lived there; is that right?

9    A.    Yes.

10   Q.    Did you locate any evidence in that room that the

11   firearms, ammunition, knives, et cetera, were found suggesting

12   that the other two roommates owned or had possession of those

13   items?

14   A.    No.

15   Q.    Did you arrest -- did you or other agents arrest those

16   other two roommates for any firearms-related crimes?

17   A.    We did not.

18   Q.    Mr. Unocic was the only person arrested as a result of the

19   November 2 investigation; is that correct?

20   A.    Correct.

21   Q.    With respect to the scope or thoroughness of the search of

22   the house, can you give the jury an idea of what parts of that

23   house you went through.

24   A.    We went through the entire house as best that we could, so

25   all rooms, all levels, et cetera.

Tubbs - Direct (Packard)                                                 105

1    Q.   Is it possible that you and other agents missed some items

2    that could have been seized?

3    A.   Yeah.  I would say it's almost always possible that you

4    could miss something inside a residence.

5    Q.   And when you are granted a search warrant by a court,

6    there are limits on what you can seize; is that right?  You

7    have to list what you want to seize; correct?

8    A.   Correct.

9    Q.   And at this point in time, the boundaries of what you

10   could seize was related to firearms, firearm-related materials,

11   explosive-related materials; is that correct?

12   A.   Yes.  There was additional items, but yeah, that was --

13   that was included.

14   Q.   Is it possible that you and other agents left behind some

15   items that could be used to cause physical harm to others?

16   A.   Not intentionally, but like I previously mentioned, it's

17   possible to hide things in a residence.  It's -- I've seen

18   trapdoors and hidden areas in my previous experience so I can't

19   ever say with certainty that you checked every single part of a

20   residence.  It would be very difficult to do that.

21   Q.   At the conclusion of your investigation on November 2, was

22   Mr. Unocic arrested?

23   A.   He was.

24   Q.   And was he lodged in jail?

25   A.   Yes.

Tubbs - Direct (Packard)                                        106

1    Q.    In terms of -- I want to ask you about how you got

2    involved in this case.  Did you seek out Mr. Unocic?

3    A.    No.

4    Q.    Okay.  So can you give the jury an idea of how this came

5    to you.

6    A.    Like I had mentioned earlier, at the beginning of the

7    investigation, it was -- it was referred from customs to HSI,

8    and then HSI referred it to ATF.

9    Q.    And so then you get assigned to work the case; is that

10   right?

11   A.    Yes.

12   Q.    Had you had any prior dealings with Mr. Unocic?

13   A.    No.

14   Q.    Was there any prior beef between you two, for whatever

15   reason, from when you were a street officer to when you became

16   an ATF agent?

17   A.    No, not that I'm aware of.

18   Q.    Were you aware of any kind of conflict between your

19   coworkers in the ATF and Mr. Unocic when you came into this

20   investigation?

21   A.    No.

22   Q.    Did you ever witness any officer in your investigation

23   make any kind of aggressive or threatening statements to

24   Mr. Unocic?

25   A.    No.

Tubbs - Direct (Packard)                                          107

1   Q.   How about you personally?  Did you ever engage in any --

2   what you would describe as any kind of threatening or

3   aggressive verbiage with Mr. Unocic?

4   A.   No.

5   Q.   When you contacted Mr. Unocic at the Veterans

6   Administration, he was at work; is that right?

7   A.   Correct.

8   Q.   It was during the daytime in the afternoon?

9   A.   Yes.

10  Q.   And you and another individual interviewed him; is that

11  right?

12  A.   Yes.

13  Q.   And who was that?

14  A.   It was Steve Shelly, and he was the EEO, which is the

15  explosives enforcement officer or the specialist with the

16  explosives.  And then there was another ATF agent that was in

17  and out of the room as well, Matt Wright.

18  Q.   How were you dressed compared to how you appear today?

19  A.   I recall I was wearing, like, a khaki -- or we call them,

20  like, a 511-type pant with, like, a long sleeve, maybe, polo or

21  half-zip type shirt with long sleeves and then maybe a jacket.

22  I just recall it was cooler and there was rain and snow that

23  day.

24  Q.   And were the other two dressed similarly in something less

25  than police uniform?

Tubbs - Direct (Packard)                                          108

1  A.   Yeah.  For warrant operations or warrant services, we

2  typically wear -- like I mentioned, it's a half-zip long-sleeve

3  shirt with, like, a khaki pant with pockets and stuff like that

4  on the side.

5  Q.   Where did the interview with Mr. Unocic take place?

6  A.   It was inside almost like a break room or interview room

7  at the VA.

8  Q.   Did you make any effort or any attempt to not make a big

9  scene at his workplace?

10  A.   Yeah.

11  Q.   Did you do that?

12  A.   I did.  I tried to.  And I think I recall telling the

13  defendant that I tried to minimize our presence there with

14  respect to him.

15  Q.   So in this room in the hospital, it's you and three

16  officers; is that right?

17  A.   Yes.

18  Q.   And you're seated at some sort of table?

19  A.   Yes.

20  Q.   And how much time did you spend with him in the room that

21  day?

22  A.   I personally spent approximately 45 minutes in that, give

23  or take, 45 minutes.

24  Q.   How would you describe Mr. Unocic's demeanor during that

25  time?

Tubbs - Direct (Packard)                                     109

1    A.   He was calm, very -- just kind of what I would consider

2    standard, normal demeanor, even a little bit reserved or quiet,

3    but fairly calm throughout the entire duration.

4    Q.   How would you describe the tone of voice of the officers

5    speaking with him?

6    A.   Just conversational.  I will add the defendant did say

7    that he was getting a little bit frustrated with EEO Shelly

8    'cause he was talking fast, and I think that was, in my

9    opinion, what -- just a style of that agent or of Mr. Shelly.

10   He tended to talk fast, but I do recall that coming up.

11   Q.   Did you observe any of the officers involved in the

12   interview behave confrontationally with Mr. Unocic?

13   A.   No.

14   Q.   Did any of the officers threaten Mr. Unocic during the

15   interview?

16   A.   No.

17   Q.   Did Mr. Unocic threaten you during the interview?

18   A.   No.

19   Q.   Did he threaten any of the officers during the interview?

20   A.   No.

21   Q.   Did you read Mr. Unocic his Miranda rights?

22   A.   I did.

23   Q.   And that included his right to remain silent, anything

24   that he said could and would be used against him in a court of

25   law, and his right to an attorney?

Tubbs - Direct (Packard)                                          110

1    A.    Yes.

2    Q.    Did he waive those rights and agree to speak with you?

3    A.    Yes.

4    Q.    Did it appear that he did so freely, voluntarily,

5    knowingly, and intelligently?

6    A.    Yes.

7    Q.    Did he appear to be under the influence of alcohol or

8    drugs?

9    A.    He did not.

10   Q.    Did he appear to be acting without mental confusion?

11   A.    Yeah.  I didn't pick up any indication of that.

12   Q.    Was he giving answers that were responsive to your

13   questions in English?

14   A.    Yes.

15   Q.    Was the interview recorded?

16   A.    It was.

17   Q.    What did he say about the suppressors -- or the suppressor

18   that you had found in his bedroom?

19   A.    He had said that it was not a suppressor.

20   Q.    Did he expound on that or give a reason?

21   A.    He said that it couldn't function as one and it was a

22   solvent trap.

23   Q.    Could you explain in layman's terms what a solvent trap

24   means.

25   A.    It would be a device that you would attach to a firearm

Tubbs - Direct (Packard)                                              111

```
1    while you're cleaning it to capture, like, the residue, carbon,
2    and solvent in that device, so hence the solvent trap name.
3    Q.   Can a solvent trap be converted into a suppressor?
4    A.   With all the correct components, I guess it's possible.
5    It is not intended or designed to be that but....
6    Q.   Did you ask Mr. Unocic about whether he had done any
7    drilling, or did he say anything about drilling?
8    A.   I did.
9    Q.   Tell us about that.
10   A.   He said he had not done any drilling to the suppressor
11   that was delivered.
12   Q.   And why is that relevant, or how is that relevant in your
13   investigation?
14   A.   I wanted to know.  Based on the examination there were
15   parts that needed to be drilled in order to use that suppressor
16   on a firearm so I'd asked him if he had done any drilling to
17   it.
18   Q.   And he says he hadn't done drilling; is that right?
19   A.   Correct.
20   Q.   And was that consistent with what you observed on the
21   suppressor?
22   A.   It was consistent.
23   Q.   You found a drill press in the garage; is that right?
24   A.   Yes.
25   Q.   Based on your training and experience, would that drill
```

Tubbs - Direct (Packard)                                     112

1    press have allowed him to do the necessary drilling to make the

2    suppressor functional?

3    A.    Yes.

4    Q.    Did he make any state- -- did Mr. Unocic make any

5    statements about whether he had, in fact, ordered the

6    suppressor?

7    A.    He did.

8    Q.    What did he say about that?

9    A.    He said he had ordered it, being what he claimed was the

10   solvent trap, only to just see if he could, in fact, order it,

11   to see if it would be delivered.

12   Q.    Did he say anything in regards to his work and how your

13   investigation might impact his work?

14   A.    He did.

15   Q.    What did he say about that?

16   A.    He had said that he had recently spoke to his boss or

17   supervisor about a promotion and he wouldn't do anything to

18   jeopardize -- to jeopardize that.

19   Q.    Did you ask him whether he owned any firearms?

20   A.    I did.

21   Q.    What did he say?

22   A.    He said he did not.

23   Q.    Did you ask him whether you would find anything illegal in

24   his residence or vehicle?

25   A.    Yes.

Tubbs - Direct (Packard)                                        113

1    Q.   And what was his response?

2    A.   He said he did not have anything illegal.

3    Q.   At the conclusion of the interview, how would you describe

4    his demeanor?

5    A.   From my recollection it seemed consistent throughout.

6    Fairly calm, somewhat reserved, but, you know, conversational,

7    and it stayed fairly consistent like that throughout the

8    interview.

9    Q.   Was your tone of voice similar to how you're testifying in

10   court today when you spoke with him?

11   A.   I would say so.

12   Q.   Did the interview end with either side, that is,

13   Mr. Unocic or agents, threatening each other?

14   A.   No.

15   Q.   So in summary, on that day, November 2, agents found two

16   loaded firearms in his bedroom; is that right?

17   A.   Yes.

18   Q.   Around 650 rounds of ammunition?

19   A.   Yes.

20   Q.   Knives?

21   A.   Yes.

22   Q.   Ghost gun kits in the bedroom?

23   A.   Yes.

24   Q.   Magazines in the bedroom?

25   A.   Yes.

Tubbs - Direct (Packard)                                                                                     114

1    Q.   And a suppressor?

2    A.   Yes.

3    Q.   Did you see anything at his residence that would suggest

4    that he was going hunting or sport shooting?

5    A.   I don't recall any other gear hunting -- I guess

6    hunting-specific gear.  I will say you could, you know, go out

7    and shoot, you know, an AR-15 or a pistol, you know, for sport

8    or for target practice or just for your own personal

9    recreation.

10   Q.   Did you see any evidence of shooting for recreation at his

11   residence on November 2?

12   A.   No, other than just the firearms and ammunition and the

13   firearms accessories.

14   Q.   Were the items contained in Mr. Unocic's bedroom illegal

15   for him to possess?

16   A.   Yes.

17   Q.   Could you explain your answer.

18   A.   Due to the fact that the defendant was a previously

19   convicted felon, it would prohibit him from possessing firearms

20   or ammunition.

21   Q.   Was Mr. Unocic charged in federal court in Wyoming as a

22   result of your investigation?

23   A.   Yes.

24   Q.   And was he convicted of being a felon in possession of a

25   firearm and ammunition?

1    A.    Yes.

2    Q.    And was he sentenced to incarceration?

3    A.    Yes.

4          MR. PACKARD:  I'd like to offer Exhibit 1, a prior

5    conviction.

6          THE COURT:  All right.  Very well.  Any objection?

7          MR. REIMAN:  The pretrial objection that I had, so

8    I'll renew that.

9          THE COURT:  Okay.  Very well.  That objection is

10   overruled for the reasons stated in the pretrial order.  That

11   is Exhibit 1?

12         MR. PACKARD:  That's correct, Judge.

13         THE COURT:  The objection is overruled.  Exhibit 1 is

14   received.

15         MR. PACKARD:  I'll ask permission to publish.

16         THE COURT:  And you may publish.

17         MR. PACKARD:  If we could focus on the top half of

18   that, Ms. Sump, the charges there.

19   BY MR. PACKARD:

20   Q.    Agent Tubbs, Mr. Unocic was charged in Count I with

21   possession of a firearm not registered in the National Firearms

22   Registration and Transfer Record; is that right?

23   A.    Yes.

24   Q.    And what does that charge relate to?

25   A.    That relates to the silencer.

Tubbs - Direct (Packard)                                                116

1   Q.   And does the -- does -- well, does the ATF deem that

2   silencer to find that as actually a firearm?

3   A.   Yes.

4   Q.   And what's the registered in the National Firearms

5   Registration part mean?

6   A.   It's -- like I previously mentioned, the silencer is an

7   NFA item and there needs to be preapproval, and it would be, in

8   fact, registered in this NFRTR or National Firearms

9   Registration and Transfer Record, and the query was done by me,

10  and it was not registered.

11         THE COURT:  All right.  Counsel, just approach just

12  for a moment, please.

13     (At sidebar)

14         THE COURT:  Just briefly, two things about Exhibit 1.

15  I'm not planning on giving any type of limiting instruction

16  unless the defense requests it.  I've already ruled that this

17  is intertwined with the underlying offense.  But if you request

18  it, I will.

19         MR. REIMAN:  That's okay.

20         THE COURT:  All right.  Secondly, I want to just be

21  real brief on this.  I mean, we're not retrying the felon in

22  possession charge so let's --

23         MR. PACKARD:  Right.  Understood.

24         THE COURT:  -- blast through it.  Okay.  Thank you.

25     (In open court)

```
 1              THE COURT:  You may proceed, counsel.
 2    BY MR. PACKARD:
 3    Q.   Agent Tubbs, Count II charges felon in possession; is that
 4    correct?
 5    A.   Correct.
 6              MR. PACKARD:  Ms. Sump, if we could move to page 4 of
 7    5, please.  Excuse me.  Not 4 of 5.  Let's go to the judgment,
 8    please.  I'm not sure what page that is.  Maybe page 6.  Yeah.
 9    BY MR. PACKARD:
10    Q.   Okay.  Agent Tubbs, does this show that Mr. Unocic pled
11    guilty to Count II, being a felon in possession of a firearm?
12    A.   Yes.
13              MR. PACKARD:  And then let's go to the next page,
14    please.
15    BY MR. PACKARD:
16    Q.   Then at the top there, Mr. Unocic was sentenced to
17    imprisonment; is that correct?
18    A.   Correct.
19              MR. PACKARD:  Thank you.
20    BY MR. PACKARD:
21    Q.   Now, this is a allegation of a threats case.  Do you
22    understand that?
23    A.   Yes.
24    Q.   So I'd like to ask you some questions related to that.
25    Did you become aware of a report that Mr. Unocic had threatened
```

Tubbs - Direct (Packard)                                         118

1    you?

2    A.    Yes.

3    Q.    How did you find out about it?

4    A.    I received a text message from the AUSA, or the Assistant

5    United States Attorney, that was working the case with me in

6    2021, Mike Elmore, on -- I believe it was March 18th of 2022.

7    Q.    Was that a Friday?

8    A.    It was.

9    Q.    About what time?

10   A.    I recall it being in the afternoon, sometime around 4:00

11   or 5:00.

12   Q.    And could you spell Elmore.

13   A.    E-L-M-O-R-E.

14   Q.    Did Mr. Unocic ever communicate any threats directly to

15   you?

16   A.    He did not.

17   Q.    Specifically, what information were you provided about a

18   threat on that date of March 18, 2022?

19   A.    I was advised on the text message that there had been a

20   credible threat against an ATF agent involved in a silencer

21   investigation, and AUSA Elmore indicated in the text and

22   presumed it was based -- based on that, it was the defendant

23   making the credible threat.

24   Q.    And was Mr. Elmore the prosecutor assigned to the felon in

25   possession case?

1    A.    Yes.

2    Q.    What was your reaction when you received that information

3    from Mr. Elmore?

4    A.    I was pretty nervous, shocked, alarmed.  I wasn't

5    expecting that type of message, obviously, on a Friday

6    afternoon so I was -- I was concerned.

7    Q.    Did you feel threatened?

8    A.    Yeah.  At the time it was -- it concerned me because it

9    was -- I presumed it was -- it was involving me, and then as

10   more details played out later in that weekend, it was confirmed

11   that it was directed towards me personally.

12   Q.    So you received more information from coworkers; is that

13   right?

14   A.    Yes.

15   Q.    Have your feelings changed since that time when you

16   initially heard the information?

17   A.    I mean, not really.  It's been fairly consistent since

18   that time.

19   Q.    And again, you've not had any prior dealings with

20   Mr. Unocic prior to November -- October and November of 2021;

21   is that correct?

22   A.    Correct.

23   Q.    At the time that you heard about this information coming

24   from Mr. Unocic, you were aware of a 2017 possession of

25   explosives conviction?

Tubbs - Direct (Packard)                                               120

1    A.    Yes.

2    Q.    You were aware of the facts surrounding that conviction?

3    A.    Yes.

4    Q.    You were aware of the evidence that you and other agents

5    had uncovered during your own investigation in October and

6    November; is that correct?

7    A.    Yes.

8    Q.    You also had interviewed Mr. Unocic?

9    A.    Yes.

10   Q.    Your name was on the search warrants in Mr. Unocic's car,

11   home, and person; is that right?

12   A.    Yes.

13   Q.    Did you participate in the -- this underlying threats

14   investigation?

15   A.    No.   I -- the only thing I recall doing was helping gather

16   access to databases or looking for prior recorded calls.

17   Q.    You didn't conduct any witness interviews; is that

18   correct?

19   A.    Correct.

20   Q.    Was it important for you at the time to have as much

21   detail as you could about the nature of the threat?

22   A.    Yes.

23   Q.    And why was that important?

24   A.    I felt I --

25              MR. REIMAN:   Objection.   Relevance, Your Honor.

Tubbs - Direct (Packard)                                         121

1            THE COURT:  Overruled.  You may answer.

2    A.   I felt I personally needed to know was this something

3    imminent, which could happen right now?  I mean, I needed to

4    know as much as I could about it, you know, to possibly protect

5    myself, and there was discussions about how to do that, so I

6    wanted to know as much as I could.

7    BY MR. PACKARD:

8    Q.   And with respect to the timeline of what was happening in

9    court in relation to when you were getting this -- receiving

10   this information, the search warrants in Mr. Unocic's arrest

11   happened in November of 2021; is that right?

12   A.   Yes.

13   Q.   He was charged in federal court in that same month; is

14   that right?

15   A.   Yes.

16   Q.   And the information that you received from Mr. Elmore and

17   other agents about this alleged threat came in March of 2022;

18   is that correct?

19   A.   Correct.

20   Q.   And at the time Mr. Unocic was -- had a pending case in

21   district court; is that right?

22   A.   Correct.

23   Q.   He had -- he, through his lawyer, had filed some motions;

24   is that correct?

25   A.   Yes.

Tubbs - Direct (Packard)                                                    122

1    Q.    And then he ultimately was sentenced in July.  July 5,

2    2022; is that right?

3    A.    Yes.

4    Q.    So basically in the middle of his case pending in Wyoming

5    is when this information comes to you; is that right?

6    A.    Yes.

7    Q.    All right.  Do you have experience interacting with

8    threatening individuals?

9    A.    Yes.

10   Q.    How often over the course of your career have you been

11   threatened by others?

12   A.    I would say it occurred mostly from my experience at

13   Lakewood Police Department the ten years I was there.  I

14   couldn't put an exact number on it, but, you know, numerous

15   times throughout my tenure.

16   Q.    How big is Lakewood?

17   A.    I believe it's roughly 180,000.  And then similar to these

18   larger cities, the population changes significantly during the

19   daytime so it would increase during the day.

20   Q.    In the course of your career, have others expressed intent

21   to cause harm to you personally?

22   A.    Yes.

23   Q.    Do you always consider these instances to be serious

24   expressions of an intent to cause harm to you?

25   A.    It would depend on some factors.

Tubbs - Direct (Packard)                                           123

1    Q.    Do you always take them as serious threats?

2    A.    Not -- not always.

3    Q.    And why not?

4    A.    There would be times, specifically on patrol, where you

5    would make an arrest and an individual would be upset at the

6    time and they would say things, and then at the end when you're

7    putting them in the detention center at the jail, they may cool

8    off, or they may even say things -- I recall them saying things

9    to me, "I'm sorry, Officer, I was heated, I was upset.  I

10   didn't mean that."  And you just kind of understand that and

11   move on.

12   Q.    As a law enforcement officer, have you had to deal with a

13   certain amount of aggressive talk from people that you come

14   into contact in the public?

15   A.    Yes.

16   Q.    And do you always ticket them or arrest them for that kind

17   of behavior?

18   A.    Not always.

19   Q.    Did this case involving Mr. Unocic feel different?

20   A.    Yes.

21   Q.    What is different about this case with Mr. Unocic?

22   A.    My observations and feelings are that this is different

23   because, like I just mentioned, there's been times where I've

24   been, you know, threatened or called names.  Individuals seem

25   upset at you, and that's at the onset of your interaction with

Tubbs - Direct (Packard)                                          124

1    them, and then you hear nothing usually later on.  This case

2    was different because it was the opposite of that.  The alleged

3    credible threat occurred later on after time had allowed for

4    processing everything, and so to me that's why it feels

5    different.

6    Q.   Do you have training as to how to diffuse angry or

7    threatening individuals?

8    A.   Yes.

9    Q.   Do you have training as to how to respond to a person

10   making threats?

11   A.   Yes.

12   Q.   Do you use this training when you come across an angry or

13   threatening individual?

14   A.   Yes.

15   Q.   Do you have to do this -- did you have to do this during

16   your time as a SWAT officer?

17   A.   Yes.

18   Q.   As a street officer?

19   A.   Yes.

20   Q.   As an ATF agent?

21   A.   Yes.

22   Q.   Based on your training and experience as an officer, what

23   facts cause you to view a threat as a serious expression of an

24   intent to cause harm to you?

25   A.   You know, it's kind of a totality of everything given what

Tubbs - Direct (Packard)                                         125

1    you learn from the beginning of the call, you know, all the way

2    through to include what was said prior to your arrival or your

3    contact.  Intoxication, any mental illnesses, your history with

4    them could come into play, prior interactions, and then, you

5    know, your observations, their demeanor, you know, physical

6    features, stance.  How are they holding their hands?  How are

7    they looking at you?  Their tone of voice, maybe witnesses

8    that, you know, are telling you things.  It's kind of totality

9    of it all.  You take all that into account while you're working

10   through it.

11   Q.   In this case in your investigation, did you make attempts

12   to diffuse Mr. Unocic?

13   A.   In this case I didn't really need to.

14   Q.   At any point in time when you had any contact with him

15   related to the case, did he seem like he was angry with you?

16   A.   No.

17   Q.   Why is it important in your job to measure the threat

18   level that individuals you come into contact with have?

19   A.   Your -- you have -- officer safety is usually taught as

20   one of the most critical components of being in patrol or a

21   case agent, whether you're local or federal or state.  It's

22   important for yourself and for others and then for the safety

23   of the defendant so you're -- you're always thinking about

24   those things usually anytime you're coming in contact with

25   suspects or even possibly even witnesses.  You just never know.

Tubbs - Direct (Packard)                                    126

1    Q.    Based on your training and experience, do individuals
2    always directly communicate their threats to their victims?
3    A.    Not always.  On patrol usually it's going to be directed
4    right -- you know, directly towards you, but I would say that's
5    not always the case.
6    Q.    Based on your training and experience, does a person's
7    incarceration prevent him from making a serious expression of
8    an intent to cause present or future harm to another?
9    A.    No.
10   Q.    Why take seriously somebody who is making threats if he's
11   behind bars?
12            MR. REIMAN:  Objection.  Argumentative.
13            THE COURT:  Overruled.  This is direct.
14   A.    Because an individual in custody -- and this is based on
15   my experience, you know.  There's communication within prisons,
16   within jails, detention centers.  There's access now with iPads
17   and FaceTimes and video chats.  I've reviewed video chats of
18   prior individuals where I can see where they're at, you know,
19   the person talking to the inmate.  There's all this technology
20   that the individuals have in these detention centers, and they
21   can communicate from inside to individuals on the outside, so
22   it's always possible to make those coordinated efforts or
23   communicate to individuals on the outside.
24            And then in addition to that, I knew that in this case the
25   defendant is not going to be incarcerated --

Tubbs - Direct (Packard)                                    127

```
 1                MR. REIMAN:  Objection.

 2                THE COURT:  Sustained.

 3    BY MR. PACKARD:

 4    Q.   Were you performing your official duties when you

 5    investigated Mr. Unocic in October and November of 2018 for

 6    firearms-related crimes?

 7    A.   I was.

 8    Q.   And were you a federal agent?

 9    A.   Yes.

10    Q.   Do you see Mr. Unocic in court today?

11    A.   I do.

12    Q.   Could you point to where he's sitting and describe what

13    he's wearing.

14    A.   He's sitting to my left here wearing a blue-and-black

15    button-up shirt.

16    Q.   How does he look different from when you contacted him

17    back on November 2?

18    A.   I would say he doesn't look much different to me.

19                MR. PACKARD:  I'd like to offer -- well, may I

20    approach the witness?

21                THE COURT:  You may.

22    BY MR. PACKARD:

23    Q.   If you could take a look at Exhibit 2, please.

24    A.   (The witness complied.)

25    Q.   Do you recognize Exhibit 2?
```

Tubbs - Direct (Packard)                                      128

1    A.    Yes.

2    Q.    How do you recognize Exhibit 2?

3    A.    I'm aware that -- of that photograph from my previous

4    investigation in 2021.

5    Q.    Is Exhibit 2 a true and accurate depiction of Mr. Unocic's

6    face as he appeared November 2, 2021?

7    A.    Yes.

8    Q.    After he was arrested, where was he taken?

9    A.    He was transported to the Platte County Detention Center

10   in Wheatland, Wyoming.

11   Q.    Wheatland?

12   A.    Correct, Wheatland.

13   Q.    Could you spell that.

14   A.    W-H-E-A-T-L-A-N-D.

15   Q.    And was the photograph, Exhibit 2, taken at Wheatland at

16   the jail?

17   A.    I believe it was.

18         MR. PACKARD:  I'll offer Exhibit 2 and ask to

19   publish.

20         THE COURT:  Any objection?

21         MR. REIMAN:  Yeah.  I'm going to object on 403 and

22   cumulative.  May we approach?

23         THE COURT:  Before that, are you identifying the

24   defendant?  I mean, is this --

25         MR. PACKARD:  I'll ask the record to reflect the

Tubbs - Direct (Packard)                                           129

1   witness has identified the defendant.

2         THE COURT:  And the record will so reflect.

3      Do you still need to approach?  All right.

4      (At sidebar)

5         MR. REIMAN:  I don't think that's from this case.  I

6   don't think it's from the 2021 case.  I think the officer -- I

7   think that they found a previous picture they could find of

8   him, and they're offering it into evidence.  So I object on 403

9   as well as it's cumulative, and they haven't laid foundation of

10  when this picture was taken from.

11        THE COURT:  Stop.  He's been identified.  That's all

12  we need.  So I will sustain the objection.  It's certainly

13  relevant, but it's cumulative, and I will sustain it as to 403.

14        MR. PACKARD:  May I be heard just briefly?

15        THE COURT:  Oh, sure.

16        MR. PACKARD:  So one of the issues is whether the

17  defendant is depicted in jail video that they're going to watch

18  later, and there's a distinctive male with tattoos, short hair,

19  black glasses.  Unless they want to stipulate that that's the

20  defendant in the video, this is being offered to show a

21  consistent -- an appearance consistent with what's viewed in

22  the jail video.

23        THE COURT:  So is there an issue as to this?

24        MR. REIMAN:  No.

25        THE COURT:  Okay.  So you will stipulate to that?

Tubbs - Direct (Packard)                                    130

```
 1              MR. REIMAN:  Yes.

 2              THE COURT:  All right.  So with that -- just a

 3   minute.

 4        With that being stipulated, then, the objection to

 5   Exhibit 2 is sustained, and we can move on.

 6              MR. REIMAN:  Thank you.

 7              THE COURT:  All right.

 8         (In open court)

 9              THE COURT:  The objection to Exhibit 2 is sustained,

10   and we can move on.

11   BY MR. PACKARD:

12   Q.   Last question.  The investigation that you performed

13   regarding the firearms-related offenses happened in Wyoming,

14   but the alleged threat investigation and where those were made

15   happened in the District of Nebraska; is that correct?

16   A.   Yes.

17              MR. PACKARD:  Thank you, Judge.  No other questions.

18              THE COURT:  Thank you.  Cross-examination.

19              MR. REIMAN:  May I use the overhead projector, Your

20   Honor?

21              THE COURT:  You may do so.

22              MR. REIMAN:  May I ask questions?

23              THE COURT:  You may approach the witness when you're

24   asking questions about the overhead projector, but otherwise

25   I'll have you be at the podium.  You may proceed, though.
```

```
 1                        CROSS-EXAMINATION
 2    BY MR. REIMAN:
 3    Q.   I would like to start off by asking you a few questions.
 4            THE COURT:  And I'm going to have you put the
 5    microphone closer so the jury can hear you.  Or up it.
 6        There we go.  Speak into it.  Whatever.
 7    BY MR. REIMAN:
 8    Q.   All right.  So I want to show you Exhibit 17A15 to begin
 9    with, Officer.  There's the exhibit sticker.  And you talked
10    about this identification, this identification of the dog; is
11    that right?
12    A.   Yes.
13    Q.   So that dog was a service dog; correct?
14    A.   My understanding, either from the tag or from what the
15    defendant had said, that is -- that was my understanding.
16    Q.   Okay.  And we had -- on Exhibit 17A26, he had that he was
17    a -- he had at least a U.S. Army veteran sticker on his
18    vehicle; correct?
19    A.   Correct.
20    Q.   And he worked at the Veterans Administration; is that
21    right?
22    A.   He did.
23    Q.   And he worked maintenance; is that correct?
24    A.   I believe he did.
25    Q.   And you found tools in his house consistent with someone
```

Tubbs - Cross                                                      132

 1    who does a lot of maintenance work; is that fair?

 2    A.    I don't recall.  I recall, you know, tools, yes.  I would

 3    say yeah, I found some tools, yeah.

 4    Q.    Thank you.  It looks like -- let's see.  You said you did

 5    a thorough search of the house; is that correct?

 6    A.    Again, like I mentioned previously, we try to do the best

 7    search that we can in these residences, but there's a lot of

 8    different areas to search.

 9    Q.    And you found medications prescribed to Mr. Unocic; is

10    that correct?

11    A.    Correct.

12    Q.    And did you notate what those medications were?

13    A.    We took -- we had the agent take photographs of the

14    prescription pills.  I don't recall writing down every single

15    prescription.

16    Q.    And if you know, were some of those for mental health type

17    of issues, if you know?

18    A.    I don't know.

19    Q.    Okay.  And it's fair to say you're not aware when

20    Mr. Unocic was in custody in Scotts Bluff if they'd maintained

21    his same medications.  That's -- you don't know.  Is that fair?

22    A.    Correct.  I don't know.

23    Q.    Okay.  And I want to talk to you about -- is that the

24    solvent trap?  Solvent trap?

25               THE COURT:  And this is Exhibit....

```
 1              MR. REIMAN:  Oh, I'm sorry.  17A21.
 2              THE COURT:  Okay.  Thank you.
 3   A.    That is the silencer that was delivered.
 4   BY MR. REIMAN:
 5   Q.    Okay.  So this is where we get into it.  On direct we
 6   talked about solvent traps; correct?
 7   A.    (Witness nods head.)
 8   Q.    So what makes this a suppressor instead of a solvent trap?
 9   A.    This device here contains the components and to include
10   the end cap, the threaded nut, the cylinder, the baffles
11   inside, and the predrilled preindentations for drilling.  All
12   those components combined make this device a silencer.
13   Q.    Okay.  What is a silencer?  Let's start there.
14   A.    A silencer is a -- it's a device that captures the report
15   or -- like I'd mentioned earlier, the report or the sound of
16   a -- of the firearm.  It captures that sound, muffles it, and
17   expels the gases through the baffle system and out the end of
18   it, and it's classified as a firearm as well.
19   Q.    Okay.  But actually, actually, a whole lot of things can
20   be an illegal -- and we're using "silencer" and "suppressor"
21   interchangeably here; is that correct?  We're meaning the same
22   thing; is that fair?
23   A.    Correct.
24   Q.    But really, from your perspective as a law enforcement
25   agent, anything you put on the end of the gun with the intent
```

Tubbs - Cross                                                              134

 1    to muffle that sound would be a suppressor in the law's eyes;
 2    is that fair?
 3    A.    It would be just -- I would say it would be situational
 4    dependent on the device.
 5    Q.    So some people will screw on a oil filter onto the end of
 6    the gun, just a regular old FRAM oil filter, in an effort to
 7    depress the sound of that firearm; is that fair?
 8    A.    I believe people have probably done that, yes.
 9    Q.    Okay.  And as far as you're concerned, that would be an
10    illegal suppressor; correct?
11    A.    Again, it could be.  It would need to be examined, and
12    each device is its own, so we would treat each device
13    differently.
14    Q.    You said this wasn't a solvent trap because it had
15    components consistent with a suppressor; is that correct?
16    A.    That's correct.
17    Q.    One of the things -- I'm going to put up Exhibit 17A30.
18    One of the things I think you talked about was that it can be
19    screwed on right here; is that correct?
20    A.    It could.
21    Q.    But a solvent trap -- the whole point of a solvent trap is
22    you screw it onto a gun; is that right?
23    A.    You could.
24    Q.    Well, how else would you use a solvent trap?
25    A.    I -- I personally could give my opinion.  In my

Tubbs - Cross                                                    135

 1   experience, you're just going to, you know, put it at the end

 2   of the barrel or the muzzle to capture the solvent trap.

 3   However -- however you want to do that or however the device

 4   attaches, you would do that.

 5   Q.   Well, let's start there.  Let's go back.  What's a solvent

 6   trap, then?  What's it for?

 7   A.   It is -- I personally have never used one or seen one

 8   used, but they are used to capture the carbon and cleaning

 9   solutions and solvent as you clean the firearm.

10   Q.   Okay.  So you would -- to use a solvent trap, you would

11   have to screw it onto a gun, then; correct?

12   A.   Yeah.  I think you could screw it on or put it over the

13   end of the muzzle, yes.

14   Q.   Okay.  And you indicated that this, what you call a

15   suppressor, fit the AR- -- or you screwed it onto the AR-15; is

16   that correct?

17   A.   Yes.

18   Q.   However, actually, it didn't screw onto the AR-15.  You

19   guys had to use some type of adapter right there to make it

20   fit; correct?

21   A.   No.  From my recollection --

22   Q.   Well, let --

23   A.   -- the threaded nut was included.

24   Q.   Included where?

25   A.   In this -- it had been included in this device.

1    Q.    Did you screw it on, or did somebody else?

2    A.    I screwed it on.

3    Q.    Okay.  And you're saying that that adapter was with the

4    suppressor?

5    A.    From my recollection, yes.

6    Q.    In that box?

7    A.    I believe it was in the box.

8    Q.    Okay.  And I don't think we have any pictures to

9    demonstrate that.  Do you recall anything like that?

10   A.    I know we took overall photographs of it, so I believe it

11   would have been in there.

12   Q.    Okay.  These -- we talked a whole lot about these things

13   here, 17A10, and what is the red part of that?  What did you

14   call that?

15   A.    So that would be the jig.

16   Q.    Okay.  And the jig -- so these Polymer80s -- some people

17   buy these Polymer80s to actually make their own gun; is that

18   right?

19   A.    Yes.

20   Q.    And as far as the ATF is concerned, that thing that we're

21   looking at right now is not a gun; correct?

22   A.    Correct.  There are -- at the time here, that was not a

23   firearm.

24   Q.    Okay.  And thus that's where we're getting into the 80/20

25   discussion; is that right?

1    A.    Yes.

2    Q.    Do you want to explain to the jurors so they know what

3    we're talking about, what that 80/20 number means?

4    A.    The Polymer80s, they consider that 80 percent finished or

5    80 percent complete, and an individual or a nonlicensee who's

6    not -- can order these.  They can order the Polymer80s.

7    They're 80 percent complete, and then they can finish them or

8    complete them, which is kind of the 20 percent that you would

9    need to do to finish the firearm.

10   Q.    So really you could just buy this kit over the Internet

11   without any identification, because the ATF doesn't consider

12   this kit a firearm; correct?

13   A.    At the time it was not considered a firearm.

14   Q.    Okay.  Have the rules changed on these 80/20s since then?

15   A.    There are changes that have occurred, and there's ongoing

16   litigation and court cases currently as we speak.

17   Q.    Okay.  And this is what you're calling a ghost gun; is

18   that right?

19   A.    Yes.

20   Q.    Okay.

21   A.    The PMF.

22   Q.    So once the individual who buys -- I'm going to throw up

23   17A8.  Once the -- and this is, like, the full jig; is that

24   right?

25   A.    I believe so.

Tubbs - Cross                                                                138

1    Q.    And you put that polymer lower receiver in that jig; is

2    that right?

3    A.    Yes.

4    Q.    And then you take a drill, and they even got the holes

5    there for you so you can just drill straight down on that; is

6    that right?

7    A.    Correct.

8    Q.    And then I think after A10 you might have to do some

9    filing and stuff up here; is that correct?

10   A.    Correct.

11   Q.    And thus you are making your own firearm; is that right?

12   A.    Correct.  You're finishing the -- yes.

13   Q.    And this, once it's a firearm, doesn't have a serial

14   number on it; is that right?

15   A.    That's correct.

16   Q.    But that's okay.  You're still legal; is that right?

17   A.    Correct.

18   Q.    As long as you can possess a firearm, I should say.  Is

19   that right?

20   A.    Correct.

21   Q.    If I tried to -- if I made this, then I tried to sell it,

22   then I could probably get in trouble; is that fair?

23   A.    It would depend on some factors in that -- in state law

24   versus federal law.

25   Q.    Okay.  But really, anybody can make their own gun.  Not

1    anyone, but most people can build their own gun, and there's

2    nothing illegal about that; is that correct?

3    A.    Correct, if they're not prohibited.

4    Q.    Okay.  So let's go back to this.  Let's go back to 17A21,

5    the solvent trap or suppressor, depending on who we're talking

6    to.  Okay?  You mentioned with these 80/20 builds, there's some

7    discussion and some changes in the rules with those; is that

8    right?

9    A.    Yes.

10   Q.    And the same has been true with solvent traps; is that

11   fair?

12   A.    I'm not sure I understand the --

13   Q.    Well, I've been kind of researching this solvent trap and

14   looking at some of your bulletins that have come out of the

15   ATF.  You guys get updated all the time on changes in the law

16   or how the ATF views things; is that correct?

17   A.    There is ongoing orders and whatnot that have come up,

18   yes.

19   Q.    And since -- when did you start with the ATF?

20   A.    I started officially in July of 2020.

21   Q.    Okay.  Well, even preceding you, if you know, there was a

22   lot of discussions within the ATF about whether these solvent

23   traps were legal or not.  Would you agree with that?

24   A.    There was ongoing issues with the solvent trap.

25   Q.    And you were getting guidance from above about when a

1    solvent trap is a suppressor and when it's not a suppressor; is

2    that right?

3    A.    Yes.

4    Q.    And some of the rules that would come up -- I think you

5    discussed it -- is if this solvent trap had a dimple on the

6    top, as in "drill here," that would be indicative that this was

7    intended to be a suppressor; is that correct?

8    A.    That would be one of the considerations.

9    Q.    Okay.  You said you looked at this item in 17A21, and you

10   said it had baffles in it?

11   A.    There were baffles inside it.

12   Q.    How were you able to tell that?

13   A.    You could unscrew either end and remove the baffles.

14   Q.    Okay.  Now, I think -- but 17A30 you couldn't -- you could

15   not fire this as it is; is that correct?  Or if you did, you

16   would risk serious bodily injury to yourself.  Is that fair?

17   A.    I would say that's fair.

18   Q.    So on direct there were some questions about -- on direct

19   there was questions about your opinion about what this type of

20   suppressor -- or what a suppressor normally does.  It

21   suppressed the sound; right?

22   A.    Essentially.

23   Q.    But it sounded to me like on direct you have never

24   actually been around when a suppressor like this has been fired

25   from a gun.  Is that a fair statement?

1    A.    Correct.

2    Q.    Okay.  And this item as it's constituted now in 17A30

3    would cause catastrophic -- possibly catastrophic failure if

4    you tried to shoot that; is that right?

5    A.    Yeah, it could.  It could.

6    Q.    And why is that?

7    A.    Because the end cap, it is not drilled.  There's no hole

8    at the end there.

9    Q.    And going back to when we looked at these 80/20s, there

10   was actually a jig that came along with the polymer under that

11   showed "drill here."  Is that right?

12   A.    I believe so.

13   Q.    And did you find any type of jig that went along with this

14   solvent trap in 17A30?

15   A.    I did not.

16   Q.    Okay.  So we've talked a whole lot -- well, you guys

17   talked a whole lot about these suppressors on direct, so I

18   don't want to belabor this point, but what I'm getting to is

19   you obtained -- okay.  At the time -- well, they still are.

20   Solvent traps were legal to own; is that right?

21   A.    Sure.

22   Q.    And they still are; is that right?

23   A.    Sure.

24   Q.    If you can tell that the person has an intent to convert

25   the solvent trap into a suppressor, that's when you would be

1    concerned if this is illegal.  Is that fair?

2    A.   Based on how this item was as it was, it was not a solvent

3    trap.

4    Q.   And again, why?  What differentiates this from a regular

5    solvent trap?

6    A.   This contained all the components to make it readily

7    convertible into a silencer.

8    Q.   And what were those components?

9    A.   The cylinder tube, the threaded nut, the end cap with the

10   dimple for the drilling, and then the baffles on the inside of

11   the suppressor.

12   Q.   Okay.  And I'm almost done with this, I promise.  The

13   threaded nut, the cylinder, the baffles, and there was a dimple

14   on the end of the cap; is that right?

15   A.   Correct.

16   Q.   Okay.  But the last thing, and then I'm going to get off

17   this, but a solvent trap's going to have a threaded nut;

18   correct?

19   A.   It could.

20   Q.   And most solvent traps are cylindrical in form; correct?

21   A.   Yeah, usually.

22   Q.   Okay.  And do solvent traps use baffles to catch the oils

23   and carbon?

24   A.   I, again, don't know specifically much about the interiors

25   of the solvent traps.  I suppose they could.

1    Q.    Okay.  But the one big thing is there was a dimple at the

2    end of it; is that right?

3    A.    Correct.

4    Q.    Okay.  Now, you obtained this and examined it.  Let's see.

5    Who sent it to you?  I'm sorry.

6    A.    It was seized by customs in LA and then sent to Homeland

7    Security Investigations in Cheyenne.

8    Q.    Okay.  And then it sounds like you and -- possibly

9    yourself and another agent examined this; is that right?

10   A.    Correct.

11   Q.    Okay.  And then you formed the opinion that this was a

12   suppressor under the law; is that right?

13   A.    We did initially.  We took additional steps to have an

14   expert as well examine the device.

15   Q.    And once you came to that conclusion, you sought out

16   search warrants; is that right?

17   A.    After surveillance and additional research and intel

18   gathering, yes.

19   Q.    Okay.  And in that search warrant you opined this was a

20   suppressor; is that correct?

21   A.    We believed that it met the definition and could be

22   readily converted or function as a suppressor.

23   Q.    Okay.  And jumping forward, when you -- it sounds like

24   when you interviewed Mr. Unocic, you and he had a argument, a

25   discussion, about whether this was a solvent trap or whether

 1   this was a suppressor.  Is that a fair statement?

 2   A.   Yeah.  I mean, he claimed that it was a solvent trap.

 3   Q.   Okay.  In your -- when you get a search warrant, you have

 4   to write out an affidavit; is that right?

 5   A.   Yes.

 6   Q.   And then the judge reads that affidavit to determine

 7   whether there's probable cause to go into somebody's home; is

 8   that correct?

 9   A.   Yes.

10   Q.   And in that affidavit you laid out, "We've looked at this,

11   this is a suppressor."  Is that fair?

12   A.   Yes.

13   Q.   And it's fair to say you didn't get into the weeds with

14   the judge about what differentiates between a solvent trap and

15   a suppressor; is that fair?

16   A.   Correct.

17   Q.   Okay.  And so if a judge wasn't versed on solvent traps,

18   this would all be Greek to them; is that fair?

19   A.   I guess, possibly.

20   Q.   Thank you.

21        MR. REIMAN:  I left my tablet over here.

22   BY MR. REIMAN:

23   Q.   Now, at -- so Mr. Unocic was charged in Wyoming and ended

24   up being housed in Scotts Bluff; is that right?

25   A.   Correct.

Tubbs - Cross                                                     145

1    Q.    And at the time you received that text message from the

2    U.S. Attorney -- when did you say that was, March?

3    A.    I believe it was March 18th, 2022.

4    Q.    And at the time that case was still pending; is that

5    right?

6    A.    Yes.

7    Q.    And Mr. Unocic was and he's still incarcerated on that

8    case; is that right?

9    A.    Yes.

10   Q.    Okay.  And it's fair to say you have -- you talk about --

11   well, on direct you talk about people getting upset immediately

12   and then calming down; is that right?

13   A.    From my experience from the patrol tenure that I had, that

14   was my observations and experience.  I had a lot of contact

15   with individuals initially during the suspected crime or

16   incident or whatever they were needing for first responders, so

17   the emotions were typically active and high at the onset of my

18   interactions.

19   Q.    So that's your interaction with the defendant; is that

20   right?  With the accused; is that right?

21   A.    Yeah.  The interaction between everyone, yes.

22   Q.    After that arrest you never spoke -- after, well, the

23   interview I suspect you never spoke to Mr. Unocic again; is

24   that fair?

25   A.    I did not.

1    Q.    Okay.  So your -- and that's probably normal, I'm

2    guessing.  Once you make the arrest, you don't have -- it's

3    probably the exception that you would have further contact with

4    somebody being accused; is that fair?

5    A.    Correct.

6    Q.    I mean, there are rules that you can't go talk to somebody

7    once they have counsel and things like that; is that fair?

8    A.    Correct.

9    Q.    Okay.  So your experience is limited to that window when

10   you have interaction with somebody who's accused of something;

11   correct?

12   A.    Yes.

13   Q.    You don't have any experience of going into jail and

14   showing somebody the reports and that's their first clue of

15   what they're looking at; correct?

16   A.    No.

17   Q.    You don't have any experience of grabbing that book and

18   throwing it on the table and saying, "Here's how much prison

19   time you're looking at."  Correct?

20   A.    I wouldn't do that anyway, but no, I wouldn't.

21   Q.    So you have no idea how people react when you're sitting

22   in a jail cell telling them how long they're going to prison;

23   is that fair?

24   A.    I do have -- I should go back.  I did have some experience

25   working at a detention center for youths for two years, so I

1    have worked in a detention center.  It was for youths or

2    juveniles, though.

3    Q.   And based upon your experience with those youth, some

4    things, when they find out the bad news, can trigger them and

5    make them pretty upset.  Is that a fair statement?

6    A.   It could.

7    Q.   Okay.  When you got these search warrants, you did a --

8    sounds like you did a pretty thorough search of the truck; is

9    that right?

10   A.   Yes.

11   Q.   And you didn't find any contraband in there; correct?

12   A.   Correct.

13   Q.   That electronic device that Mr. Packard talked to you

14   about sounded like it was connected to some solar panels up top

15   is your lay view of it.

16   A.   It could have been connected.  I don't even recall.

17   Q.   But you have a basic -- I don't know much about police

18   scanners either, but I'm sure you've probably seen somebody

19   with a police scanner; is that fair?

20   A.   I would say probably during my ten years or just....

21   Q.   Aren't police scanners mounted up on the dash so you can

22   see them?

23   A.   Typically.

24   Q.   And whatever that electronic device was, that was in the

25   back of the rig, wasn't it?

Tubbs - Cross                                                              148

1    A.    Yes.

2    Q.    Okay.  So Mr. Unocic had a service dog, and it sounds -- I

3    appreciate it.  It sounds like you took care of that dog; is

4    that fair?

5    A.    I did try, yes.

6    Q.    Okay.  But in the end you left it with his roommates; is

7    that correct?

8    A.    Yes.

9    Q.    Okay.  And you did -- I understand that you might miss

10   something, but you guys did as good a job as possible to search

11   that residence from top to bottom; is that correct?

12   A.    Correct.

13   Q.    And you pulled anything -- any guns, ammo, explosives,

14   ingredients for explosives -- from that house; is that correct?

15   A.    Yeah.  Anything listed on the attachment would have been

16   seized.

17   Q.    That included cell phones, proof of residence, stuff like

18   that; is that correct?

19   A.    Yes.

20   Q.    So that search warrant allowed you to get into basically

21   any crevice, crawl space, closet, attic that any of that --

22   those items could be hidden; is that correct?

23   A.    Yes.

24   Q.    And how many agents helped do that search?

25   A.    I would say the agents actively searching were probably 10

 1    to 12.  They have different roles during the search so....

 2    Q.    Okay.  And did you -- at any point in this investigation,

 3    did you attempt to locate whether Mr. Unocic owned any other

 4    property?

 5    A.    There's databases and queries that are conducted that may

 6    include that, but I didn't specifically search for any other, I

 7    guess, ownership of land or anything like that.

 8    Q.    Okay.  You learned of this what you termed credible threat

 9    in March of 2022; correct?

10    A.    Yes.

11    Q.    Okay.  And you -- I understand that you weren't involved

12    in the investigation.  You were still involved in the

13    suppressor or the illegal firearms case, but it sounds like you

14    kind of stayed away from the investigation regarding the

15    threats; is that fair?

16    A.    Yes.

17    Q.    Okay.  Notwithstanding that, you at least paid attention

18    to what was going on; is that correct?

19    A.    Yes.

20    Q.    And it sounded on direct like you paid enough concerns so

21    you could at least be prepared or defend yourself or see what

22    was coming at you; is that correct?

23    A.    Yes.

24    Q.    Okay.  So I take it -- without getting into what was said,

25    I take it that you reviewed the statements from these

Tubbs - Cross                                                      150

```
 1   individuals in jail who said they heard Mr. Unocic make these
 2   threats; is that correct?
 3   A.   It was -- yeah.  It was communicated to me initially.
 4   Q.   Okay.  And it sounds like you were looking at these
 5   statements so you could be prepared in case there was a
 6   imminent threat; is that correct?
 7   A.   Yeah.  That would be part of it for sure.
 8   Q.   Okay.  After you read these statements and learned what
 9   was said, did you attempt to go back to the house and search it
10   again?
11   A.   No.
12   Q.   Did you attempt to go back to the roommates and ask them
13   whether they were hiding any type of weapons for Mr. Unocic?
14   A.   No.
15   Q.   Did you attempt to -- did you attempt to make sure you'd
16   got all the weapons that Mr. Unocic possibly had?
17   A.   We did not.
18   Q.   Okay.  Do you know Tracy Hoops?
19   A.   No.
20   Q.   You weren't on his case; is that correct?
21   A.   No.
22   Q.   You have -- prior to knowing -- I suspect you know he's a
23   witness on this case; is that correct?
24   A.   Yes.
25   Q.   Okay.  But you've never talked with the man; is that
```

Tubbs - Cross                                                    151

1    correct?

2    A.    Correct.

3    Q.    You've had zero involvement in his criminal case; is that

4    correct?

5    A.    Not to my knowledge, I have no involvement.

6    Q.    How about Ryan Rivera?  Have you ever spoken to Ryan

7    Rivera?

8    A.    Not to my knowledge.

9    Q.    You're not on his case?

10   A.    No.

11   Q.    You don't have any type of relationship with Mr. Rivera?

12   A.    No.

13              MR. REIMAN:  May I have one second to speak with --

14              THE COURT:  You may.

15        (An off-the-record discussion was had.)

16   BY MR. REIMAN:

17   Q.    I'm almost done.  I appreciate your patience, sir.  One of

18   the things you spoke about on direct is with the way inmates

19   are able to communicate and whether Mr. Unocic would be trying

20   to convey that to somebody on the outside; is that correct?

21   A.    Yes.

22   Q.    And you're aware that all phone calls are monitored up at

23   the Scotts Bluff jail; correct?

24   A.    I believe they are.

25   Q.    And I think you talked about -- did you talk about how

Tubbs - Cross                                                              152

1    inmates can chirp or whatever now?

2    A.    They have iPads and can FaceTime and video chat, et

3    cetera.

4    Q.    And you're aware that law enforcement's even monitoring

5    that stuff; correct?

6    A.    They can.

7    Q.    And, I don't know, were you involved in monitoring any of

8    that on Mr. Unocic to make certain he wasn't trying to convey

9    the harm he wished to you outside the walls of that jail?

10   A.    Initially I was involved in that because of the 2021 case,

11   but at the time in March, I did not want to involve myself, so

12   I did not listen or view any calls.

13   Q.    So at least regarding your involvement, you didn't find

14   any indication that Mr. Unocic attempted to recruit somebody

15   outside the walls of that jail; is that fair?

16   A.    No.

17   Q.    That he didn't even -- the harm that he was wishing to

18   you, speaking in the jail to Rivera and Hoops, you didn't have

19   any indication he was saying same thing to somebody on the

20   outside on the phone; is that correct?

21   A.    I did not.

22   Q.    Now, the last time you spoke to Mr. Unocic was in November

23   of 2021?

24   A.    Yes.

25   Q.    And he didn't call you a name on that day; correct?

Tubbs - Cross                                                   153

1   A.    No.

2   Q.    Sounded like he was fairly agreeable to get along with.

3   A.    He was, yeah, cooperative.

4   Q.    Okay.  And that was the last time you spoke to Mr. Unocic;

5   is that correct?

6   A.    Yes.

7   Q.    And during January 1st to April 12th of 2022, you did not

8   have any contact with Mr. Unocic; correct?

9   A.    We just may have interacted.

10  Q.    You might have saw him in court or something like that?

11  A.    Correct.

12  Q.    Okay.  But Mr. Unocic did not say one word to you during

13  that time frame; is that correct?

14  A.    I don't believe so.

15  Q.    And as far as you know, did Mr. Unocic try to call you?

16  A.    Not that I'm aware of.

17  Q.    Did you receive any letters from Mr. Unocic during that

18  time?

19  A.    Not that I'm aware of.

20  Q.    Did he attempt to chirp you, if you know?

21  A.    Sorry.  Chirp?

22  Q.    Whatever it is on those iPads.

23  A.    No.

24        MR. REIMAN:  That's all the questions that I have.

25  Thank you.

 1          THE COURT:  All right.  Very well.  Thank you.

 2      Redirect.

 3                    REDIRECT EXAMINATION

 4  BY MR. PACKARD:

 5  Q.    You were asked some questions on cross-examination about

 6  the suppressor or silencer involved in your investigation;

 7  correct?

 8  A.    Yes.

 9  Q.    You saw the picture of the rifle with the suppressor

10  attached?

11  A.    Yes.

12  Q.    You said that an expert was involved in reviewing that?

13  A.    Yes.

14  Q.    And what was the -- who was the expert?

15  A.    Excuse me.  I don't recall his name off the top of my

16  head, but they are attached to the firearms and technology

17  division within ATF, and they are expert examiners in firearms,

18  and we have the ability to send off firearms or suspected

19  firearms to them for examination, and then they write up a

20  report.

21  Q.    And did that occur in this case?

22  A.    Yes.

23  Q.    And did that happen prior to sentencing, July 5, 2022?

24  A.    Yes.

25  Q.    Were you involved in the examination at all?

Tubbs - Redirect (Packard)                                      155

1    A.    I was just involved in my initial examination, and then it

2    was sent off physically to the expert's location.

3    Q.    Was the expert's opinion consistent with your opinion?

4    A.    Yes.

5              MR. PACKARD:  Could we publish Exhibit 11, please,

6    page 1.

7        I'm sorry.  Exhibit 1.  Let's look at the bottom, Count II

8    there.

9    BY MR. PACKARD:

10   Q.    Again, this is the prior conviction regarding the case you

11   worked; is that right?

12   A.    Yes.

13   Q.    Count II is what Mr. Unocic pled to; is that right?

14   A.    Yes.

15             MR. PACKARD:  All right.  Let's move to the second

16   page of Count II, and if we could focus on that language at the

17   top there.

18   BY MR. PACKARD:

19   Q.    So Count II also includes firearms, ammunition, namely, an

20   unknown type of firearm silencer; is that right?

21   A.    Yes.

22   Q.    And that's the count he pled guilty to; is that right?

23   A.    Yes.

24   Q.    And with respect to the function of a suppressor or

25   silencer, would it be fair to say that using a suppressor helps

Tubbs - Redirect (Packard)                                    156

1    a person escape detection if he or she wants to?

2    A.    It could.

3    Q.    Because it muffles the sound of a gunshot; right?

4    A.    Yes.

5    Q.    You were asked some questions with respect to the picture

6    with the rifle with the silencer attached to it.  You remember

7    that?

8    A.    Yes.

9    Q.    What is -- and I think your testimony was that it wouldn't

10   work as it's pictured there but it needed to be drilled out for

11   it to work.  Is that a fair characterization of what needs to

12   happen for that silencer to work with that gun?

13   A.    In short, yes, that would need to occur.

14   Q.    And how long does it take to drill out the silencer?

15   A.    I think to generalize it, if you have the tools readily

16   available, possibly seconds to several minutes, depending on

17   your ability to use tools and whatnot.

18   Q.    And you're basically just taking a drill bit and drilling

19   a hole in the end of the silencer.  Is that a fair layman's

20   characterization of it?

21   A.    Yes.

22   Q.    Mr. Unocic had the tools to do that in his house; is that

23   correct?

24   A.    Yes.

25   Q.    You were asked about whether you seized a cell phone of

1    Mr. Unocic; is that right?

2    A.    Yes.

3    Q.    And did agents search his cell phone?

4    A.    Yes, agents did.

5    Q.    Was there content on there consistent with him searching

6    for silencers?

7    A.    There was search history, yes.

8    Q.    There was questioning about rules about the gun kits and

9    the P80 and 80/20 rules, things like that; correct?

10   A.    Yes.

11   Q.    And the gun kits allow you to make a firearm that's

12   unserialized; is that right?

13   A.    Yes.

14   Q.    And how does the ATF use serial numbers when investigating

15   gun crimes?

16   A.    It is one component or part of the identification of a

17   firearm so it can be traced back to the first retail purchaser.

18   Q.    So does an unserialized firearm allow one to escape

19   detection in an investigation that's based on serial numbers?

20   A.    It could.

21   Q.    You were asked questions about a service dog.  Do you

22   remember those?

23   A.    Yes.

24   Q.    You and others conducted surveillance of Mr. Unocic's

25   house for a period of time before the arrest; right?

1    A.    Yes.

2    Q.    You guys kept a detailed log of what you were seeing every

3    time somebody left the house; is that right?

4    A.    Yes.

5    Q.    All three roommates, whenever they left, you were writing

6    it down?

7    A.    Yes.

8    Q.    Same thing with Mr. Unocic?

9    A.    Yes.

10   Q.    And you did surveillance from October 19, 2021, through

11   November 1, 2021; is that correct?

12   A.    Yes.

13   Q.    Was there only one time that you saw Mr. Unocic leave with

14   his dog?

15   A.    I believe -- and just for clarification, we had -- yeah.

16   We had different individuals monitoring the surveillance at

17   different days, different times.

18   Q.    And have you reviewed the log of others who have written

19   about what they've seen?

20   A.    Yes.

21   Q.    Is there one entry from October 19 through November 1 when

22   he left with his dog?

23   A.    Yes.

24   Q.    When you contacted him at the VA, he didn't have his dog

25   with him; is that right?

1    A.    Correct.

2    Q.    And during that time frame that surveillance was kept,

3    were there multiple times on a daily basis that he was leaving

4    the house?

5    A.    Yes.

6    Q.    In fact, you were able to determine what his work schedule

7    was so that you would know when it was safe to go search the

8    house and contact him at work; is that right?

9    A.    Yes.

10   Q.    So there was some pretty intensive preparation before

11   November 2, in terms of surveillance; correct?

12   A.    Yes.

13   Q.    You were asked about medication and mental illness.  Do

14   you recall those questions?

15   A.    Yes.

16   Q.    Now, at any point in time that you spoke with Mr. Unocic,

17   did he ever tell you he suffered from some mental illness that

18   would prevent him from understanding you?

19   A.    No.

20   Q.    Did he -- I mean, in the course of your career, you've

21   come across mentally ill individuals; is that fair?

22   A.    Yes.

23   Q.    People who exhibit certain signs of maybe suffering under

24   an episode?

25   A.    Yes.

Tubbs - Redirect (Packard)                                          160

1    Q.   Did you ever witness him ask for any kind of medication or

2    say that he was not clearly thinking because of medication?

3    A.   Excuse me.  Not during the interview.  It may have been

4    told to me by another agent.  He may have asked questions at

5    the detention center about the medication, but I don't

6    specifically recall those details.

7    Q.   And are you trained as a law enforcement officer to

8    constantly evaluate whether somebody you're talking to is

9    having some sort of mental health episode such that they don't

10   understand what they're saying?

11   A.   Yes.

12   Q.   And were you doing that in this case when you interviewed

13   Mr. Unocic?

14   A.   Yes.

15   Q.   Did you ever feel the need to not talk to him or wait till

16   some other occasion?

17   A.   No.

18        THE COURT:  Counsel, it's about 10:20.  Is this a

19   time to break?  Or if you're about done, we'll finish.

20        MR. PACKARD:  I'm about done, Judge.  Thank you.

21        THE COURT:  Okay.  Let's finish up.

22   BY MR. PACKARD:

23   Q.   Did you review any police reports stemming from things

24   that Mr. Unocic allegedly was saying to other inmates?

25   A.   I don't recall any police reports or anything like that.

1    Q.    And did you make some attempt to remove yourself from that

2    underlying threats investigation?

3    A.    Yes.

4    Q.    And why did you do that?

5    A.    Excuse me.  Just based on my experience and what I've been

6    taught and learned is that if you're involved in an

7    investigation, specifically as a victim, you would not want to

8    participate in that case.  It could be a conflict of interest

9    or compromise it, so I wanted to not be involved.

10              MR. PACKARD:  Thank you.  No other questions.

11              THE COURT:  All right.  Very well.  And may this

12    witness be excused?

13              MR. REIMAN:  Yes.

14              THE COURT:  From the government and from the defense?

15              MR. REIMAN:  Yes.

16              THE COURT:  All right.  Very well.  Agent Tubbs, you

17    are excused from these proceedings.  Thank you for your

18    testimony.

19              THE WITNESS:  Thank you.

20              THE COURT:  You may step down.

21         Ladies and gentlemen of the jury, we're going to take our

22    midmorning break at this point in time.  And as I've instructed

23    you before, until this case is completed, until you've heard

24    all the testimony and been instructed on the law, you're not to

25    discuss the evidence or this case with anybody, including each

1    other.

2        We're going to take a 15-minute break at this time.  We'll

3    come back just shortly after 10:35.  Thank you.

4        (Jury out at 10:21 a.m.)

5            THE COURT:  You may be seated.  Counsel, anything to

6    take up before we break?

7            MR. REIMAN:  No, sir.

8            MR. PACKARD:  No, Your Honor.

9            THE COURT:  Very well.  And the next witness will

10   be....

11           MS. FLIAM:  Special Agent Russell Sparks.

12           THE COURT:  Very well.  Okay.  We will take a

13   15-minute break and resume at 10:35.

14       Counsel, I want to let you know over the noon hour I do

15   have a hearing for about 15 minutes, but you can leave -- it's

16   a Rule 35.  You can leave your stuff there if you want to, but

17   there will be a hearing so...okay.  Thank you.

18       (Recess taken at 10:22 a.m.)

19       (At 10:40 a.m. on September 26, 2023; with counsel for the

20   parties and the defendant present; WITHOUT the jury:)

21           THE COURT:  We're outside of the presence of the

22   jury.  Back on the record.

23       Counsel, anything to take up before we bring the jury?

24           MS. FLIAM:  No.

25           MR. REIMAN:  No, sir.  Thank you.

1          THE COURT:  All right.  Very well.  Let's bring the

2     jury.

3          (Jury in at 10:41 a.m.)

4          THE COURT:  You may be seated.  Welcome back, ladies

5     and gentlemen of the jury.  The government may call its next

6     witness.

7          MS. FLIAM:  Thank you, Your Honor.  The government

8     would call Russell Sparks.

9          THE COURT:  All right.  Agent Sparks, if you'd come

10    forward.  Have a seat at the witness stand.  We'll have you

11    sworn as a witness.

12         If you'd please just have a seat.

13         Ms. Miller, you can swear the witness.

14         COURTROOM DEPUTY:  Please state and spell your name

15    for the record.

16         THE WITNESS:  It's Russell Sparks, R-U-S-S-E-L-L.

17    Last name is S-P-A-R-K-S.

18         COURTROOM DEPUTY:  Please raise your right hand.

19         RUSSELL SPARKS, PLAINTIFF'S WITNESS, SWORN

20         THE COURT:  Very well.  Counsel, you may inquire.

21         MS. FLIAM:  Thank you, Your Honor.

22                      DIRECT EXAMINATION

23    BY MS. FLIAM:

24    Q.   Special Agent Sparks, can you tell us how you're employed.

25    A.   I'm a senior special agent with the United States Secret

Sparks - Direct (Fliam)                                      164

1   Service, currently in Cheyenne, Wyoming.

2   Q.   And how long have you been with the Secret Service?

3   A.   A little over 21 years.

4   Q.   Walk me through a little bit of the training it took to

5   become a Secret Service agent.

6   A.   One more time.  I'm sorry.

7   Q.   Yeah.  How -- tell me a little bit about the training it

8   took to become a Secret Service agent.

9   A.   Sure.  So most federal agents go through -- it's basically

10  like a police academy in Glynco, Georgia.  We spend about three

11  months there, and then the Secret Service has an additional

12  three months of training over in Maryland, where we really

13  focus on our financial crimes and our protection assignments.

14  Q.   And I want to have you explain a little bit to the jury.

15  What is it that a Secret Service agent does?

16  A.   Okay.  Most people know us for protecting the President,

17  Vice President, former Presidents, heads of states, but really

18  the vast majority of what we do is financial crimes.  We

19  started back in 1865 doing counterfeit currency, and since then

20  we've just really taken on more of the financial crimes for our

21  investigations.  We do counterfeit Treasury checks, we do

22  identity theft, basically anything that has to do with

23  computers or Internets, and we do a lot of digital forensics.

24  Q.   Now, when an agent comes out of the training you talked

25  about in Georgia, are they either a financial crimes Secret

Sparks - Direct (Fliam)                                             165

1    Service officer or a protection Secret Service officer, or do

2    your duties mingle?

3    A.    No.  We're one of the few entities that have a dual role,

4    so we're always doing investigations and doing protection.

5    Q.    Tell me how that looks like for you, maybe, in the last

6    five years.

7    A.    Sure.  So I started off in the Houston Field Office where

8    I was primarily -- it's called phase one, where we mostly do

9    investigations but we still assist with protection assignments.

10   You may be tasked to stand post for a President or Vice

11   President anywhere in the world.

12        And then we have -- what we do is called phase two, which

13   is our permanent protection assignment.  For myself, that was

14   President Bush, the Senior, so I was on his and Mrs. Bush's

15   detail, and then once they passed away, I got transferred back

16   into the field office where I ended up in Cheyenne, Wyoming.

17   And that's a pretty typical path for agents.  You do phase one,

18   phase two, and then you go back into the field and basically

19   kind of start all over again.

20   Q.    And that phase two, that permanent protection, that can

21   last how long?

22   A.    Typically now it's a six- to eight-year assignment so

23   you're doing a protection assignment full time between six and

24   eight years.

25   Q.    Jumping back to that phase one where you're also doing

1    investigations, and you've talked about the financial crime

2    aspect of it, have you had ongoing training as it pertains to

3    financial crimes?

4    A.    We do routinely get training throughout our career.

5    Q.    And you told me that you're currently based out of

6    Cheyenne, Wyoming; is that right?

7    A.    That's correct.

8    Q.    How long have you been at the Cheyenne outpost?

9    A.    Just right around four years right now.

10   Q.    And can you tell us how many Secret Service agents there

11   are in Wyoming?

12   A.    There's -- when I first started, there was just one.

13   We're -- now there's a second agent that just joined myself,

14   but for the last 17 or 18 years of Cheyenne, Wyoming, there's

15   been one agent that handles the state of Wyoming.

16   Q.    Now I'm going to ask you a couple of questions about a

17   Ryan Rivera.  Are you familiar with a Ryan Rivera?

18   A.    I am.

19   Q.    And, in fact, I believe you were the investigating officer

20   on a bank fraud case he was convicted of; is that right?

21   A.    That's correct.

22   Q.    Was that out of Cheyenne, Wyoming?

23   A.    It was.

24   Q.    Now, Mr. Rivera was ultimately convicted as a result of

25   your investigation; is that fair?

Sparks - Direct (Fliam)                                                167

1    A.    That's correct.

2    Q.    And are you familiar at all with a proffer interview?

3    A.    I am.

4    Q.    Tell me, how would you define a proffer interview to the

5    jurors?

6    A.    So a proffer interview is typically conducted after a

7    conviction or a plea agreement where the investigating agent

8    has a chance to sit down with -- it's typically the agent, the

9    defendant, their counsel, and usually U.S. Attorney's Office,

10   and we're able to -- as part of the process, we'll be able to

11   ask some questions regarding the crime that the defendant was

12   convicted of.  It helps us.  For me, it helps me, especially in

13   these financial crimes, kind of get a better idea of maybe how

14   the crime was committed, were there other individuals

15   associated with it, maybe if there's more victims out there

16   that we could potentially go look at and assist.

17   Q.    Now, obviously, whoever's sitting down with you, they have

18   to agree to this proffer interview; is that right?

19   A.    That's correct.

20   Q.    And when you go into a proffer interview, are there

21   standard rules you lay out for whoever you're interviewing?

22   A.    It's typically handled on the attorney side, but I'm aware

23   of the rules.

24   Q.    What are the rules, to your knowledge?

25   A.    The general rule is, is that if there's something that's

1    said in a proffer, it can't be used against the defendant to go

2    further and investigate the crimes or other crimes that they

3    may admit to.

4    Q.    And you talked about, as a law enforcement officer, the

5    proffer is beneficial for you sometimes twofold.  You can help

6    other people, and you can learn how these crimes are being

7    committed maybe on a more intimate level.  Is that fair?

8    A.    That's correct.

9    Q.    When you sit down and start these interviews, do you kind

10   of give a scope or explain what you're expecting from the

11   interviewee?

12   A.    That's done -- again, I'm aware of it, but I think that's

13   handled much more with the defense attorney and the U.S.

14   Attorneys, but I'm aware of the process, and I think everybody

15   knows why we're there.

16   Q.    And so typically there's attorneys involved in these

17   proffers; is that right?

18   A.    Every proffer I've ever been involved with, there's been

19   attorneys present.

20   Q.    Are inmate -- or the interviewees, are they made any

21   promises as part of this proffer interview?

22   A.    I believe, again, that part of this proffer process is

23   prior to it.  There may be some downward departures.  There may

24   be a plea agreement where, if they come in and do a proffer,

25   there may be something taken off their sentence.  But there's

1    nothing that is promised on my behalf or during the proffer

2    that if you say this, you're going to get this.  It's all done

3    ahead of time.

4    Q.   Did you proffer with Mr. Rivera?

5    A.   I did.

6    Q.   And I believe the first time you sat down and talked with

7    him -- do you recall when that was?

8    A.   I believe it was February.  I believe it was

9    February 18th, or if -- I believe it was February 15th of 2022.

10   Q.   Okay.  And where did -- just generally, where does this

11   proffer inter- -- where did Mr. Rivera's proffer interview take

12   place?

13   A.   We did it at the federal courthouse in Cheyenne.

14   Q.   And you were present, Mr. Rivera was present, I'm assuming

15   there was an attorney for the U.S. government, and Mr. Rivera

16   had an attorney?

17   A.   That's correct.

18   Q.   Anybody else around?

19   A.   I believe there were two DEA agents that were also

20   involved in the proffer.

21   Q.   And same process you've already testified about, but you

22   didn't make Mr. Rivera any promises?

23   A.   I did not.

24   Q.   What was the general subject of that February 15, 2022,

25   proffer?

Sparks - Direct (Fliam)                                          170

1    A.   The vast majority of it was involving Mr. Rivera's --

2    again, the alleged -- well, not alleged.  The crimes he was

3    convicted of with the bank fraud, the wire fraud.  We really

4    tried to get into some of the -- of some of the checks that he

5    was involved with and really tried to determine if there were

6    other people involved in the criminal activity.

7    Q.   So kind of that aspect of looking for more victims or

8    looking for more maybe codefendants?

9    A.   That's correct.

10   Q.   Do you recall about how long that interview lasted?

11   A.   I think it was probably less than an hour, but I don't

12   remember.

13   Q.   And at the end of that interview, you went one way, and

14   Mr. Rivera went another.  Is that fair?

15   A.   That's correct.

16   Q.   Were you contacted again about speaking yet again with

17   Mr. Rivera?

18   A.   I was.

19   Q.   And when was that?

20   A.   I believe that I received an email from his defense

21   counsel in March.  I believe it was March 18th, I received an

22   email.

23   Q.   And that would have been of 2022?

24   A.   This would have been in 2022, correct.

25   Q.   So about a month after you sat down and talked with him?

Sparks - Direct (Fliam)                                          171

1    A.    About a month, yes.

2    Q.    In general, what was that -- and you said that email came

3    from Mr. Rivera's attorney?

4    A.    Correct.

5    Q.    What was that email asking you to do?

6    A.    That Mr. Rivera reported to his defense counsel that there

7    was a threat made against an ATF agent and they wanted to

8    somehow facilitate another interview or proffer to kind of --

9    for us to discuss that.

10   Q.    Now, what did you do in response to that email?

11   A.    I think at that point in time, I don't remember if there

12   was a mention of the individual.  I just think it was an ATF

13   agent.  I reached back out to the U.S. Attorney's Office, who I

14   believe was also cc'd on the email, and arrangements were made

15   to do a telephonic interview proffer within a couple days.

16   Q.    And what was your understanding of what that second

17   telephonic proffer was going to cover?

18   A.    It was going to cover the threat against an ATF agent that

19   Mr. Rivera reported to his defense counsel.

20   Q.    What was your understanding of why wasn't that discussed

21   in that first proffer?

22   A.    I'm assuming because it didn't happen.  The report was

23   made after the proffer in February.

24   Q.    Did you actually sit down and have that second telephonic

25   proffer?

Sparks - Direct (Fliam)                                                   172

1    A.    We did.  We had a phone call, telephonic communications of

2    the proffer.  It was on March -- I believe it was March 21st of

3    2022.

4    Q.    The same rules that you've testified about govern this

5    proffer as well?

6    A.    Correct.

7    Q.    So again, you're not making any promises?

8    A.    Correct.

9    Q.    In general, I'm going to explain what you did next.  What

10   did Mr. Rivera disclose in that proffer?

11   A.    During the proffer he stated why he was -- that he

12   witnessed or overheard a threat against the ATF Agent Tubbs,

13   Tubb -- Tubbs, and wanted to report it and went into some

14   detail about the -- what the threat involved.

15   Q.    Same people present as in that first proffer: yourself,

16   Mr. Rivera's attorney, the U.S. Attorney?

17   A.    Yes.

18   Q.    Now, you testified earlier that Secret Service does a lot

19   of financial crimes; is that fair?

20   A.    That's correct.

21   Q.    Do you handle a lot of threat cases that don't involve

22   somebody you're on a protective detail for?

23   A.    I do not.

24   Q.    So this isn't something that you or your agency would

25   typically investigate; is that right?

Sparks - Direct (Fliam)                                            173

1    A.    That's correct.

2    Q.    What did you do with the information you got from this

3    second phone call?

4    A.    So at this point I only knew one ATF agent in Cheyenne, so

5    I contacted him, advised him of the threat, and I was told that

6    they were aware of it already and they were investigating it.

7    Q.    Do you remember who the ATF agent was that you called?

8    A.    I'm going to butcher his last name.  I think it's Lupia or

9    LaTulippe.

10   Q.    And you were informed ATF was aware?

11   A.    That's correct.

12   Q.    Okay.  At some point did you participate, then, in a

13   conference call involving multiple federal agencies in

14   Cheyenne?

15   A.    We did.  It was the following day.  I believe it was the

16   22nd of March, 2022.

17   Q.    And what was the purpose of that conference call?

18   A.    Basically, the U.S. Attorney's Office called the

19   conference call to determine the best way to move forward with

20   investigating this alleged crime.

21   Q.    Did part of that involve trying to figure out what agency

22   was going to handle the investigation?

23   A.    That's correct.

24   Q.    Ultimately, who was it decided was going to handle this

25   investigation?

Sparks - Direct (Fliam)                                                    174

1    A.    Eventually the decision was made to have ATF handle the

2    investigation, I believe specifically to ask an outside agent

3    not currently in Cheyenne to do the investigation.

4    Q.    Fair to say that you testified that there's only two

5    special agent -- or Secret Service agents that cover all of

6    Wyoming; is that fair?

7    A.    At the time there was just myself.

8    Q.    Fair to say that Wyoming's not that big of a state,

9    population wise at least, and there's not a whole lot of

10   federal agents there?

11   A.    No.  It's a pretty small community.

12   Q.    So there were that -- hence the reason to bring in

13   somebody from outside the state?

14   A.    I think that was the major concern with the U.S.

15   Attorney's Office is how do we -- you know, how does this crime

16   get investigated without somebody, you know, knowing or being

17   around the victim?

18   Q.    Knowing that this was going to be handled by an ATF agent

19   from outside the Cheyenne community, did you turn over any

20   information that you had gathered?

21   A.    I did.  So I reported -- in our reporting period I

22   documented both proffers with Mr. Rivera and then turned over

23   my reports to the ATF agent.

24   Q.    Did you have any other involvement in the investigation?

25   A.    Not really.  The only thing that we kind of left it at

```
 1    with that conference call was that if there was assistance that
 2    needed to be done, I'd be more than willing to provide it.  At
 3    that point in time, I didn't know the victim.  I was still
 4    considered as kind of an outside entity, but I didn't
 5    participate much more than just giving my reports.
 6    Q.   Okay.  And then having to come here to testify?
 7    A.   Correct.
 8    Q.   All right.  Well, thank you very much, Agent Sparks.
 9              MS. FLIAM:  I don't have any other questions for this
10    witness.
11              THE COURT:  All right.  Very well.  Thank you.
12         Cross-examination.
13                         CROSS-EXAMINATION
14    BY MR. REIMAN:
15    Q.   Agent Sparks, I just have a few questions.  So it sounds
16    like you've done proffers before; is that correct?
17    A.   That's correct.
18    Q.   Okay.  And there's normally a -- it's a form letter that
19    the defendant signs before you begin the interview; is that
20    correct?
21    A.   That's correct.
22    Q.   It essentially says this interview is off the record, so
23    to speak, and nothing you say during this interview can be used
24    to prosecute for further crimes.  Do I have the gist of that
25    correct?
```

1    A.    That's correct.

2    Q.    Now, if -- but then there's another paragraph that says,

3    "If you provide testimony different than what you told the

4    police, then it can be used against you."  Is that a fair

5    statement?

6    A.    I believe so, yes.

7    Q.    Okay.  But there's no promises in it.  There's no

8    guarantees that you're going to get -- the defendant is going

9    to get a lower sentence just by doing this proffer; correct?

10   A.    That's correct.

11   Q.    And then once you interview that individual, I'm assuming

12   you probably get together with the United States Attorney and

13   discuss whether, "A," the person was telling the truth; is that

14   fair?

15   A.    I don't know how much the U.S. Attorney is involved in

16   that because, being the case agent, I would have probably much

17   more information than they would of whether the person was

18   being truthful, but in general I agree with your statement.

19   Q.    Okay.  You at least let the U.S. Attorney -- you at least

20   give your opinion to the U.S. Attorney whether this person was

21   truthful with you; is that fair?

22   A.    That's a fair statement.

23   Q.    And the second thing you probably need to let them know is

24   does this person have any information, valuable information,

25   that we can use on other cases.  Is that the other

1    consideration?

2    A.    That's correct.

3    Q.    And then you're probably kind of out of the loop after

4    that.  Is that fair, that then the U.S. Attorney or the

5    prosecutor and the defense attorney handle it from there?

6    A.    I would say it would depend on what the -- the proffer

7    came out, there was -- if there were additional leads or

8    additional information that I could follow up, I would

9    obviously follow up on that.

10   Q.    But at least regarding plea negotiations between the

11   individual who proffered and the government, that's probably --

12   I doubt -- maybe you are involved in how much the guy is going

13   to get reduced from his sentence.  I take it you kind of step

14   back at that point?

15   A.    I'm not involved in that whatsoever.

16   Q.    Okay.  And it sounds like Mr. Rivera signed one of those

17   proffer letters; is that right?

18   A.    That's true.

19   Q.    If I'm following this timeline correct, you went and

20   interviewed him for the first time on February 15th of 2022?

21   A.    For a proffer, that's correct.

22   Q.    And where was that at?

23   A.    That was in Cheyenne.

24   Q.    Okay.  And do you know where Mr. Rivera was -- he was in

25   custody at the time?

Sparks - Cross                                                      178

```
1    A.    He was in custody.  I believe it was in Scottsbluff,

2    Nebraska.

3    Q.    Okay.  So he was transported from Scotts Bluff to

4    Cheyenne, is that right, for the proffer interview?

5    A.    I believe -- I believe at that point he was in Scotts

6    Bluff.  There was a possibility between all this he could have

7    been housed in Platte County in Wyoming, but I believe that the

8    marshals brought him back for that first proffer from Scotts

9    Bluff.

10   Q.    And how -- approximately how far is Scotts Bluff from the

11   federal courthouse in Cheyenne?

12   A.    I think it --

13   Q.    Approximately.

14   A.    I think it's around two hours, but I'm not sure.

15   Q.    And during this first interview on February 15,

16   Mr. Rivera, it's fair to say, didn't mention anything about

17   threats?

18   A.    That's correct.

19   Q.    And then the next thing you heard -- at least regarding

20   the first time you heard anything about Mr. Rivera having

21   information about threats, it looks like that was on March 18.

22   A.    Correct, via email.

23   Q.    And then that was followed up with another telephone phone

24   call or proffer, so to speak; is that correct?

25   A.    That's correct.
```

Sparks - Redirect (Fliam)                                        179

1    Q.   And during -- was there two conversations regarding the

2    threat on the 18th and the 21st or just one?

3    A.   The 18th was an email --

4    Q.   Okay.

5    A.   -- basically stating that he wanted to set up an interview

6    or a proffer regarding the threat, and then the 21st was the

7    first interview that I conducted with him.

8    Q.   And it sounds like both on February 15th and on

9    March 21st, a United States Attorney was present?

10   A.   Correct.

11   Q.   And Mr. Rivera's defense counsel was present?

12   A.   Correct.  Just to verify that, on this second proffer this

13   was all done over the telephone.

14   Q.   Thank you.

15   A.   Okay.

16   Q.   The defense counsel was at least on the phone call; is

17   that fair?

18   A.   Correct.

19            MR. REIMAN:  That's all the questions I have.  Thank

20   you.

21            THE COURT:  All right.  Very well.  Any redirect?

22            MS. FLIAM:  Briefly.

23                     REDIRECT EXAMINATION

24   BY MS. FLIAM:

25   Q.   Just to clarify, 'cause we've heard some earlier testimony

Sparks - Redirect (Fliam)                                    180

1    about the ways inmates can communicate, that March 18th, 2022,

2    email, that came from Mr. Rivera's defense attorney; is that

3    right?

4    A.    That's correct.

5    Q.    It didn't come from him, himself?

6    A.    Correct.

7    Q.    And was it the same U.S. Attorney who sat in on both

8    proffers?

9    A.    I believe so, yes.

10   Q.    Who was that, do you recall?

11   A.    I don't recall.

12   Q.    Okay.  That's fine.  Thank you.

13         MS. FLIAM:  I don't have any other questions.

14         THE COURT:  All right.  Very well.  May this witness

15   be excused?

16         MR. REIMAN:  Yes, sir.  Thank you.

17         MS. FLIAM:  Yes.

18         THE COURT:  All right.  Very well.  Agent Sparks, you

19   are excused from these proceedings.  Thank you.

20       And the defense may -- defense.  Government may call its

21   next witness.

22         MS. FLIAM:  Your Honor, we would call Ryan Rivera.

23         THE COURT:  All right.  Very well.  And I assume he's

24   been notified?

25         MS. FLIAM:  Yes, Your Honor.

Rivera - Direct (Fliam)                                         181

```
1              THE COURT:  Mr. Rivera, if you'll take a seat at the
2     witness stand, we'll have you sworn as a witness.
3          Yes.  All right.  Make yourself comfortable.
4          Let's swear the witness.
5              COURTROOM DEPUTY:  Please state and spell your name
6     for the record.
7              THE WITNESS:  Ryan Rivera, R-Y-A-N, R-I-V-E-R-A.
8              COURTROOM DEPUTY:  Please raise your right hand.
9               RYAN RIVERA, PLAINTIFF'S WITNESS, SWORN
10             THE COURT:  All right.  Just a moment.  Marshal, I'm
11    going to have you move the microphone up a little bit, if you
12    can.
13         Speak into the mike, if you would, Mr. Rivera.
14         And, counsel, you may inquire.
15             MS. FLIAM:  Thank you.
16                        DIRECT EXAMINATION
17    BY MS. FLIAM:
18    Q.   Mr. Rivera, how are you this morning?
19    A.   Good.  How are you?
20    Q.   I'm not bad.
21             MS. FLIAM:  I'm going to -- is -- how is that
22    microphone for the jury and the court reporter?
23             COURT REPORTER:  Fine.
24             MS. FLIAM:  Okay.  We'll try it.
25    BY MS. FLIAM:
```

Rivera - Direct (Fliam)                                              182

1   Q.   Can you tell us --

2              THE COURT:  Let me know if you can't hear.

3         All right.  Very well.  You may proceed.

4   BY MS. FLIAM:

5   Q.   Can you tell us how old you are, Mr. Rivera?

6   A.   Thirty-seven.

7   Q.   And you are here today in handcuffs and in a orange

8   jumpsuit, so I'm going to assume you're in custody.  Is that

9   fair?

10  A.   Yes, ma'am.

11  Q.   Can you tell me how long you've been in jail?

12  A.   For, like, two and a half years.

13  Q.   And what's the status of your case?  Are you pending a

14  case?  Are you serving a sentence?

15  A.   I'm serving a sentence in the state of Colorado right now.

16  Q.   And I believe when you're done serving this sentence, you

17  have another sentence to serve; is that right?

18  A.   Yeah, a federal sentence.

19  Q.   What district is that out of or what state?

20  A.   Wyoming.

21  Q.   The sentence you're currently serving, what's the crime

22  for?

23  A.   Identity theft.

24              THE COURT:  I'm going to have you sit up and speak

25  in --

Rivera - Direct (Fliam)                                                183

1    A.    Identity theft.

2            THE COURT:  Thank you.  Okay.

3    BY MS. FLIAM:

4    Q.    Do you need that microphone moved closer to you?

5    A.    No.  It's okay.

6    Q.    Okay.  So you're serving a sentence for identity theft out

7    of Colorado; is that right?

8    A.    Yes, ma'am.

9    Q.    Is that a felony?

10   A.    Yes, ma'am.

11   Q.    And do you remember when you were convicted and started

12   serving that sentence?

13   A.    Last year in, like, August.

14   Q.    August of 2022?

15   A.    Yeah.

16   Q.    And then you told me that you still have a federal

17   sentence out of Wyoming to serve; is that right?

18   A.    Yes, ma'am.

19   Q.    What's the crime?

20   A.    Bank fraud.

21   Q.    And when were you convicted of that, if you remember?

22   A.    Like, nine months ago.

23   Q.    Also a felony?

24   A.    Yes, ma'am.

25   Q.    Have you within the last ten years been convicted of any

1    other felonies?

2    A.    Yes, ma'am.

3    Q.    What states?

4    A.    Just Colorado.

5    Q.    And what kinds of crimes have you been convicted of that

6    are felonies?

7    A.    Identity theft, possession of a weapon by a previous

8    offender, and possession of methamphetamine.

9    Q.    All felonies?

10   A.    Yes, ma'am.

11   Q.    All out of the state of Colorado?

12   A.    Yes, ma'am.

13   Q.    So Wyoming's your only federal conviction?

14   A.    Yes, ma'am.

15   Q.    And you've talked about possession of methamphetamine.  In

16   your eyes, does that tie into any of your bank fraud or your

17   identity theft cases?

18   A.    Yes, ma'am.

19   Q.    How?

20   A.    Just to support my habit.

21   Q.    Would you say you are or were a methamphetamine addict?

22   A.    I think I'll always be an addict.

23   Q.    Can I ask how long you've used methamphetamine?

24   A.    Since I was 14.

25   Q.    You're here today from jail.  Are you sober today?

Rivera - Direct (Fliam)                                                185

1    A.    Yes, ma'am.

2    Q.    And can you tell the jury -- you stated you were serving a

3    sentence for a Colorado crime; is that right?

4    A.    Yes, ma'am.

5    Q.    Were you incarcerated in the state of Colorado?

6    A.    Yes, ma'am.

7    Q.    And how did you wind up here in this courtroom?

8    A.    You guys writted me here.

9    Q.    What's a writ?  What's your understanding of a writ?

10   A.    So you guys put, like, a request in to bring me here.

11   Q.    Did you drive -- did they drive you straight from Colorado

12   to here?

13   A.    Unfortunately, no.

14   Q.    Okay.  So can you tell the jury a couple of the different

15   jails you've been in to get here.

16   A.    So from Ordway I went to Englewood, from Englewood I went

17   to Oklahoma, from Oklahoma I went to Kansas City, and then from

18   Kansas City I came here, or to Saline County Jail.

19   Q.    Have you enjoyed your tour of the Midwest?

20   A.    Absolutely not.

21   Q.    In your time in custody, have you ever been in the Scotts

22   Bluff County Detention facility?

23   A.    Yes, ma'am.

24   Q.    And can you tell me about when you were in Scotts Bluff

25   County.

Rivera - Direct (Fliam)                                           186

1    A.    So I was in Scotts Bluff County fighting my fed case out

2    of Wyoming.  That's where they hold you out for your federal

3    inmates is in Scotts Bluff.

4    Q.    And how long -- do you remember when you first entered the

5    Scotts Bluff County jail?

6    A.    I was there from, like, August of '20 until '21 of July.

7    Q.    So you think you went into Scotts Bluff around August of

8    2020 and then left Scotts Bluff in July of 2021?

9    A.    Yeah, give or take, or it might have been '22, maybe.  I'm

10   not 100 percent sure.

11   Q.    Okay.  We had somebody from the Scotts Bluff County jail

12   testify yesterday, and if it said that you first came into the

13   Scotts Bluff County jail on August 5th of 2021, would that

14   sound accurate to you?

15   A.    Yeah.  And then left July of '22, then.

16   Q.    I'm assuming, then -- I don't mean this as a slight --

17   days tend to run together?

18   A.    Yeah.

19          THE COURT:  So to be clear, August of 2021 through

20   July of 2022; correct?

21          THE WITNESS:  Yes.

22          THE COURT:  Okay.  Very well.  You may proceed.

23   BY MS. FLIAM:

24   Q.    Now, when you were in Scotts Bluff, did you live in the

25   same kind of housing unit?

Rivera - Direct (Fliam)                                          187

1    A.    Yes.

2    Q.    And do you remember that setup?

3    A.    Yeah.  So it was, like, pretty small.  You walk in, and

4    there's, like, a door.  You go into -- the bathroom was on the

5    left-hand side, and then there's, like, one bunk, two bunk,

6    three bunk, four bunks, five bunks, six, seven bunks, but it's

7    super small, probably about as big as that jury box.

8    Q.    Are you living there alone?

9    A.    No.

10   Q.    Do you remember about how many other people were there?

11   A.    Probably -- at the time probably maybe 10, 12.

12   Q.    Did you stay with the other 10 or 12 inmates, or did other

13   people come and go?

14   A.    I was in there the whole time, but people came and went.

15   Q.    Did you do everything kind of in that -- and I don't know

16   what to call it -- housing unit, cell?

17   A.    Yeah.  You eat, shower, everything.

18   Q.    Is there any TVs or anything like that?

19   A.    Yeah.  There's one TV and then a phone and a kiosk that

20   you do, like, video visits on.

21   Q.    Did you know anybody in Scotts Bluff County jail before

22   you got there?

23   A.    No.

24   Q.    Are you aware that you're here today in a federal case

25   involving an Anthony Unocic?

Rivera - Direct (Fliam)                                              188

1    A.    Yes.

2    Q.    Are you familiar with Mr. Unocic?

3    A.    Yes.

4    Q.    And how do you know him?

5    A.    We were in the same county jail when I was fighting my fed

6    case in Wyoming.

7    Q.    And that county jail being the Scotts Bluff County jail?

8    A.    Yeah, Scotts Bluff.

9    Q.    How would you have -- well, how long do you think you and

10   Mr. Unocic were housed together?

11   A.    Maybe, like, a month and a half, two months.

12   Q.    Again, understanding time tends to blur?

13   A.    Yeah, a little bit.

14   Q.    How would you describe -- did you have a relationship with

15   Mr. Unocic?

16   A.    I mean, we talked.  We always -- everybody talked about,

17   like, their cases and what they were in jail for and....

18   Q.    Now, in your experience, is that a fairly common

19   occurrence in jail?

20   A.    Yeah.

21   Q.    It's the one thing you all have in common?

22   A.    Yeah.

23   Q.    Now, at some point did you reach out to your attorney

24   about something you heard Mr. Unocic say?

25   A.    Yes.

Rivera - Direct (Fliam)                                      189

1    Q.    Tell me, at the time what was your attorney's name?

2    A.    Gay Woodhouse.

3    Q.    And what did you hear that made you reach out to

4    Ms. Woodhouse?

5    A.    So we were talking about our cases.  I was talking about

6    how I was in there for bank fraud and owed the federal

7    government, like, certain amounts of money, and he started

8    talking about how he had, like, a standoff with, like, Weld

9    County PD in Weld County, Colorado.

10   Q.    Did that conversation go beyond that standoff?

11   A.    Yes.  So then he started talking about how he had gotten

12   arrested by the federal government for -- or by the ATF for

13   having silencers.  I guess they were solvent traps or supposed

14   to be solvent traps, which I guess are for cleaning guns or

15   something, and he said that the ATF Agent Tubbs had, I guess,

16   found a box or something at his house that he had gotten sent

17   from, like, China or something.

18   Q.    Okay.  Did he say anything more?

19   A.    Yeah.  He said that he had lost everything and he wanted

20   to kill this ATF agent.

21   Q.    You said that this came up in the context you guys were

22   just talking about your cases?

23   A.    Yeah.  Well, we were talking about -- first, we were

24   talking about the, like, standoff with Weld County, and then I

25   was talking about, like, how I owed the federal government,

Rivera - Direct (Fliam)                                                  190

```
 1    like, $40,000, and we pulled out our paperwork, and I was
 2    showing, like, my checks that, like, they had, like,
 3    photocopied, and he showed us his stuff.
 4    Q.   What specifically was he showing you?
 5    A.   Discovery that he got.
 6    Q.   Okay.  And what is discovery?
 7    A.   So discovery is basically like what the federal government
 8    or any government has against you, like, the case that they
 9    have.
10    Q.   The evidence, in other words?
11    A.   Yeah.
12    Q.   Did Mr. Unocic ever tie that Weld County standoff into his
13    current case and Agent Tubbs?
14    A.   He just said that he had had a standoff with police before
15    so he wouldn't hesitate to kill another cop or, like, shoot at
16    cops.
17    Q.   And he said -- he told you, I believe you testified, that
18    he had lost everything; is that right?
19    A.   Yeah.  He said he lost his house, his dog, his car.
20    Q.   Who did he blame for that?
21    A.   That Agent Tubbs dude, the ATF guy.
22    Q.   And you said that Mr. Unocic specifically told you he was
23    going to kill this agent; is that right?
24    A.   Yeah.  He said that he wouldn't, like, hesitate when he
25    got out 'cause he had already lost everything so it would be
```

Rivera - Direct (Fliam)                                              191

1   easy for him to, like, go find out, like, where this guy

2   worked.  He could follow him and, like, put a bomb under his

3   car or shoot at him.  It's not....

4   Q.   And he told you -- he told you he could put a bomb under

5   his car?

6   A.   Yeah.

7   Q.   How did that come up in this conversation?

8   A.   That was just what he said.  I don't -- it didn't really

9   just come up.  It was just....

10  Q.   Okay.  Or he could shoot him?

11  A.   Yeah.

12  Q.   Did he tell you where he was going to shoot him?

13  A.   No.  He just said that he can follow him home from, like,

14  work, 'cause I guess he was the guy that got the box with the

15  solvent traps or whatever they were in them.

16  Q.   So that was kind of his focus?  That's why he was focusing

17  on this agent?

18  A.   Yeah.

19  Q.   You testified way earlier when you talked about your

20  criminal history, you have a conviction for felon in

21  possession; is that right?

22  A.   Yeah.

23  Q.   And that was a firearm?

24  A.   Yeah.

25  Q.   Are you familiar with guns?

Rivera - Direct (Fliam)                                          192

1    A.    No.

2    Q.    How did you end up with that conviction?

3    A.    So my sister's boyfriend had the gun in the car, and it

4    doesn't matter, like, if you're a felony -- like, a felon in

5    Colorado and you are anywhere around a gun, they charge you

6    because you're a previous offender.  There's no, like, law that

7    states, like, how you're in, like, possession of the gun.

8    Q.    We might call it constructive possession of the weapon.

9    A.    Yeah.

10   Q.    Okay.  So when Mr. Unocic was using these terms like

11   "silencer" or "solvent trap," were those terms that you were

12   familiar with?

13   A.    Absolutely not.

14   Q.    Had this conversation ever come up between you and

15   Mr. Unocic before?

16   A.    No.  I mean, everybody talks about their cases.  It was

17   just, like, three of us that were there that were discussing

18   it, like, that Pacific day -- specific day.  Sorry.

19   Q.    Describe Mr. Unocic's demeanor when he was telling you

20   these things about the agent and that he was going to kill him.

21   A.    He didn't seem too happy.  He was kind of, like, serious.

22   I don't know.

23   Q.    Well, let me put it this way.  Have you heard other

24   people -- you said you yourself were kind of railing against

25   the federal government; right?

Rivera - Direct (Fliam)                                    193

1    A.    Well, yeah.

2    Q.    You've heard people make threats in prison?

3    A.    Yeah, absolutely.

4    Q.    You've heard people express displeasure with the officers

5    that have put them there?

6    A.    Yeah.

7    Q.    Probably with the judges?

8    A.    Absolutely.

9    Q.    Prosecutors?

10   A.    Yes, especially the prosecutors.

11   Q.    Probably even their own attorneys; right?

12   A.    Yes.

13   Q.    Okay.  Do you always call your attorney when you're

14   hearing that language?

15   A.    No.  So after we -- like, after he said it, it was kind of

16   a thing that, like, I thought about for a minute.  And then

17   when I called my attorney, she called the Secret Service dude,

18   and then we talked about it, and then I thought it was over

19   with after that, and then I got visited by an ATF agent while I

20   was in prison, and it kind of went from there.

21   Q.    Okay.  Did you feel that Mr. Unocic was serious in these

22   threats against --

23   A.    Yes.

24   Q.    Why?

25   A.    I mean, 'cause of the bragging about, like, having a

Rivera - Direct (Fliam)                                          194

1    standoff with Weld County PD and just how this dude, like,

2    ruined his life, basically.

3    Q.   And you said that you were showing each other paperwork.

4    Was he showing you stuff involving Weld County?

5    A.   Yes.

6    Q.   What sort of things was he showing you?

7    A.   It was just like a discovery that said that he had had a

8    standoff with Weld County PD.

9            MR. REIMAN:  Your Honor, I'm objecting based on

10   hearsay, and this goes beyond your order.

11           THE COURT:  Okay.  Counsel approach.

12       (At sidebar)

13           THE COURT:  Okay.  Let's start these one at a time.

14   First of all, as to hearsay.  These are statements made by the

15   defendant.

16           MR. REIMAN:  If he's going to testify about --

17           THE COURT:  Just a moment.  So the hearsay objection

18   is overruled.  But you're talking about it's going beyond the

19   order?

20           MR. REIMAN:  Well, I believe he was getting ready to

21   testify about what he read in the police reports.  That's not

22   my client's statement, so it is hearsay.  And according to your

23   order, he may be able to testify about what Mr. Unocic told

24   him; however, there's nothing in here about that he gets to

25   testify about what's in these police reports, which I would

1    submit I don't believe Mr. Rivera has read it.

2            THE COURT:  All right.  I think I understand the

3    objection now.

4            MS. FLIAM:  So my response would be that if the

5    defendant is holding these police reports out in a conversation

6    about this is what I feel like, he's ratifying those statements

7    and adopting them as factual as his own statements.  I think

8    the issue with statements, what Mr. Rivera read also go to how

9    he interpreted the statements, which is at issue as to whether

10   or not this was truly a threat.

11           THE COURT:  Okay.  And that would be -- I mean, I

12   will be listening as far as how it was communicated to him,

13   whether that was a ratification of the statement or not.  In

14   other words, if he's having a conversation holding up the sheet

15   of paper saying, "This is accurate, this is what I said...."  I

16   don't know how it's going to come out, okay, but that would be

17   a ratification.

18      Now, the hearsay objection will be overruled.  The hearsay

19   objection is overruled at this point in time, but we'll see how

20   the testimony comes out as far as what he said, how it was

21   communicated to him.  It certainly is relevant as to whether or

22   not this threat is credible or not, so the line of questioning

23   is appropriate.  Whether this is a ratification or not, we have

24   to see where it goes.  Okay?

25           MR. REIMAN:  Thank you.

1          THE COURT:  Very well.  So right now it's overruled.

2     (In open court)

3          THE COURT:  As to the last question, the hearsay

4     objection is overruled.  Let's take these one question at a

5     time.

6     And you may proceed.

7     BY MS. FLIAM:

8     Q.   I'm going to actually have you back up a little bit,

9     Mr. Rivera.

10    A.   Okay.

11    Q.   You said that this whole conversation actually started

12    with the 2015 Weld County standoff; is that right?

13    A.   Yes.

14    Q.   How did that come up, that topic?

15    A.   So we were original- -- I was talking about, like, my

16    federal case, and I was -- I had, like, pictures of, like, bad

17    checks that I had wrote that they had photocopied and, like,

18    sent to me, and I was talking about, like, the -- how my time,

19    like, was going to run because of the amount of money that,

20    like, I had spent, and then he pulled out his discovery and

21    started talking about, like, how he had had a standoff with

22    police in Weld County.

23    Q.   Was he showing you those police reports in that this is

24    what happened?

25    A.   Yeah.

1    Q.    Was he encouraging you to read them or look at them?

2    A.    Yeah.  There was three of us that actually read them.

3    Q.    Who else was there?

4    A.    Tracy Hoops.

5    Q.    And did you take a look at -- well, what was Mr. Unocic's

6    interpretation, or how did he explain the standoff to you?

7    A.    Just that he had had a standoff with police.  They

8    cornered off, like, a block by his house or by a house and that

9    they, Weld County PD, had to wait to get him out or try to get

10   him out.  They had, like, a SWAT team there and some other

11   things.

12   Q.    Okay.  Did he show you those police reports?

13   A.    Yes.

14   Q.    And was he showing them like, "See, this is what actually

15   happened"?

16   A.    Yes, ma'am.

17   Q.    Did you skim through those reports?

18   A.    Yeah.

19   Q.    And how did reading those reports -- well, I guess, what

20   did you read?

21   A.    Basically that he had a standoff with the police

22   department and held up in his house -- or a house, I don't know

23   if it was his house or not, but a house and that they had to

24   have a SWAT team get him out.

25   Q.    Did you read anything about weapons?

Rivera - Direct (Fliam)                                          198

1   A.   Yeah.  He had, like, some guns.

2   Q.   Did you read anything about explosives?

3   A.   Not that I'm aware of.  I don't remember.

4   Q.   How did you feel reading through that report?

5   A.   I thought it was kind of crazy.

6   Q.   In what way?

7   A.   Just, like, having a standoff with the police department.

8   Q.   Not something you had ever been involved in?

9   A.   No.

10  Q.   Had you heard it bragged about in other jails you've been

11  in?

12  A.   No.  I mean, I've seen it on, like, TV but....

13  Q.   How did -- Mr. Unocic bringing up that 2015 standoff in

14  the context of this conversation about how much Tubbs had taken

15  from him, how did that impact your understanding of what he was

16  saying?

17  A.   Well, when he said it, it was kind of like saying, like, I

18  don't have a problem dealing with, like, police in, like, a

19  negative way.

20  Q.   Did it change the dynamics from just venting?

21  A.   Well, yeah.

22  Q.   Why, "Well, yeah"?

23  A.   I mean, 'cause if you have a standoff with police and then

24  you're talking about killing an ATF agent, it kind of goes hand

25  in hand.

Rivera - Direct (Fliam)                                            199

1    Q.   It seemed to you that those two things were linked in

2    Mr. Unocic's mind?

3    A.   Yes.

4    Q.   And I think you testified that he specifically held out

5    this 2015 standoff as, "I don't have a problem killing cops"?

6    A.   Yes, ma'am.

7    Q.   Did he say that exactly?

8    A.   He said, "I don't have a problem, like, dealing with" --

9    like, yeah.

10   Q.   Did he talk about -- you had referenced he specifically

11   said that he could shoot the agent; is that right?

12   A.   Yes, ma'am.

13   Q.   Did he talk at all about how he could get a gun to do that

14   or anything like that?

15   A.   He said he had guns, I guess, at the house that he was

16   staying at.

17   Q.   So he had access to a weapon?

18   A.   Yes.  Well, that's what he said.  I don't know if he

19   actually did or not.

20   Q.   Okay.  He held out to you that he did?

21   A.   Yeah.

22   Q.   Did he talk at all about blowing -- how he could blow him

23   up?

24   A.   He just said that he could put a bomb under his car.

25   Q.   And ultimately I think you said you kind of sat and you

Rivera - Direct (Fliam)                                                        200

1    reflected on this conversation; is that right?

2    A.    Yeah.

3    Q.    What did you decide to do?

4    A.    I ended up calling my lawyer.  I told her a little bit

5    about it and then left it alone.

6    Q.    Why did you ultimately call her?

7    A.    'Cause it was kind of serious.

8    Q.    Were you worried about the safety of this agent?

9    A.    Yeah.

10   Q.    So you said you called your attorney, and then I think you

11   ended up talking -- excuse me.  You ended up talking to the

12   Secret Service Agent Sparks; is that right?

13   A.    Yeah, over the phone.  They did, like, a phone interview.

14   Q.    And Secret Service Agent Sparks was who investigated your

15   case; is that right?

16   A.    Unfortunately, yes.

17   Q.    Why unfortunately?

18   A.    'Cause I ended up in prison.

19   Q.    Did you talk, then, with any other law enforcement?

20   A.    I talked to the two ATF agents at one point in Scotts

21   Bluff County, and then I left to go back to Colorado, and I was

22   in Colorado for, like, eight months, and then another ATF agent

23   lady came, and she talked to me, and then I thought it was kind

24   of over with 'cause I didn't hear nothing until you guys came

25   to get me.

Rivera - Direct (Fliam)                                                    201

1    Q.    Okay.  Now, you testified, Mr. Rivera, that you are

2    currently serving a Colorado sentence; is that right?

3    A.    Yes, ma'am.

4    Q.    So that case is over and done with; is that right?

5    A.    No.

6    Q.    What's left?

7    A.    I still have to -- so when I'm done here, I go back to

8    Colorado, and I have probably, like, eight months left on that

9    one.

10   Q.    Okay.  So you have to do the time yet?

11   A.    Yeah.

12   Q.    But there's no other court or anything like that?

13   A.    I found out recently that I have a warrant in Denver and

14   then one in Texas, I guess.

15   Q.    Do you know what those are for?

16   A.    Probably identity theft.

17   Q.    And you say you "found out recently."  When did you find

18   out?

19   A.    Just that I had the warrants.

20   Q.    Do you know when?

21   A.    When I found out?

22   Q.    Yeah.

23   A.    When you guys told me.

24   Q.    Okay.  And then you said once you're done with your state

25   sentence, you have to go back and serve a federal sentence; is

Rivera - Direct (Fliam)                                              202

1    that right?

2    A.    Yes, ma'am.

3    Q.    So you're not looking to get out at any point --

4    A.    No.

5    Q.    -- in the near future?

6    A.    No.

7    Q.    How long is your federal sentence?

8    A.    Eighteen months.

9    Q.    And do you know where you'll serve that?

10   A.    No idea.

11   Q.    In other words, your federal case is also over and done

12   with; is that fair?

13   A.    Yeah.

14   Q.    And I think your attorney's actually retired.  Is that

15   your understanding?

16   A.    Yes, ma'am.

17   Q.    Have you been promised anything in order to come testify?

18   A.    No, ma'am.

19   Q.    Did you make any deals with any government agent to come

20   testify?

21   A.    No, ma'am.

22   Q.    So not with ATF?

23   A.    No.

24   Q.    Not with Secret Service?

25   A.    No.

Rivera - Direct (Fliam)                                               203

1    Q.   Not with the U.S. Attorney in Wyoming?

2    A.   No.

3    Q.   Not with the U.S. Attorneys here in Nebraska?

4    A.   No.

5    Q.   Are you hoping for anything?

6    A.   No.

7    Q.   In your mind, is there anything you can get out of

8    testifying honestly?

9    A.   No.

10   Q.   So why do it?

11   A.   'Cause it's the right thing to do.

12   Q.   And when you say "the right thing to do," why?

13   A.   'Cause somebody's life was kind of at stake.

14   Q.   Have you ever testified before?

15   A.   Yes.

16   Q.   Tell me about that.

17   A.   So I testified in a murder trial of Kelsie Schelling in

18   Denver, Colorado.

19   Q.   Kelsie -- what was her last name?

20   A.   Schelling.

21   Q.   Can you spell it?

22   A.   I have no idea how to spell it.

23   Q.   And she was the woman that was killed; is that right?

24   A.   Yes, ma'am.

25   Q.   Why did you end up testifying in a murder trial?

Rivera - Direct (Fliam)                                                204

1    A.    I got called after I talked to one of the captains in the

2    jail about something that had happened, and a few inmates

3    overheard this person say something.

4    Q.    "This person" being the person accused of murder?

5    A.    Yeah, Donthe Lucas.

6    Q.    So you overheard Mr. Lucas say something relevant or you

7    thought might be relevant?

8    A.    Yeah.

9    Q.    And you shared it with a jail member?

10   A.    Yes.

11   Q.    Or a jail staff member.

12   A.    Yes, ma'am.

13   Q.    And ultimately ended up getting to testify in that case?

14   A.    Yes, ma'am.

15   Q.    Okay.  Did you get anything in exchange for testifying

16   there?

17   A.    No, ma'am.

18   Q.    Was that a good experience for you?

19   A.    No, ma'am.

20   Q.    Tell me what made it rough.

21   A.    You're testifying in a case.  They put my face all over,

22   like, *Dateline*.  Like, I can't live in my hometown anymore.

23   Q.    And when you say it makes it difficult, is there a --

24   you've been in custody, obviously, for a period of time;

25   correct?

1   A.   Yes, ma'am.

2   Q.   Have you ever heard anything about what happens to

3   snitches?

4   A.   Well, it's not good.

5   Q.   Okay.  In what ways?

6   A.   Probably have to go to, like, PC, which is, like,

7   protective custody or something so other inmates don't know

8   that you told on somebody.

9   Q.   What can happen to you if you're not in protective

10  custody?

11  A.   I mean, you could probably get killed, I'm assuming.  Beat

12  up at least.

13  Q.   Is that a fear that you've thought about?

14  A.   Of course.

15  Q.   And again, with that weighing on you, why did you decide

16  to come forward in this case?

17  A.   'Cause it was the right thing to do.

18  Q.   Okay.  What you overheard Mr. Unocic say, I believe you

19  testified that was -- you're sitting there.  You're sharing

20  paperwork with each other; is that right?

21  A.   Yes, ma'am.

22  Q.   That was a one-time conversation where you two were

23  talking back and forth with the paperwork?

24  A.   Yeah.  Well, there was three of us, but yeah.

25  Q.   Okay.  You, Mr. Unocic, and Mr. Hoops?

1    A.    Yes, ma'am.

2    Q.    Okay.  That conversation occurred in the Scotts Bluff

3    County Detention Center?

4    A.    Yes, ma'am.

5    Q.    Which is in Nebraska?

6    A.    Yes, ma'am.

7              MS. FLIAM:  One second, please, Your Honor.

8              THE COURT:  Okay.

9              MS. FLIAM:  Judge, I don't have any other questions

10   for this witness.

11             THE COURT:  All right.  Very well.

12   Cross-examination, Mr. Reiman.

13                     CROSS-EXAMINATION

14   BY MR. REIMAN:

15   Q.    Okay.  Mr. Rivera, in February of 2022, it's my

16   understanding you were in custody in the Scotts Bluff jail; is

17   that right?

18   A.    Yes, sir.

19   Q.    And was Mr. Unocic also in that jail pod with you?

20   A.    Yes.

21   Q.    And how long were you and Mr. Unocic in the same pod, do

22   you remember?

23   A.    Maybe like a month, month and a half.

24   Q.    And at the time were you facing these federal fraud

25   charges?

1    A.    I had already been sentenced during -- after this --

2    before this conversation happened.

3    Q.    Well, at some point you signed a proffer letter; is that

4    right?

5    A.    Yes.

6    Q.    Okay.  And then I believe in February of 2022, you did a

7    proffer with that Secret Service agent.  Do you recall that?

8    A.    Yes.

9    Q.    Okay.  And I think they might have transported you from a

10   Scotts Bluff jail to the Cheyenne courthouse.  Is that where it

11   happened, at the federal building?

12   A.    Yes.

13   Q.    Okay.  Coming back to you a little bit?

14   A.    Kind of.  I remember.

15   Q.    Okay.  And so at some point prior to that interview, you

16   and your attorney sat down and went over a proffer letter; is

17   that right?

18   A.    Yes.

19   Q.    And a proffer letter kind of lays out what you -- it

20   promises you that what you say is off the record and it's not

21   going to come back and hurt you.  That's one of the things in

22   there; is that correct?

23   A.    Yeah, I believe so.

24   Q.    Okay.  And it also says that the government is going to --

25   after the interview the government's going to look at your

1    information and, "A," see if you were truthful, and "B," see if

2    you had any valuable information that they can use on other

3    cases.  Is that fair?

4    A.    Yes.

5    Q.    Okay.  So you do these proffers -- your incentive for a

6    proffer is you're trying to get your sentence reduced; is that

7    correct?

8    A.    Yeah.

9    Q.    Okay.  And one of the other things in that proffer letter

10   is, while it says what you say is off the record and they can't

11   use that against you -- you're with me so far; right?

12   A.    Okay.

13   Q.    But it also says, in the event you get up on the stand and

14   testify and say something different than you did in the

15   proffer, they can use that proffer -- or they can then bring

16   out the report and impeach you.  Does that sound familiar?

17   A.    Yes.

18   Q.    Okay.  So as long as you keep saying the same thing, that

19   proffer's not going to come back and harm you; is that correct?

20   A.    I assume so.

21   Q.    Okay.  So in February of 2022, it sounds like you were

22   transported to Cheyenne and you told this Secret Service agent

23   a whole bunch of things about the fraud case; is that correct?

24   A.    Yes.

25   Q.    And during that first -- during that first proffer in

1   February, you didn't bring up anything about Mr. Unocic; is

2   that correct?

3   A.    Not that I'm aware of.  We did it over the phone later.

4   Q.    Okay.  So I guess that's my question.  Then after that you

5   apparently got ahold of your defense attorney; is that correct?

6   A.    Yes, sir.

7   Q.    And told him about this threat that you'd heard; is that

8   right?

9   A.    Her, yes.

10  Q.    Her.  I'm sorry.  Now, did -- how many times -- did you

11  just say you heard Mr. Unocic -- this happened once, this

12  conversation about him being upset?

13  A.    Yeah.  That conversation -- specific conversation, yeah.

14  Q.    Did that happen before or after this February proffer?

15  A.    The one that I went to the courthouse for?

16  Q.    Yes.

17  A.    I believe it was after, 'cause we had to call the Secret

18  Service agent from Scotts Bluff.

19  Q.    Okay.  And after you proffered, what generally happens is

20  if the U.S. Attorney thinks you have some valuable information,

21  they'll give you a cooperation plea agreement.  Is that your

22  experience or your understanding of what was supposed to

23  happen?

24  A.    I didn't know anything about a cooperation agreement.

25  Q.    Well, did they give -- did they knock any charges off or

Rivera - Cross                                                            210

1    reduce your sentence because of your proffer?

2    A.    I got two levels off for acceptance of responsibility,

3    yes.

4    Q.    But they didn't give you anything else based upon your

5    proffer?

6    A.    Not the one that I did in February, no, and not that I'm

7    aware of that it happened afterwards either.

8    Q.    Okay.  But certainly it's fair to say when you were

9    proffering that first time, you were hoping that it was going

10   to benefit you to a lower sentence on your federal case; is

11   that correct?

12   A.    Yes.

13   Q.    And then after your first proffer, did you have a

14   conversation with your -- well, I don't want to get too close,

15   but did they offer you a cooperation plea agreement?

16   A.    No.

17   Q.    And when did you learn about that?

18   A.    What, a cooperation plea agreement?

19   Q.    That you weren't going to get a cooperation plea deal.

20   A.    I never thought I was going to get a cooperation plea

21   deal.

22   Q.    Then why did you proffer?

23   A.    So you have a proffer, and then you have, like, self

24   proffer.  So when I proffered, I was telling them what happened

25   to my case and, like, the situations that I was in, and they

Rivera - Cross                                                          211

1    said that it's an acceptance of responsibility so you get,

2    like, two levels off.

3    Q.    Okay.  So after you proffered, you again get ahold of your

4    attorney and let her know about this threat that you heard; is

5    that correct?

6    A.    Yes.

7    Q.    And then this second proffer happens over the phone; is

8    that right?

9    A.    I don't know if it was necessarily a proffer.  I don't

10   know if that's what they -- 'cause I didn't sign anything or

11   anything, but they just did, like, an interview over the phone

12   where they asked me, like, what had happened.

13   Q.    And your defense attorney was on the phone during this as

14   well; correct?

15   A.    Yeah, she was on the phone.  The Secret Service agent was

16   on the phone, and then he said that he would get ahold of

17   whoever, and then they were done with it after that.

18   Q.    And you were later sentenced on this federal case; is that

19   correct?

20   A.    Yeah, March 30th.

21   Q.    And did your attorney bring it up to the judge about how

22   you'd attempted to help law enforcement?

23   A.    She brought up the fact that I had testified for law

24   enforcement before prior to anything, yeah.

25   Q.    So when you're at sentencing, your attorney's giving her

Rivera - Cross                                                          212

1    best argument to try to get you the lowest sentence possible;

2    is that correct?

3    A.    Yes.

4    Q.    Okay.  And you probably got to say a few things as well if

5    you chose to; correct?

6    A.    I didn't choose to, but yes.

7    Q.    Okay.  And so your attorney was probably trying to say

8    every good thing that she could to try to convince that judge

9    to give the lowest sentence possible; is that fair?

10   A.    Of course, yeah.

11   Q.    Okay.  And did your attorney bring up, if you know, that

12   you had met with police and proffered with them?

13   A.    I know that she turned off -- they turned off the

14   microphones and went up to the front, but I don't know exactly

15   what they said.

16   Q.    Okay.  Now, it's -- in your experience, it sounds like

17   you've been in jail somewhat of -- around a variety of people.

18   Is that a fair statement?

19   A.    Yes.

20   Q.    And I'm sure you meet all sorts of characters in jails and

21   prisons.  Is that a fair statement?

22   A.    Yeah.

23   Q.    Is it a fair statement that some inmates boast, brag?

24   A.    I mean, yeah.

25   Q.    Some inmates try to come across as tougher than they

Rivera - Cross                                                                  213

1    probably really are?

2    A.    Yeah.

3    Q.    Some inmates make it sound like they're extremely tough or

4    bad in hopes to be left alone.  Is that a fair statement?

5    A.    Yeah.

6    Q.    Okay.  Then I'm probably sure there's some inmates that

7    probably just try to fly low and --

8    A.    Yeah, stay out of the way.

9    Q.    Okay.  So in a way, at least in some facilities, you're

10   doing your best to survive; is that correct?

11   A.    Very true.

12   Q.    And there's some inmates that are looking to pick on the

13   weaker, younger, in the cell; is that correct?

14   A.    I mean, at times, yeah, it happens.

15   Q.    And you don't want to run into that person; correct?

16   A.    Probably not.

17   Q.    And so that is one reason some of these inmates will make

18   them -- puff themselves up bigger and badder than they actually

19   are; is that correct?

20   A.    Yes.

21   Q.    How many times did you make that trip from Scotts Bluff to

22   Cheyenne, Wyoming?  Do you remember?

23   A.    Probably five, maybe.

24   Q.    How long a drive is it?

25   A.    An hour.

Rivera - Cross                                                                214

1   Q.   Okay.  You did not want to come testify; is that correct?

2   A.   No.

3   Q.   Okay.  And in fact, did they have to come drag you out of

4   the cell or something like that to make you come testify?

5   A.   Well, the first writ I refused, and then the second writ

6   they got a drag order so I had to come.

7   Q.   Okay.  So the first time they came to you to bring you

8   back to testify in this case; is that correct?

9   A.   Yeah.

10  Q.   And I take it you told them something like, "Go fly a

11  kite"?

12  A.   Something like that I told them, yeah.

13  Q.   So after that they apparently went to a judge and got

14  another order that says you can use force to bring this guy

15  back here; is that correct?

16  A.   Yes.

17  Q.   Okay.  At that point you consented and got on the van and

18  came back; is that correct?

19  A.   Well, I didn't consent.  I didn't have a choice, but I

20  came, yes.

21  Q.   You at least didn't fight them about it; is that fair?

22  A.   Yes.

23  Q.   Okay.  Now, so you -- back when you were proffering in

24  February and March of 2022, you were hoping this would get you

25  a lower sentence, is that correct, your proffers?

1   A.   The one proffer that I did, yes.

2   Q.   Okay.  And you met with the police in February, and then

3   there was a phone call in March regarding the threats; is that

4   correct?

5   A.   Yes.

6   Q.   And I think they interviewed you again after that

7   regarding the threats; correct?

8   A.   Yeah.  Two ATF agents came to the jail and asked what

9   happened, and then they left, and then I left.

10  Q.   And as long as you -- like you talked about earlier, as

11  long as you are consistent from what you told them in the

12  beginning and your story stays the same, that proffer cannot

13  come back to harm you; correct?

14  A.   The one about my fraud?

15  Q.   About all of your statements.

16  A.   Yeah.

17  Q.   Okay.  Oh.  Did Mr. Unocic ever ask you to -- or try to

18  solicit you to go help him kill this agent?

19  A.   No.

20  Q.   Did he, I don't know, get -- ask you for advice or the

21  best way to off this agent?

22  A.   No.  It was just a conversation like --

23  Q.   Did you ever see Mr. Unocic trying to recruit other people

24  to help him pull this off?

25  A.   No.

1   Q.   Did you ever see -- when you're in that Scotts Bluff jail,

2   is it like everywhere else where, the phone's out there and

3   everybody can kind of hear what you're doing, or do you have

4   any privacy out there?

5   A.   I mean, the phone's by the door.  It's....

6   Q.   Did you ever hear Mr. Unocic on the phone attempting to

7   recruit somebody to go help him kill this agent?

8   A.   Well, phone calls are recorded, so no.

9   Q.   Okay.  Did you ever see Mr. Unocic writing a letter trying

10  to recruit somebody to go help him kill this agent?

11  A.   No.

12  Q.   Did Mr. Unocic ever ask you to convey his words to Agent

13  Tubbs?

14  A.   No.

15  Q.   You don't even know who Agent Tubbs is, do you?

16  A.   Absolutely not.

17  Q.   Never met him before; correct?

18  A.   No.

19  Q.   So if -- you said you believe Mr. Unocic was sincere when

20  he made these statements about wanting to kill the agent; is

21  that correct?

22  A.   Yes.

23  Q.   So it's a fair statement that Mr. Unocic -- the last thing

24  he wanted you to do was go tell Agent Tubbs; is that fair?

25  A.   I mean, I highly doubt he wanted me to tell anybody.

```
1    Q.    Okay.  So Mr. Unocic, when he said these words, did not
2    want you to communicate it to law enforcement.  Was that your
3    perspective?
4    A.    I mean, I wouldn't think anybody would want anybody to
5    communicate that to anybody.
6    Q.    I'm almost done.  Mr. Rivera, it sounds like you have
7    multiple convictions of fraud; is that correct?
8    A.    Yes.
9    Q.    In various states in the country?
10   A.    Colorado.
11   Q.    Okay.  And you apparently have warrants out for you for
12   some type of fraud in a couple of states right now?
13   A.    No.  Denver.  My Denver fraud case is from 2020 still, and
14   then my Texas case is when I got arrested on my federal
15   warrant.
16   Q.    Okay.  So hopefully you'll be able to get that dismissed?
17   A.    I don't know if it's going to get dismissed.  I have to go
18   to court.  I have a warrant.
19   Q.    The federal case also involved fraud?
20   A.    Yeah.  It was bank fraud.
21   Q.    So it sounds to me like you have become -- you have spent
22   at least part of your life lying to people; is that correct?
23   A.    I've spent part of my life stealing from people.
24   Q.    Okay.  And you are -- well, the fraud, apparently you were
25   deceiving someone; is that correct?
```

Rivera - Redirect (Fliam)                                                    218

1    A.    Financial institutions, yeah.

2    Q.    Okay.  So you must be pretty good at lying to financial

3    institutions to benefit yourself; correct?

4    A.    I assume so.

5    Q.    Okay.  But I guess not that good, because they caught you

6    at least a couple times; is that correct?

7    A.    More than a couple, because I've gotten caught every time.

8    Q.    And I understand you have a drug addiction, sir, and I

9    hope you get that resolved, but you've become pretty good at

10   tricking people to benefit yourself; correct?

11   A.    I mean, but it doesn't benefit me.

12   Q.    I understand.  But you've spent years -- you've spent

13   years tricking banks and people to benefit yourself; correct?

14   A.    I would say banks, yes.

15            MR. REIMAN:  Okay.  Thank you.  That's all I have.

16            THE COURT:  All right.  Very well.  Redirect.

17                       REDIRECT EXAMINATION

18   BY MS. FLIAM:

19   Q.    All right.  Mr. Rivera, just a few questions.  Hopefully

20   we'll have you out for lunch, although I know you're not

21   thrilled with the Saline County food.

22   A.    No.

23   Q.    One of the questions Mr. Reiman was asking you was about

24   kind of posturing in a jail cell; is that right?

25   A.    Yeah.

1    Q.    People boasting or bragging, stuff like that?

2    A.    Yeah.

3    Q.    Would you consider yourself a aggressive person?

4    A.    No.

5    Q.    A violent person?

6    A.    No.

7    Q.    Have you ever been written up for an assault while in

8    jail?

9    A.    No.

10   Q.    Is it okay if I ask you about your tattoos?

11   A.    Yeah.

12   Q.    Okay.  So you have a couple of tattoos; is that right?

13   A.    Yes, ma'am.

14   Q.    Can you tell me what they are of.

15   A.    I have a little, like, Bratz doll on my arm and a fairy on

16   the top of my right shoulder.

17   Q.    So would you consider those tattoos -- well, have you seen

18   tattoos in jails that can be intimidating or signify some sort

19   of gang affiliation?

20   A.    Yeah.

21   Q.    Fair to say your tattoos do not?

22   A.    No, ma'am.

23   Q.    Okay.  When Mr. Unocic made these threats to kill the ATF

24   agent, did you feel like it was just to boast?

25   A.    I mean, he named the agent, so no.

1    Q.    Okay.  Did you feel like he was trying to make himself

2    seem tougher than he was to you?

3    A.    He was actually a pretty nice guy.

4    Q.    Did you feel like he was trying to get you to leave him

5    alone by saying these things?

6    A.    No.

7    Q.    You talked about how long you two were together.

8    A.    Yeah.

9    Q.    Who left first?

10   A.    He did.

11   Q.    And do you recall when he left in relation to this

12   conversation?

13   A.    Probably, like, two days afterwards.

14   Q.    Okay.  Were there any statements -- did he make any

15   statements about this conversation in relation to his leaving?

16   A.    I don't know if it was about this conversation

17   specifically, but he said that somebody had said something and

18   that's why they were moving him.

19   Q.    Mr. Reiman also asked you:  Mr. Unocic didn't try to

20   recruit you or anybody else that you know of to kill Agent

21   Tubbs; correct?

22   A.    Correct.

23   Q.    In fact, he made it sound or seem to you that he was quite

24   capable of doing it on his own?

25   A.    Yes.

1    Q.   And last question:  You've owned up to your history today;

2    is that fair?

3    A.   Yes, ma'am.

4    Q.   You're aware you came in and you took an oath to tell the

5    truth?

6    A.   Yes, ma'am.

7    Q.   Did you tell the truth today?

8    A.   Yes, ma'am.

9              MS. FLIAM:  Nothing further.

10             THE COURT:  All right.  Very well.  May this witness

11   be excused?

12             MS. FLIAM:  Yes.

13             MR. REIMAN:  Yes.

14             THE COURT:  Mr. Rivera, you are excused.

15        All right.  Counsel, before we call our next witness, it's

16   the Court's intent -- we're about five minutes till noon.

17   We'll just break earlier today, and we'll come back at 1:00 to

18   recommence the testimony.

19        Ladies and gentlemen of the jury, we will take our

20   noon-hour break at this point in time.  As I've instructed you

21   before, until this case is completed, until you've heard all

22   the testimony and been instructed on the law, you're not to

23   discuss this case or the evidence with anyone, not to do any

24   research on your own, and you're not to discuss it with each

25   other also.

1          So we're going to take about an hour, five for break.

2     I'll ask you to be back at 1:00 or a couple minutes after, and

3     we will recommence the trial at that time.  Thank you.

4          (Jury out at 11:54 a.m.)

5              THE COURT:  Counsel, is there anything we need to

6     take up before we break?

7                MR. PACKARD:  No, Your Honor.

8                THE COURT:  All right.

9                MR. REIMAN:  No, sir.

10               THE COURT:  Very well.  We are going to have a

11    hearing right at noon for just a few minutes, but it's fine to

12    leave your materials where they are, but just so you know,

13    there's going to be a hearing.  If you wish to take them, you

14    can.

15         So we will break, and we will recommence the testimony at

16    1:00.  All right.  Thank you.  We're in recess.

17         (Recess taken at 11:55 a.m.)

18         (At 1:02 p.m. on September 26, 2023; with counsel for the

19    parties and the defendant present; WITHOUT the jury:)

20               THE COURT:  We're back on the record outside of the

21    presence of the jury.  All counsel are present.  Mr. Unocic is

22    present.

23         Counsel have anything to take up before we bring the jury?

24               MR. PACKARD:  No, Your Honor.

25               MR. REIMAN:  No.

 1            THE COURT:  All right.  Let's bring the jury.

 2       (Jury in at 1:03 p.m.)

 3            THE COURT:  Welcome back, ladies and gentlemen of the

 4  jury.

 5       I believe the government was about to call its next

 6  witness, and you may do so.

 7            MR. PACKARD:  The government calls Tracy Hoops.

 8            THE COURT:  All right.  Mr. Hoops, I want to make

 9  sure the microphone is set for you.  We're going to have you

10  sworn as a witness.  All right?

11            THE WITNESS:  Okay.

12            THE COURT:  You may do so, Ms. Miller.

13            COURTROOM DEPUTY:  Please state and spell your name

14  for the record.

15            THE WITNESS:  Tracy Douglas Hoops, T-R-A-C-Y,

16  H-O-O-P-S.

17            COURTROOM DEPUTY:  Please raise your right hand.

18            TRACY D. HOOPS, PLAINTIFF'S WITNESS, SWORN

19            THE COURT:  All right.  Very well.  Counsel, you may

20  inquire.

21                          DIRECT EXAMINATION

22  BY MR. PACKARD:

23  Q.   Good afternoon, Mr. Hoops.

24  A.   Good afternoon.

25  Q.   You're obviously in custody; is that correct?

Hoops - Direct (Packard)                                                    224

1    A.    That is correct.

2    Q.    And we'll get to that in just a little bit.  How old are

3    you?

4    A.    How old am I?  Forty-nine.

5    Q.    And what's your educational background?

6    A.    College, business major.

7    Q.    Where did you grow up?

8    A.    Wisconsin.

9    Q.    And where do you live when you're not in jail?

10   A.    Wyoming.

11   Q.    Do you have children?

12   A.    I do.

13   Q.    How many?

14   A.    Two.

15   Q.    And how old are they?

16   A.    Fifteen, my son, and my daughter just turned seven.

17   Q.    Are you currently incarcerated on charges that are

18   pending?

19   A.    I am.

20   Q.    Let's talk about those.  Do you have pending charges in a

21   number of states?

22   A.    That is correct.

23   Q.    You have charges in Colorado?

24   A.    Yes.

25   Q.    Nebraska?

1   A.   Correct.

2   Q.   Wyoming?

3   A.   Correct.

4   Q.   What do you have pending in Colorado?

5   A.   In Colorado there is a domestic assault case in -- oh.

6   Q.   And has that been resolved yet?

7   A.   It is before the judge to be dismissed as of last week

8   so....

9   Q.   As we sit here today, though, that case is still pending?

10  A.   That is correct.

11  Q.   And do you have any kind of agreement with the prosecution

12  or the government in that case to testify?

13  A.   No, not at all.

14  Q.   Does that case have anything to do with factually what

15  you're here to testify about today?

16  A.   No.

17  Q.   Does that case involve Anthony Unocic at all?

18  A.   No.

19  Q.   Does it involve the Scotts Bluff County Detention Center?

20  A.   It does not.

21  Q.   You also have some charges in Nebraska?

22  A.   Correct.

23  Q.   And those are pending; is that right?

24  A.   Yes.

25  Q.   And what are you charged with in Nebraska?

Hoops - Direct (Packard)                                          226

1    A.    I have a unlawful possession of a firearm drug charge, and

2    I believe there's a resisting arrest charge as well in that

3    indictment.

4    Q.    Do you also have some DUI cases pending in Nebraska?

5    A.    That is correct.

6    Q.    So we have a drug charge, a firearm charge, resisting, and

7    DUI.  Anything else?

8    A.    We've got -- in Nebraska?  I'm sorry.  I'm --

9    Q.    Yeah.  Anything else, anything else in Nebraska?

10   A.    No.  Sorry.

11   Q.    Okay.  And those matters are yet -- those cases are yet

12   unresolved; is that right?

13   A.    That is correct.

14   Q.    Haven't entered a plea, haven't had a trial, that sort of

15   thing?

16   A.    No.

17   Q.    And do those cases involve Anthony Unocic at all?

18   A.    They do not.

19   Q.    Do those cases -- did any of the events giving rise to

20   that -- or to those charges happen at the Scotts Bluff County

21   Detention Center?

22   A.    I guess I'm confused by the question.  I'm not --

23   Q.    Sure.  Were you charged with anything when you were

24   staying -- well, did any of the events giving rise to those

25   charges happen at the Scotts Bluff County Detention Center?

1    A.    No, not at all.

2    Q.    Okay.  Anything else in Nebraska?

3    A.    No.

4    Q.    Okay.  Also you talked about Wyoming.  What do you have

5    pending in Wyoming?

6    A.    So Wyoming, I've got a case out of Albany County that is

7    still pending a disposition in that, theft charges.  There is

8    multiple DUI in Albany County as well.

9    Q.    And are those charges in Albany County, Wyoming, felony

10   related or felony level charges?

11   A.    Yeah.  They're -- I believe two of them are felony

12   related, and I believe the rest are misdemeanor.

13   Q.    And those are felony theft charges?

14   A.    That is correct.

15   Q.    And in Nebraska are one or more of your charges felony

16   level?

17   A.    In Nebraska, yeah.  In Sidney there would be, I believe,

18   one or two of the three charges.

19   Q.    Would it be fair to say that, adding all these charges up,

20   you face some significant jail or prison time if you are

21   convicted?

22   A.    I believe that's a fair statement.

23   Q.    Let's talk about your criminal history.  In the last ten

24   years, you've been convicted of a felony?

25   A.    Yes.

1    Q.    How many times?

2    A.    Twice.

3    Q.    And in the last ten -- well, in the past have you worked

4    before as a government informant or a cooperating witness for

5    the government?

6    A.    I did.

7    Q.    Let's talk about that.  What was the first time?

8    A.    So the first time would have been I believe in '97.  I was

9    arrested, and during that arrest I met with two detectives that

10   were doing the interview, and they were, I think, a little bit

11   more concerned about my associates, and so we spent a couple

12   evenings driving around to various locations where serious

13   crimes were being committed.

14   Q.    So you were showing police where crimes were happening?

15   A.    Meth labs, guns, other fairly serious stuff.

16   Q.    And this was in Arizona?

17   A.    That's correct.

18   Q.    And you were charged at the time with something?

19   A.    I was.

20   Q.    And what were you charged with?

21   A.    At the time I had a burglary charge.  There was a theft

22   and forgery charge, I believe, at that moment that was pending.

23   Q.    And what year was that again?

24   A.    That would have been '97.

25   Q.    And it sounds like you essentially pointed out places

Hoops - Direct (Packard)                                          229

1   where police could go investigate; is that right?

2   A.   That's correct.

3   Q.   Did you introduce police officers to other potential

4   defendants who were engaging in illegal conduct?

5   A.   Not at that time but I did later.

6   Q.   What other cooperation did you offer in that case?

7   A.   That was it in that particular case.

8   Q.   Did you receive any benefit as a result of your work in

9   that case?

10  A.   I did not, and quite honestly, I'd still do it again.  It

11  took some --

12  Q.   So why didn't you receive any benefit from that?

13  A.   You know, I think sometimes, you know, thing -- people get

14  busy.  They steamroll through stuff.  I didn't sign an

15  agreement.  Nobody had an obligation to do anything, and they

16  didn't but --

17  Q.   Did you end up going to prison as a result of your own

18  case?

19  A.   Correct.

20  Q.   How long?

21  A.   Six and a half years.

22  Q.   Anything else related to your cooperation work in 1997 in

23  Arizona?

24  A.   No.

25  Q.   Let's talk about the next time you worked as a cooperating

1   witness.  Tell us about that.

2   A.   So in 2011, I was in a housing unit in Maricopa County,

3   and there was a individual that was coming up talking to myself

4   and another about soliciting -- basically wanting to know if we

5   knew of anybody that would kill his witness, his codefendant.

6   Q.   And what was the nature of your cooperation in that case?

7   A.   So I reached out to jail intelligence.  Obviously it was a

8   very serious thing, and there was a intelligence officer and a

9   sheriff's deputy that -- or I believe a detective that

10  interviewed me and stated that if he approached me again with

11  that that we would -- I would let him know that I had somebody

12  specifically, a guy by the name of Striker, as we called him,

13  and he could handle it if that's what he wanted done, and he

14  did.  He met with a detective twice on audio-video recording in

15  a video visit, and that was my cooperation.

16  Q.   Did you overhear the defendant making some threats to kill

17  another or hire somebody else to kill another?

18  A.   Those were made directly to me.  It wasn't a third party

19  at all.

20  Q.   Did you sign a cooperation agreement to testify?

21  A.   I did.

22  Q.   And did you receive any benefit?

23  A.   Yes.  I had a open range plea from three and a half to six

24  and a half years, and when I agreed to testify in that case,

25  they capped it at four years.

Hoops - Direct (Packard)                                    231

1    Q.    What year was that?

2    A.    That I signed the agreement?

3    Q.    That you were sentenced.

4    A.    It would have been -- I wasn't sentenced until 2017 in

5    that case because the matter hadn't went to trial yet.

6    Q.    And when were you actively cooperating on that case?

7    A.    2011.

8    Q.    In what jurisdiction?

9    A.    Maricopa County.

10   Q.    Thank you.  Anything else related to your cooperation?

11            THE COURT:  Counsel, I think most people know where

12   Maricopa County is, but Arizona; right?

13            THE WITNESS:  Yes, Arizona.

14            THE COURT:  Thank you.

15   BY MR. PACKARD:

16   Q.    Anything else about the 2011 case that you remember as far

17   as your cooperation?

18   A.    No.  I mean, they had -- at that time there were other

19   things discussed but nothing that -- it was more of, hey, just

20   be on the lookout for this.  There's a guy, you know, talking

21   about -- you know, basically telling somebody on the phone

22   don't show up to court type of deal, tampering with a witness,

23   and that was discussed at the time, but it was just a very

24   brief, hey, what -- around what time and day was that?  And

25   that would have been the extent.

1    Q.   All right.  Let's turn your attention to this case.  Do

2    you have any agreement with the government to testify in this

3    case?

4    A.   I do not.

5    Q.   Has the government made any promises to you in exchange

6    for your testimony?

7    A.   Not at all.

8    Q.   Has anybody threatened you to get you to testify in this

9    case?

10   A.   No.

11   Q.   Are you hoping that a sentencing judge on your case or

12   your cases will consider your participation in this case?

13   A.   I would hope so, I think, you know, at least somebody

14   seeing that I did some good along the way.

15   Q.   Has any state court prosecutor or government agent

16   promised you any benefit along the way for your participation

17   in this case?

18   A.   None whatsoever.

19   Q.   Did you actually experience the opposite?  You reached out

20   through your lawyer to see if there would be a benefit, and

21   that was rejected; is that fair?

22   A.   Well, just to keep the record straight, it was actually my

23   attorney kind of on his own steam.  It was like, "Hey, this guy

24   did something," and he reached out to the prosecution --

25   prosecution at the time, and he would -- would not entertain

Hoops - Direct (Packard)                                            233

1   any type of agreement.

2   Q.   And in spite of that happening, did you agree to speak

3   with law enforcement agents in this case?

4   A.   I did, and I was actually home at the time that I met with

5   them.

6   Q.   Were you interviewed by ATF investigators in this case?

7   A.   I was.

8   Q.   Did any of them promise you anything in exchange for your

9   talking to them?

10  A.   They did not.

11  Q.   All right.  Let's talk about the case itself.  In 2022,

12  did you spend time at the Scotts Bluff County Detention Center

13  in Gering, Nebraska?

14  A.   I did.

15  Q.   And during what time frame were you there?

16  A.   So it would have been approximately from April -- late

17  April of 2021 through the beginning of April of 2022, just

18  under a year.

19  Q.   And were you -- what charges were you there for?

20  A.   That would have been the unlawful possession of a firearm,

21  the drug charge, and the resisting charge.

22  Q.   And in April you bonded out; is that right?

23  A.   That's correct.

24  Q.   Describe the area where you spent most of your time at the

25  Scotts Bluff jail.

Hoops - Direct (Packard)                                    234

1    A.   So, you know, it's a little pod, just a small area.  It's

2    got -- golly.  I think there's six bunks, double bunks, so

3    there's a maximum of 12 people that can be in that pod, you

4    know, with -- it's open.  We don't have a area to lock down.

5    It's -- you know, you're just kind of there.  And there's two

6    toilet stalls, there's a shower, a couple sinks, and a TV and

7    stuff, and I think there's three tables in there for everyone

8    to sit and eat and play cards and such.

9    Q.   Are there surveillance cameras?

10   A.   There are.

11   Q.   When you went into the Scotts Bluff County Detention

12   Center in April of 2021, did you know anybody?

13   A.   I did not.

14   Q.   Did inmates come and go throughout that time that you were

15   there?

16   A.   Yes, lots of them.

17   Q.   Did you become familiar with some of the inmates that were

18   staying there as well in J pod?

19   A.   Yes.

20   Q.   Was one of those inmates named Ryan Rivera?

21   A.   That is correct.

22   Q.   And had you known Mr. Rivera before being in jail with him

23   together?

24   A.   Not at all.

25   Q.   How would you describe your relationship with Mr. Rivera?

1    A.    He's funny, and, you know, we have kind of a loose

2    friendship, I guess.  You know, when you're around people

3    24 hours a day, you can't help but, you know, take a better

4    attitude towards people that aren't constantly talking about

5    crime.

6    Q.    You and he are currently not incarcerated together; is

7    that right?

8    A.    That's correct.

9    Q.    When was the last time you saw Mr. Rivera in person?

10   A.    That would have been March of 2022.

11   Q.    And what was the status of your relationship back then in

12   March of 2022?

13   A.    Good.  I mean, we -- you know, my account -- my commissary

14   account was really negative because I had represented myself at

15   one point.  With copies and everything, it was three or $400 in

16   the red, so I put money on his account to be able to order

17   commissary and stuff like that.  We just kinda -- you know, we

18   made food together and hung out.

19   Q.    Can you explain to the jury what it means to have a

20   commissary account and how that -- how that's important in the

21   jail.

22   A.    Yeah.  So, you know, everybody's, I'm sure, got stories,

23   whether it's on TV or something, of the quality of food in

24   jails.  It's not always the best.  So, you know, they have a

25   commissary, which is a store for you to order various items off

Hoops - Direct (Packard)                                    236

1   the store to at least spice up the food and, you know, coffee

2   and such.  So we all do it, you know.  It's kind of a way,

3   especially if your account is negative for some reason, for you

4   to still be able to order from the store and use the phone and

5   such.

6   Q.   Did Mr. Rivera provide money to you for your commissary

7   budget?

8   A.   He did.  I mean, we all shared in there.  Honestly, we all

9   shared.  The defendant, all of us, we shared coffee.  We shared

10  food.  We just -- everybody kind of looked out for everybody.

11  Q.   And for purposes of what we're talking about now, I'm just

12  kind of focusing on Mr. Rivera.  Did he put -- let's see.  Did

13  you -- did he put money on your books?

14  A.   No, he did not.

15  Q.   But you put money on his books?

16  A.   Correct.

17  Q.   And that was typically after he'd ask for something.  Is

18  that generally how that would work?

19  A.   No.  So my ex-wife, you know, we were communicating

20  civilly at the time, and, you know, she was always asking me if

21  I needed money on my commissary, and I told her mine was so

22  negative that I'd either have it put on Ryan's or Dustin's

23  books on occasion.

24  Q.   Did you speak with Mr. Rivera on a daily basis while you

25  were housed together?

1   A.   I think it's fair to say I spoke with everyone on a daily

2   basis there, but yes.

3   Q.   Was one of the inmates that you were around back in

4   January through March of 2022 named Anthony Unocic?

5   A.   Yes.

6   Q.   And do you see him in the courtroom today?

7   A.   I do.

8   Q.   Could you point to where he's sitting and describe what

9   he's wearing.

10   A.   Yes.  A blue striped shirt.

11        MR. PACKARD:  I'll ask the record reflect the witness

12   has identified the defendant.

13        THE COURT:  The record so reflects.

14   BY MR. PACKARD:

15   Q.   How often would you speak with Mr. Unocic back in that

16   time frame of January to April 2022?

17   A.   Often, up and to literally the morning that he left.

18   Q.   What was your relationship like with him?

19   A.   We -- I was considering him a friend at that point.

20   Q.   Had you put money on his books?

21   A.   I had not.  You know, like I said, we kind of look out for

22   each other.  His mom was putting money on his account at one

23   point, and then I think her rent went up or something and he

24   didn't have money again, so I was kind of helping him out.

25   Q.   I'm going to -- I appreciate the addition that you're

Hoops - Direct (Packard)                                              238

1   giving, but I need you to just --

2   A.    Yeah.

3   Q.    -- listen to the --

4   A.    Sorry.

5   Q.    -- question that I'm asking and just answer that.

6   A.    Okay.

7   Q.    And we'll get through this a little quicker.

8   A.    Yeah.

9   Q.    You good with that?

10  A.    Absolutely.

11  Q.    All right.  Thank you.  Did he put money on your books?

12  A.    Not at all.

13  Q.    But you guys were friends throughout the time that he was

14  there; is that right?

15  A.    Correct.

16  Q.    And did that ever change?  Did you guys have any blowups

17  or flare-ups?

18  A.    None.

19  Q.    Did you guys get into any fights?

20  A.    No.

21  Q.    Did you have any beef with him?

22  A.    Not at all.

23  Q.    Did he have any beef with you?

24  A.    No.

25  Q.    Did you ever see Mr. Rivera get into it with him?

1   A.    Not at all.

2   Q.    Did Mr. Unocic divulge personal information to you about

3   his case?

4   A.    He did.

5   Q.    How about his life?

6   A.    He did.

7   Q.    About everything that was going on with him he talked to

8   you about; is that fair?

9   A.    Pretty thorough, yes.

10  Q.    Some of those conversations, did those happen in the

11  presence of Ryan Rivera?

12  A.    Yes.

13  Q.    Did he also write you some letters?

14  A.    He did.

15  Q.    When was the last time he wrote you a letter?

16  A.    It would have been, I believe, late March of 2021 -- or

17  sorry, 2022.

18  Q.    And what did he tell you in the letter?

19  A.    The first letter he was letting me know that they took him

20  to Wheatland and I believe a change of plea.  The second letter

21  was letting me know that he was back at Scotts Bluff but they

22  had moved him to -- I think it was L pod.

23  Q.    So at some point in time, he's transferred out of that

24  same pod that you're in; is that right?

25  A.    Correct.

Hoops - Direct (Packard)                                                     240

1    Q.    About when was that?

2    A.    He was -- it would have been the first or second week of

3    March.

4    Q.    Could you describe how that went down.

5    A.    So 5 a.m. all of a sudden they're telling Tony to roll up,

6    and, you know, we're all sleeping, but you can't help but wake

7    up.  It's a small area, you know.  He got up and the -- he made

8    some interesting statements that morning that were very

9    concerning.  He started giving away his property, which is

10   typically what we do if we're leaving a facility, 'cause you

11   can't take it with you, and as he was -- as he was leaving that

12   morning -- or as he was packing up his stuff that morning, he

13   said, "I wonder if I'm being rolled up 'cause somebody told on

14   me for wanting to kill somebody."

15   Q.    Did you and he have any exchange?

16   A.    Oh, yeah.  He actually left me his radio that morning.

17   I'm pretty sure I gave him a hug and I shook his hand, wished

18   him well, obviously with concerns.

19   Q.    Would it be uncommon for you and he to fist-bump during

20   that time that you stayed in the same pod?

21   A.    You know, it's definitely not uncommon.  I think almost

22   everyone in there does it at one time or another.

23   Q.    Did he show you paperwork on occasion in regards to his

24   own pending case?

25   A.    He did later on in -- I would say about two and a half

Hoops - Direct (Packard)                                    241

1    months into my stay there.

2    Q.    About what time frame?  If you could ballpark it.

3    A.    I would say at the beginning of March.

4    Q.    Of 2022?

5    A.    That is correct.

6    Q.    And how would that scenario happen where he's showing you

7    paperwork?  What happens?

8    A.    So they had recently changed the protocol for getting

9    legal mail.  So prior to that they would come into the pod and

10   have you sign for the legal mail.  They'd open it in front of

11   you, shake it out, make sure there was nothing in it.  They

12   changed that, so Tony had to go up to admin -- we all had to go

13   up to admin to get our legal mail starting at the beginning of

14   the year.  He had come back with legal mail, and it was a

15   motion of some sort.  It was towards a suppression hearing,

16   trying to suppress information in a case that he had pending at

17   the time.

18              THE COURT:  Do we have a time frame, counsel?

19   BY MR. PACKARD:

20   Q.    Can you give me the time frame of when this incident is

21   that you're talking about?

22   A.    Yeah.  It would have been the first week of March of 2022.

23   Q.    Was there more than one occasion where he would show you

24   paperwork related to his case?

25   A.    I don't believe so.  I think at one point he tried to pull

1    some stuff out, but I wasn't engaging in any of that at that

2    point.

3    Q.    Okay.  When you were testifying, you said "Tony."  Can you

4    tell me about that.

5    A.    You know, his first name is Anthony.  He goes by Tony, and

6    that's what we've always called him.

7    Q.    Does he look different in court today than he looked back

8    then?

9    A.    I wouldn't even have recognized him, honestly, without a

10   little bit of his facial hair.  He was bald when I saw him, and

11   he just had a little bit of -- I don't even know what you call

12   it on the chin.

13   Q.    Did he have glasses?

14   A.    Yes, and they were wraparound-type glasses, dark.

15   Q.    All right.  At some point in time, between January and

16   April when you were housed with Mr. Unocic, did you notice

17   anything about what he talked about with respect to his case?

18   A.    So almost immediately within the first week of me being in

19   that pod, the first week of January of 2022, he was making a

20   statement as we were walking and talking or sitting having

21   coffee about he was going to kill the person that put him in

22   here.  That was his exact words.

23   Q.    Did he identify who that was?

24   A.    Not initially, but he did later on, yes.

25   Q.    What other sorts of things was he saying early on in

Hoops - Direct (Packard)                                    243

1    January when you and he first get to know each other?

2    A.    You know, he was just talking about, you know, how, you

3    know, the system wronged him.  The ATF officer, as this was,

4    you know, going on, had -- I think the term he used was he was

5    green and, you know, that they jumped the gun, I think, was his

6    exact term in the bust that they did against him.

7    Q.    Was this statement in the context of Mr. Unocic talking

8    about his own criminal case?

9    A.    That's correct.

10   Q.    Did you come to learn that he had been charged with some

11   sort of offense related to firearms from the District of

12   Wyoming?

13   A.    Yes.

14   Q.    And that's why he was in custody?

15   A.    Correct.

16   Q.    Before Mr. Unocic talked about his case, had you had any

17   involvement or knowledge about that incident that he was

18   involved in?

19   A.    None whatsoever.

20   Q.    Had you ever met him before that time where you and he are

21   in custody together?

22   A.    Not at all.

23   Q.    All right.  So he says he's going to kill the person that

24   put him there.  Can you -- does that change over time?  Like,

25   does he add details?  Does he expound on that?

Hoops - Direct (Packard)                                          244

1    A.    He did.  I mean, there was a progression of it over the

2    course of three months that became quite scary.  You know, I've

3    met people in jails.  I met people in prison years and years

4    ago that they hold on to anger, and, you know, the majority of

5    people that say -- you know, the majority of people that say

6    that, they get out, and they lead a normal life.  They don't

7    expound on it.  It's a one- or two-time thing that they bring

8    up.  It's not a repetitive thing.  It's not in a planning

9    stage.  It's literally just drivel, as they say.  That wasn't

10   the case with Tony.

11   Q.    When you first heard him say he was going to kill the

12   person that put him there, what was your reaction?

13   A.    Speaking frank, I thought he was full of crap, and I

14   continued to believe that for quite some time.

15   Q.    About how long -- well, over the course of that time frame

16   of January to April, how many different times would Mr. Unocic

17   bring up the agent or the person that put him there and what he

18   was going to do?

19   A.    There was probably half of the actual time that I had been

20   there when he and I would speak where that was a subject, and

21   it was progressively getting worse.

22   Q.    So more than five times or less than five times over that

23   three to --

24   A.    More than five times.

25   Q.    Pardon?

1    A.    More than -- several more than five times.

2    Q.    More than ten times or less than ten times?

3    A.    More than ten.

4    Q.    More than 20 times or less than 20 times?

5    A.    It would have been more than 20.

6    Q.    So do you believe that on a daily basis Mr. Unocic was

7    talking about his own case and what he was going to do?

8    A.    Not every day.  I mean, I was there for -- I guess he

9    would have been there for three and a half or just under three

10   and a half months while I was there.  I would say roughly half

11   of that time, if I couldn't -- they say, you know, talk him off

12   the ledge, he was back to negative and about hurting and

13   killing this person.

14   Q.    Did it change?  Did your reaction change at some point

15   from you feeling like he was full of it to something other than

16   that?

17   A.    Absolutely.  Like I said, I thought he was full of crap.

18   I mean, you know, people lie.  They make up reasons why they're

19   there.  There's all kinds of, you know, things.  And in that

20   particular case, when he came back with his paperwork from his

21   lawyer and he slid it over the table at me, everything that he

22   had been telling me prior to that I now saw as being fact, and

23   it changed for me.  Because, you know, it's one thing for

24   somebody to be going on about, you know, I'm going to do this,

25   I'm going to do that, and, you know, what he did in his past

Hoops - Direct (Packard)                                         246

1    led me to believe at that point that he was very serious about

2    what he was going to do in the future.

3    Q.   At about what time frame was it that you remember this

4    change in your reaction for what you were perceiving?

5    A.   So it would have been, I believe, either the very last few

6    days of February or the early few days of March of 2022.

7    Q.   So what I want to do is take that in chunks.  I want to

8    ask you about before that time frame of late February.  Then I

9    want to ask you about the paperwork and how you felt, and then

10   I want to ask after the paperwork.  You follow me?

11   A.   Okay.  Uh-huh.

12   Q.   Let's talk -- is that a yes?

13   A.   Yes, it is.  Sorry.

14   Q.   Let's talk about the things that Mr. Unocic said leading

15   up to the time that he shows you paperwork.  What other things

16   did you hear him say about his case or Mr. -- or the person

17   that put him there?

18   A.   So early on in the communication that I was having with

19   Tony, you know, he was talking about, you know, how, you know,

20   this agent jumped the gun and, you know -- you know, he was

21   discussing at the time the current charge that he was there

22   for, which was relating to a silencer which he described as a

23   solvent trap, and how he was in the process of -- he had just

24   received it, but he had to work that day, and, you know, he

25   brought up the fact that there was a postal inspector that

Hoops - Direct (Packard)                                          247

1    actually made the delivery to him, had him sign for it.

2         So he took it back into his room, and he was living with

3    two other men at that time -- I guess they all kind of rent out

4    a place -- and that the ATF ended up coming to his workplace

5    and arresting him.  So he kept saying the fact that, you know,

6    it was still a solvent trap at the time, it wasn't -- it wasn't

7    drilled out, it wasn't -- I guess the little remaining spot

8    that needed to be drilled out so that a bullet would fire

9    through it had to be done, so he was still wanting to argue

10   that it was a solvent trap, that it was in no way, you know,

11   anything illegal.

12        And, you know, he told me about his truck.  It was kind of

13   set up like a little command center.  He had a little bed in

14   the back of his pickup with a camper shell, you know, radio

15   scanner, some special lighting, some other gear, you know,

16   related to that.  We discussed --

17        MR. REIMAN:  I'm going to object and ask that another

18   question be asked.

19        THE COURT:  Narrative.  Yeah.  Sustained.  Okay.

20   BY MR. PACKARD:

21   Q.   So it sounds like he was talking to you about his own

22   underlying case in Wyoming; correct?

23   A.   That is correct.

24   Q.   And did he say -- in connection with that did he express

25   anger, frustration, anything of the sort towards the law

Hoops - Direct (Packard)                                              248

1    enforcement officers that worked the case?  That's a yes-or-no

2    question.

3    A.    Yes.

4    Q.    All right.  So what I want you to focus on is what, if

5    anything, do you remember him saying about those individuals

6    that worked the case?

7    A.    So specifically the agent that worked the case he wanted

8    to kill, he wanted to blow up.  As he said directly to me, "I

9    am the type of guy that will walk up with a grenade, and I will

10   blow us both up."  He also said that he was trained in special

11   knife techniques, which he demonstrated at one or more times of

12   how he was also going to walk up and stab this agent to death.

13   Q.    What was his demeanor like when you remember him saying or

14   telling you that he was going to either blow up the agent with

15   a grenade or walk up and stab the agent?

16   A.    Animated and angry, both, and it was escalating pretty

17   quick from one day to the next.

18   Q.    Did he talk about any kind of special training that he had

19   prior to this time when you had seen the paperwork?

20   A.    Yes.  He talked about having some military training.  He

21   was very well-versed in explosives, combat training with

22   knives, and some type of -- I'm not sure what type of stick it

23   is, but it's a martial arts type of training as well, along

24   with these knives that he described which are -- the handle and

25   the blade curves around the knuckles so that it's -- I guess

Hoops - Direct (Packard)                                            249

1    it's hard to describe, but the blade would actually go up over

2    the knuckles in a semicircle.

3    Q.   So he's describing this blade to you?

4    A.   Yes.

5    Q.   And what's the context?  Why would he be describing a

6    blade to you?

7    A.   The blade that he was describing was a set of knives that

8    were in his possession at his house that he said when he was

9    released he was going to use that to kill the agent with.

10   Q.   Did he talk about the search of his own residence that

11   happened?

12   A.   He did.

13   Q.   Did he talk about whether -- what was found, what wasn't

14   found?

15   A.   He made it very clear.  He said that they missed a bunch

16   of stuff.  They missed some anarchist books on explosives and

17   making other items, the knives, you know, a box full of knives

18   and such.

19   Q.   Did he tell you what his role was in the military?

20   A.   He did not.

21   Q.   How would you describe his height?  Like, how tall was he?

22   A.   I'm five-eight or five-seven-ish.  I think we're about the

23   same height, maybe -- maybe....

24   Q.   Could you estimate his weight back then.

25   A.   I would say about 180 pounds.

1    Q.   And you had occasion to see him walk around the pod; is

2    that right?

3    A.   Correct.

4    Q.   Did you guys also have kind of a yard area for exercise

5    and so forth?

6    A.   We did.

7    Q.   Did Mr. Unocic bring up this agent and this case, that is,

8    his own Wyoming case, when you guys were out in the yard?

9    A.   Yes.

10   Q.   So that happened out in the yard and in the pod?

11   A.   That is correct.  And it's not really a yard, per se.

12   It's kind of a -- I'd say about a 25-by-20-foot little

13   contained area with a basketball hoop.

14   Q.   Based on your observations of Mr. Unocic's physical

15   abilities, did he look like somebody who could carry out the

16   things he was talking about doing?

17   A.   Absolutely.

18   Q.   Did he look like he had any physical limitations?

19   A.   None at all.

20   Q.   When he would talk to you about these things like blowing

21   up the agent, did it appear to you that he was understanding

22   what he was saying?

23   A.   Yes.

24   Q.   Why do you believe that?

25   A.   You know, he's a very intelligent person.  I've talked to

1    him and I'm -- you know, he talked about things outside of, you

2    know, murderous actions that were -- I know just from my

3    experience in life that were factual: mechanical stuff,

4    computer programming, you know, surfing the Internet, different

5    sites and stuff.  That was all stuff that he communicated on.

6    And like I said, when he was talking about that, killing an

7    agent, killing that agent, he was focused on it.  There wasn't,

8    you know, delusions of grandeur at that point.  That was a

9    dedicated action on his part to follow through with it.

10   Q.    Prior to early March did he talk to you about his training

11   with respect to explosives?

12   A.    Yes.

13   Q.    What did he say about that?

14   A.    That he had training in the military.  And also there was

15   an incident that he described, very detailed, to me.  Which

16   again, I took it as BS when he told me about an incident that

17   occurred in Colorado some years prior to that.

18   Q.    Did he go into detail about the Colorado incident?

19   A.    He did.

20   Q.    Did he say about when that had happened?

21   A.    It would have been maybe four or five years earlier than

22   his current offense at the time.

23   Q.    Could you estimate when that conversation was had when he

24   was telling you about the Colorado incident?

25   A.    Oh, he probably told me four or five times on the Colorado

1    incident.  It was kind of bragging, and like I said, I didn't

2    believe what he said at all, but it was very detailed in his

3    explanation.

4    Q.   At some point, you know, you said you thought it was BS;

5    right?

6    A.   Correct.

7    Q.   And at some point did that change?

8    A.   It did.

9    Q.   So let's talk about before that changed.  What would you

10   tell you -- or what did he tell you about the Colorado

11   incident?

12   A.   So he told me that he barricaded himself into a home or

13   some type of residence and that he had a flak jacket on or some

14   type of bullet vest and gear on, knives, and other things, that

15   he had booby-trapped the doors and windows with explosives

16   and --

17          MR. REIMAN:  Your Honor, I apologize for

18   interrupting.  I should go ahead and lodge my objections.  I

19   apologize I didn't do that sooner, but I'll do it now.

20          THE COURT:  On 403?

21          MR. REIMAN:  Yeah.  For the pretrial stuff we already

22   discussed.

23          THE COURT:  Okay.  All right.  And those objections

24   are noted and overruled --

25          MR. REIMAN:  Thank you.

1          THE COURT:  -- based on -- okay.  Based on 401 and

2   403, as I understand.

3          MR. REIMAN:  Thank you.  Yes, sir.

4          THE COURT:  You may proceed.

5   BY MR. PACKARD:

6   Q.   Mr. Hoops, you were testifying to what Mr. Unocic told you

7   about this Colorado incident, and you were talking about him,

8   that is, Mr. Unocic, saying he had booby-trapped the home in

9   some fashion; is that right?

10  A.   That's correct.

11  Q.   What other details do you remember Mr. Unocic telling you

12  about that?

13  A.   So he was talking about shooting at the police as well,

14  and again, I did not believe it because I'm thinking there's no

15  way this guy would even be out to be able to commit another

16  crime.  He's shooting at cops.  Explosives in the place that he

17  had barricaded himself into.  At one point he told me he was

18  engaged with them in a hallway, and he described having two

19  knives in his hand as he was going down through this hallway

20  confronting law enforcement head-on.

21  Q.   Did he talk about whether firearms were related to that

22  Colorado incident?

23  A.   Yeah.  He was specifically talking about firing a weapon

24  at police, shooting up inside and out of the residence at them.

25  Q.   And what's the context for this particular Colorado

Hoops - Direct (Packard)                                        254

1    incident coming up?  Are you egging him on?  Is he volunteering

2    it?  Is it something in between?

3    A.    You know, I don't egg on anyone.  I was writing children's

4    books at the time.  And his conversations, every time I would

5    try to steer them into positive things, he would go right back

6    into crime and things that he had done or were doing.

7    Q.    All right.  So at some point he -- things change.  You

8    didn't believe it, and then something changed; is that right?

9    A.    That's correct.

10   Q.    Tell us what changed and when that happened.

11   A.    So like, I believe, the end of February, the very early

12   part of March, within a few days of March, he had went up to

13   the admin and got legal mail, and when he came back, he slid or

14   handed a -- it was a motion along a suppression line to

15   suppress evidence in his case, and from the first page it

16   talked about Colorado.  It talked about explosives.  It talked

17   about barricading himself in.  It talked about shooting at law

18   enforcement in the residence.  It talked about knives.  I knew

19   at that moment that he was no longer joking.

20   Q.    How did you see that paperwork?

21   A.    He handed it to me.

22   Q.    Did you read it?

23   A.    I read -- I read probably the first page, maybe page and a

24   half at most, and realized that he was no longer full of shit.

25   I now had him in the -- pardon the -- I now had more of a

Hoops - Direct (Packard)                                             255

1    credible person that was going to cause harm to this agent.

2    Q.   What was his demeanor like when he handed you the

3    paperwork that you looked at?

4    A.   From the end of February, I would say, until he left, he

5    was pretty much filled with rage constantly.  It was very

6    unhealthy and it's just negative.  I mean, everybody's dealing

7    with their own stuff, but it was just negative, negative with

8    him all the time.

9    Q.   Did it appear to you that when he handed you the

10   paperwork, he was just kind of blowing off some steam such that

11   later he was able to calm down?

12   A.   No.  You know, I think we all have a way there of blowing

13   off steam.  We might work out.  We might, you know, write a

14   letter.  We might, you know, scream in the shower out in the

15   rec area.  This was not only a continuation, but it was getting

16   more violent in the details that he brought up, and he was

17   dedicated to carry that out.

18   Q.   Did you try to dissuade him from carrying out what he said

19   he was going to do?

20   A.   And this, I think, is what irritates me is I literally was

21   like, "Listen, guy, you've got things going when you get out.

22   Get some college, you know, get, you know, some things behind

23   you.  This wasn't -- you know, you've got an opportunity."  I

24   was actually the one -- and I don't know if I'm out of turn,

25   but I was the one that suggested that he sign his plea

Hoops - Direct (Packard)                                              256

1    agreement.  It was a good deal.  It was a fair deal.

2    Q.   So he trusted you enough for you to talk about those

3    weighty issues with him; is that right?

4    A.   Correct.

5    Q.   All right.  At any point in time when you were with him

6    and he was talking about these -- the Colorado incident or what

7    he was going to do, did he ever appear to be mentally confused?

8    A.   No, not at all.  He was very sharp and --

9    Q.   Thank you.  Was he ever under the influence of alcohol or

10   drugs?

11   A.   Not at all.

12   Q.   Did he ever seem like he was bragging about it?

13   A.   I don't know that "bragging" would be the correct term.

14   It was more of just a focused planning in what he was saying,

15   and it happens in jail.  You know, people go in, and it's

16   almost like their crimes are their credentials.  That was like

17   his credential of I'm serious and this is going to happen.

18   Q.   Did he identify the person that he was going to kill?

19   A.   He did.

20   Q.   And when did that come about?  What's the time frame?

21   A.   That would have been late January or early February.

22   Q.   So kind of from the beginning he's articulating who he's

23   going to kill; is that right?

24   A.   That is correct.

25   Q.   And who did he say he was going to kill?

1    A.    It is Officer Tug or Tubbs.  And I apologize.  I never

2    really got the one or the other.  It's....

3    Q.    Tug, as in T-U-G?

4    A.    Tug or Tub, yes.

5    Q.    So just so I'm understanding right, T-U-G or T-U-B,

6    something along those lines?

7    A.    Correct.

8    Q.    Did he ever waiver on that name of the person that he was

9    going to kill?

10   A.    No, not at all.

11   Q.    So it wasn't like just the ATF generally or police in

12   general; is that fair?

13   A.    There was no wavering.  He very much had one person, one

14   goal, and that was that agent.

15   Q.    Did he tell you about some specific plans that he had made

16   to accomplish this?

17   A.    So --

18   Q.    That's a yes-or-no question.

19   A.    Yes, he did.

20   Q.    And did he do so after he had shown you the paperwork, or

21   is this before showing you the paperwork?

22   A.    Well, well before.

23   Q.    Okay.  And what did he tell you about his specific plan?

24   A.    You know, I brought up the part about, you know, him

25   saying, you know, I'm the guy that will walk up with a grenade

Hoops - Direct (Packard)                                    258

1    and blow both of us up.  He was very adamant about his

2    expertise and being able to find people on the Internet, very

3    adamant about finding this agent's home and either attacking

4    him directly with his curved knives or creating some type of

5    explosive device to blow him and that agent up.

6    Q.    I mean, did it appear to you that he understood the

7    consequences of what he was saying?

8    A.    Yes.

9    Q.    And why do you think that?

10   A.    Because he made the statement to me, "Prison, if I survive

11   it, is my retirement plan."

12   Q.    Did he say why he felt this way?  What was his motive?

13   Did he talk about that?

14   A.    Yes, he did give a motive for it.  He said, you know,

15   after the -- after his arrest he lost his dog, he lost his

16   home, you know, valuables that he had within the home his

17   roommates were getting rid of.  He lost his job, which was a

18   huge thing for him, and also his truck was impounded at the VA

19   Hospital.

20   Q.    Did he have a motorcycle at the time?

21   A.    He did.

22   Q.    Did he talk about losing that as well?

23   A.    He did.

24   Q.    And was that a Harley-Davidson?

25   A.    No.  It's a Buell.

Hoops - Direct (Packard)                                          259

1    Q.    How do you spell that?

2    A.    B-U-E-L-L, I believe.

3    Q.    Did you and he talk about that?

4    A.    We did.

5    Q.    What kind of truck did he have?

6    A.    It was a Denali truck with a camper or a shell on it.

7    Q.    And is this something that he told you about?

8    A.    He did, yes.

9    Q.    You never went and saw his truck?

10   A.    No, I did not.

11   Q.    Did he ever make -- did he ever tell you that his plans

12   were conditional?  Like, "I'm only going to do this if this

13   thing happens"?

14   A.    No.  They were dedicated to "When I get out, I'm going to

15   kill that agent."

16   Q.    So it wasn't like he tells you, "If my case turns out

17   good, I'm not going to go after this person, but if it doesn't,

18   maybe I will."  Was there anything like that?

19   A.    None.  None whatsoever.

20   Q.    So this was a plan that was not conditional on anything;

21   is that fair?

22   A.    Yes.

23   Q.    Did he tell you about any kind of beef or conflict that he

24   had with this Agent Tub or Tug before his own Wyoming case?

25   A.    No.  This would directly relate to the Wyoming case.

Hoops - Direct (Packard)                                    260

1    Q.   Did you witness Mr. Unocic at any time directly

2    communicate what he was saying to the law enforcement Agent Tub

3    or Tug?

4    A.   No.

5    Q.   You never saw him writing out letters, getting on the jail

6    calls, stuff like that?

7    A.   No, not at all.

8    Q.   Did Mr. Unocic show you that he had a propensity to engage

9    in violence?

10   A.   He did.

11   Q.   How did he show you that?

12   A.   He showed me some moves with -- I don't remember whether

13   it was a pencil or a brush or something that was in his hand,

14   but he was showing me specifically the techniques and the moves

15   that he was trained in specifically talking about how he was

16   going to do that to the agent.

17   Q.   Did he talk about the equipment that he had to carry out

18   what he said -- what he was saying he was going to do?

19   A.   Yes.

20   Q.   And what equipment did he tell you he had in order to

21   carry this out?

22   A.   So I've never read *The Anarchist Cookbook*, but it's

23   definitely got -- based on the information that he's told me

24   and a few other inmates that --

25   Q.   I just want to know what he told you, not what you know or

1    others told you.

2    A.   Right.  What he told me specifically was that he had the

3    capability of building explosives to carry out that -- the

4    killing of the agent.  He told me that he had access at one

5    point to grenades because of his military background.  He did

6    tell me that because they screwed up and didn't take

7    everything, as he said, from where he was staying that he also

8    had access to a variety of knives and such as well.

9    Q.   Were you afraid for the agent at some point?

10   A.   Absolutely.

11   Q.   And when did that -- when did you feel that way?

12   A.   You know, I was leaning towards the end of February when

13   just the -- his posture changed.  I think he had received a

14   letter, termination letter, from his job and then that motion

15   that was sent in.  Just the anger and rage that he had, I felt

16   at that point that there was an absolute -- when he got out, he

17   was going to kill that agent.  It was a mission.  It wasn't a

18   statement.

19   Q.   Thank you.

20        MR. PACKARD:  Can I approach the witness?

21        THE COURT:  You may.

22   BY MR. PACKARD:

23   Q.   Mr. Hoops, your hands are shackled; is that right?

24   A.   They are.

25   Q.   I'm going to show you what's been marked as Exhibit 8A.

Hoops - Direct (Packard)                                                   262

1    Have you had a chance to view that?

2    A.    Yes.

3    Q.    I'm going to show you what's been marked as Exhibit 8B.

4    A.    Yes.

5    Q.    All right.  How do you recognize Exhibit 8A?

6    A.    I was the one that drew it.

7    Q.    Is that a true and accurate duplicate of a diagram showing

8    J pod as it would have appeared back between the time of

9    January and April of 2022, when you, Mr. Rivera, and Mr. Unocic

10   were in J pod?

11   A.    Yes.

12   Q.    And how did that Exhibit 8A come into being?  Did you draw

13   it yourself?

14   A.    I did.

15   Q.    And what was the context?  Why were you drawing it?

16   A.    So I would have drawn that.  I believe that would have

17   been October of 2022 at the federal building in Cheyenne,

18   Wyoming, at the request of the ATF agent that I was speaking

19   with at the time.

20   Q.    So an ATF agent from Denver had flown to Cheyenne to

21   interview you?

22   A.    Correct.

23   Q.    And you were there with your Nebraska defense lawyer?

24   A.    Uh-huh, yes.

25   Q.    Yes?

1    A.    Yes.

2    Q.    And you had agreed to talk to her about what you knew

3    about the case?

4    A.    I did.

5    Q.    And in the course of that conversation, you drew a diagram

6    of where people were in J pod?

7    A.    Correct.

8            MR. PACKARD:  I'd like to publish -- or offer

9    Exhibit 8A and publish that.

10            THE COURT:  Any objection?

11            MR. REIMAN:  No.

12            THE COURT:  Okay.  8A is received and you may

13    publish.

14    BY MR. PACKARD:

15    Q.    All right.  Is your signature and the date in the middle

16    there of the rectangle?

17    A.    Yes.

18    Q.    All right.  And what -- could you just describe for the

19    jury what we're looking at here.

20            MR. PACKARD:  And that was helpful to rotate that.

21    If you could do that, Kathy, please.

22    A.    Not my better drawings.  So this is the -- would be J pod

23    at the time that I was in it, and specifically I was just

24    giving kind of the four corners of that pod.  If you look up in

25    your top right corner, that says "Fred" and "Ryan" kind of at a

Hoops - Direct (Packard)                                      264

1    vertical, and then horizontally would be "Tony," and these are

2    representing our bunks.

3        On the bottom right corner would be my name and my bunk

4    location, the bathroom and the shower obviously to the other

5    side, an entrance -- and an office entrance, as well as on the

6    right side, top -- in front of -- or just below Tony's bunk

7    would be the table that we sat at all the time where most of

8    these discussions took place.

9    BY MR. PACKARD:

10   Q.   In the upper right-hand portion of this exhibit as it

11   appears on the screen, we'll say closest to the name Tony or

12   Ryan, you see those X's there.  What are those?

13   A.   So the "X" would be -- well, the "X" in the center is the

14   table.  The "X" to the right would be where I sat, and then it

15   looks like from the drawing there is a little circle with two

16   lines on that square with Tony's name in it, and that's where

17   Tony would sit.  He would actually sit on the edge of his bunk.

18   We'd just pull the table a little bit closer in lieu of a

19   chair.

20   Q.   And had you seen any kind of video surveillance from J pod

21   when you drew this?

22   A.   I had not.

23   Q.   And how did this come up in the context of the

24   conversation with the ATF agent interviewing you?

25   A.   The agent, I believe, at the time just wanted to know kind

 1   of the location that, you know, these conversations were taking

 2   place.

 3   Q.   And you had previously testified about Mr. Unocic making

 4   some gestures or motions; is that right?

 5   A.   That is correct.

 6   Q.   And did the ATF agent also ask you about those things?

 7   A.   Yes, she did.

 8   Q.   And did you describe what you remember seeing to her as

 9   well?

10   A.   I did.

11   Q.   And did this diagram help locate where things might have

12   happened when that demonstration of those gestures was being

13   made?

14   A.   Yes.

15   Q.   All right.  Let's move to the other diagram.  8B, that was

16   a second diagram.  Did you draw that?

17   A.   Yes.

18   Q.   And that was dated August 14, 2023?

19   A.   That is correct.

20   Q.   And was that in the course of you getting transported

21   from, what, Wyoming to Nebraska for this trial?

22   A.   Yes.  It was actually while I was in the jail there in

23   Cheyenne.

24   Q.   And is that a true and accurate duplicate of the diagram

25   that you drew depicting how J pod appeared between January and

1  April of 2022?

2  A.   Yes.  I don't see it on the screen, but it's the second

3  one, yes.

4            MR. PACKARD:  I'll offer Exhibit 8B and ask to

5  publish.

6            THE COURT:  Any objection?

7            MR. REIMAN:  No.

8            THE COURT:  8B is received and you may publish.

9  BY MR. PACKARD:

10  Q.   Is your signature and the date at the top of that exhibit?

11  A.   It is.

12  Q.   Is this just a little bit more detailed aerial diagram of

13  J pod?

14  A.   Yes.

15  Q.   And this was done in August of 2023, so about two years

16  after you were a resident there?  Or let's see.

17  A.   Would have been a year and a half.

18  Q.   Year and a half?

19  A.   Yeah.

20  Q.   Okay.  Any differences between this diagram and the other

21  that you recall?

22  A.   Yeah.  I put more detail on there, and I don't know if I

23  can elaborate on that but --

24  Q.   Let's focus on the lower right-hand corner there.

25  A.   Okay.

1          MR. PACKARD:  Thank you, Ms. Sump.

2     BY MR. PACKARD:

3     Q.   And what are we looking at there?

4     A.   So just a better diagram of where our bunks were located,

5     where the table was at, specifically where I sat, where he sat,

6     people in, you know, that vicinity that would have engaged or

7     heard the conversations.

8     Q.   Can you tell us, using this as a reference, where the

9     camera would have been capturing J pod.

10    A.   So I believe there's three cameras in there.  There should

11    be one, if I remember correctly, right above Ryan and Fred's

12    bunk.  There would have been one kind of in the center of the

13    pod, and then there's one over by the restroom.

14    Q.   And does "Tony" in this diagram refer to Anthony Unocic?

15    A.   Yes.

16    Q.   Thank you.  In the course of preparation for this case and

17    in being interviewed by the ATF, did you watch some jail

18    surveillance video?

19    A.   I did.

20    Q.   And did you see captured on video some of the conduct that

21    you've described in your testimony today?

22    A.   I did.

23    Q.   And I'm showing you what's been marked as Exhibit 10B.  Is

24    that a true and accurate duplicate of some of the video footage

25    from the jail taken March 3rd, 2022?

Hoops - Direct (Packard)                                    268

1   A.   Yes.

2   Q.   Around 8:20 p.m.?

3   A.   Correct.

4   Q.   And it's maybe five to eight minutes in length?

5   A.   Correct.

6   Q.   And what do you remember the context being to that

7   particular -- pardon me, that particular footage, March 3rd,

8   8:20 p.m.?

9   A.   That particular footage was Tony, Anthony Unocic, showing

10  me various techniques that he was going to use to kill that

11  agent.

12           MR. PACKARD:  I'll offer Exhibit 10B.

13           THE COURT:  Any objection?

14           MR. REIMAN:  Oh, I'm sorry.  No, Your Honor.

15           THE COURT:  Okay.  10B is received and you may

16  publish.

17           MR. PACKARD:  Ask to publish, please, 10B.

18           THE COURT:  And this has no audio; is that right?

19           MR. PACKARD:  That's right.

20  BY MR. PACKARD:

21  Q.   Officer --

22           MR. PACKARD:  You can pause it, please.  Okay.

23  BY MR. PACKARD:

24  Q.   Before we play this, we're using a VLC player, Mr. Hoops,

25  and we're at one second.  Can you just identify yourself and

1    Mr. Unocic, if you can.

2    A.    I'm in the lower center.  Anthony Unocic is -- would be to

3    the lower right-hand side sitting down on a bunk.

4    Q.    Do you see Ryan Rivera in this particular frame?

5    A.    I do.  He is up at the kiosk, which is a device where we

6    can have visits and order store commissary in the -- there's a

7    wall up there that separates the half wall from the bathrooms,

8    and he would be off to the right sitting down in front of that

9    screen.

10   Q.    So as we look at the screen, top right, the individual

11   there seated in a chair appears to be looking at the wall.

12   A.    Correct.

13   Q.    And that's a TV or a computer screen of some sort?

14   A.    It is.

15           MR. PACKARD:  Okay.  Thank you, Kathy.  You can play

16   it.

17       (A portion of Exhibit 10B was played.)

18           MR. PACKARD:  Could you pause right there.

19       We stopped it at 1:57.

20   BY MR. PACKARD:

21   Q.    What is Mr. Unocic talking about here?  Or first of all,

22   describe what you're seeing him do.

23   A.    So he's describing to me how -- when he engages with this

24   agent, knife techniques that he's going to use against him.  I

25   think if -- if you look a little bit before that, there's a --

Hoops - Direct (Packard)                                      270

1    he does kind of a quadrant split of the upper body, describing

2    kill points on the body.

3    Q.    Thank you.

4          (A portion of Exhibit 10B was played.)

5                THE COURT:  Counsel, does that conclude the playing

6    of that portion of the video?

7                MR. PACKARD:  Yes, Your Honor, that concludes the

8    presentation of Exhibit 10B.  I'd like to approach the witness

9    with an exhibit.

10               THE COURT:  You may.

11               MR. PACKARD:  9B, please.

12   BY MR. PACKARD:

13   Q.    Mr. Hoops, I don't know if this is on, but I'm going to

14   show you what's been marked as Exhibit 9B.

15         Have you had a chance to review Exhibit 9B?

16   A.    Yes.

17   Q.    Do you recognize what is shown in Exhibit 9B?

18   A.    I do.

19   Q.    Is this a collection of about 11 photographs?

20   A.    Correct.

21   Q.    And are these still images captured from the video we just

22   watched, Exhibit 9B?

23   A.    They are.

24   Q.    Are these still shots that were shown to you by Amanda

25   Schweiner when she interviewed you in October 2022?

Hoops - Direct (Packard)                                           271

1   A.   I think I saw the video.  I'm not sure if I saw the actual

2   still photos.

3   Q.   Do these photos appear to be true and accurate depictions

4   of what we just watched in the video?

5   A.   Absolutely.

6          MR. PACKARD:  I'll offer Exhibit 9B and ask to

7   publish just page 1.

8          THE COURT:  Any objection?

9          MR. REIMAN:  I'm going to object as it being

10  cumulative.

11         THE COURT:  That objection -- and you're just showing

12  page 1?

13         MR. PACKARD:  Yes, Your Honor.

14         THE COURT:  All right.  Overruled, and you may.

15  BY MR. PACKARD:

16  Q.   We're looking at page 1 of Exhibit 9B.  Is that your

17  signature?

18  A.   Yes.

19  Q.   And is that the date you looked at these still photos?

20  A.   Correct.

21  Q.   It's stills.  I'm not sure what it is, but this photo, you

22  looked at it on October 7; right?

23  A.   I did.  That one --

24  Q.   And that was at a federal building when you were being

25  interviewed by Ms. Schweiner?

1    A.    Correct.

2    Q.    And what was the context?  How were you being shown these?

3    A.    So it would have been after I had drawn the diagram of the

4    layout.  She asked me if I could identify them and exactly what

5    the context was of those still shots.

6    Q.    Did you -- when Mr. --

7              MR. PACKARD:  We're done publishing that exhibit.

8    I'm sorry.

9              THE WITNESS:  Thank you.

10   BY MR. PACKARD:

11   Q.    Let's look at Exhibit -- have you seen before trial some

12   video of Mr. Rivera other than what you've already talked

13   about?

14   A.    No.

15   Q.    Okay.  That's fine.  When you were housed with Mr. Unocic

16   between January and April, did you ever see any other inmates

17   try to avoid him because of what he was talking about?

18   A.    Yes, several.

19   Q.    Could you provide an example.

20   A.    So there was a guy by the name of Dustin that came and sat

21   down at our table as he was describing blowing up an agent --

22   the agent, and he got up and said, "I don't even want to be a

23   part of this conversation," and walked off.

24   Q.    Okay.  So you saw -- you heard these concerning things.

25   You just saw the video, and did you -- you never came forward

1    and, you know, called up your lawyer or called up the police

2    and said, "Hey, here's something I witnessed."  Is that fair?

3    A.    It was at the time, yes.

4    Q.    Okay.  And is there a risk involved when you inform on

5    another inmate?

6    A.    There's a lot of --

7    Q.    That's a yes-or-no question.

8    A.    It is, yes.

9    Q.    All right.  And how do you know this, that there's a risk

10   involved?

11   A.    I've seen death in jails and prison because of people that

12   come forward.

13   Q.    So how did you get involved as a witness in this case?

14   A.    At Ryan's -- at one point he reached out to his -- an

15   attorney, and his attorney had reached out to ATF.

16   Q.    And how did you feel about Rivera giving your name to his

17   lawyer?

18   A.    You know, it's always dicey but I -- you know, doing

19   what's right's not always popular.  I'll just say that.

20   Q.    Did agents come speak with you shortly after Mr. Rivera

21   told you that I gave -- that he gave your name to his lawyer?

22   A.    They did.

23   Q.    Did you know they were coming?

24   A.    No.

25   Q.    So they just show up at the jail, and they talk to you?

1    A.    Correct.

2    Q.    You didn't have time to get your stories straight or talk

3    with Mr. Rivera?

4    A.    No.

5    Q.    Did those agents that interviewed you promise you anything

6    in exchange for your talking to them?

7    A.    Not at all.

8    Q.    Did you and Mr. Rivera discuss the facts before you talked

9    to them?

10   A.    No.

11   Q.    Were you and Rivera interviewed back to back, same day?

12   A.    Yes.

13   Q.    It wasn't a situation where you're in a room and you and

14   Rivera are just kind of chatting about what happened; right?

15   A.    No, not at all.

16   Q.    You were alone in a room with ATF agents; is that right?

17   A.    Correct.

18   Q.    Did you have any visual aids with you?  Like, did you have

19   this video or police reports, anything like that?

20   A.    No, not at all.

21   Q.    Has anyone shown you any police reports related to this

22   investigation other than what you've already talked about

23   Mr. Unocic showing you?

24   A.    Not at all.

25   Q.    Have you read any news media accounts about what happened?

1    A.    No.

2    Q.    Have you discussed the facts of what happened between

3    January and April 2022 with Mr. Rivera since that time?

4    A.    No.  I -- I'll -- no.

5    Q.    Did you ever know the person that Mr. Unocic was

6    threatening?

7    A.    No.  I never met him.

8    Q.    Have you ever had any conflict in your life with somebody

9    named David Tubbs?

10   A.    No.

11   Q.    How about with the Wyoming ATF office?

12   A.    No.

13         MR. PACKARD:  May I have just a moment, Judge?

14         THE COURT:  You may.

15   BY MR. PACKARD:

16   Q.    Between January and April of 2022, did Mr. Unocic talk

17   about his work history?

18   A.    He talked about -- yes, he did.

19   Q.    What did he say as far as what previous occupations he's

20   had?

21   A.    So his previous occupation was with the VA Hospital, and

22   he didn't really go into detail on what he did there, but it

23   was -- as he said, you know, he described himself as unhireable

24   and that --

25         MR. REIMAN:  I'm going to object.  He's answered the

1   question.

2            THE COURT:  Okay.  Sustained.  You can go ahead.

3   BY MR. PACKARD:

4   Q.   Has Mr. Unocic talked about some sort of military

5   experience; is that right?

6   A.   That's correct.

7   Q.   Did he tell you what branch?

8   A.   He did not.

9   Q.   Did he tell you what his assignment was, if any, in the

10  military?

11  A.   What he did say was he talked about munitions and

12  explosives.

13  Q.   After he showed you the paperwork that he got in end of

14  February, early March, you said you believed what he said he

15  was going to do; is that right?

16  A.   Yes.

17  Q.   Did that change at any point in time until he left J pod?

18  A.   No, it did not change at all.

19  Q.   And why is that?

20  A.   Because it only escalated.  It only was getting worse.

21  His planning an execution of that agent was more detailed and

22  more exact.

23  Q.   These statements and actions made by Mr. Unocic happened

24  in Scotts Bluff County, District of Nebraska; correct?

25  A.   Yes.

```
 1                MR. PACKARD:  Thank you, Judge.  No other questions.

 2                THE COURT:  Very well.  Cross-examination,

 3    Mr. Reiman.

 4                MR. REIMAN:  Do you know when we're going to break?

 5                THE COURT:  In about 20 minutes.

 6                MR. REIMAN:  Okay.  I'll start, but at some point I'm

 7    going to need a break.  We need to retrieve some items from

 8    downstairs so I don't know if we want to do --

 9                THE COURT:  Do you need it before you start?

10                MR. REIMAN:  It would help if we did.

11                THE COURT:  All right.  Then we'll take our

12    midafternoon break at this point in time.

13         Ladies and gentlemen of the jury, we will take our

14    midafternoon break, and as I've instructed you before that

15    until this case -- until this case is submitted and you've

16    heard all the evidence, you're not to discuss the evidence or

17    the trial with anybody, including each other.

18         We'll take a 15-minute break at this time.  Thank you.

19         (Jury out at 2:26 p.m.)

20                THE COURT:  We're outside of the presence of the

21    jury.  Counsel, anything we need to take up?

22                MR. REIMAN:  No.

23                MR. PACKARD:  No, Your Honor.

24                THE COURT:  Okay.  Very well.  We'll break for

25    15 minutes, 2:40.  We stand in recess.
```

Hoops - Cross                                                              278

```
 1              (Recess taken at 2:26 p.m.)

 2              (At 2:45 p.m. on September 26, 2023; with counsel for the

 3    parties and the defendant present; WITHOUT the jury:)

 4              TRACY D. HOOPS, PREVIOUSLY SWORN, RESUMED THE STAND

 5                  THE COURT:  We're back on the record outside of the

 6    presence of the jury.

 7          Counsel, anything we need to take up before we get

 8    started?

 9                  MR. PACKARD:  No, Your Honor.

10                  MR. REIMAN:  No.

11                  THE COURT:  All right.  Very well.  Let's bring the

12    jury.

13          Mr. Hoops, there's water there if you want.  Do you need

14    water or anything?

15                  THE WITNESS:  No.  I'm good.  Thank you.

16                  THE COURT:  If you do, let us know, and we'll get it.

17                  THE WITNESS:  Okay.

18              (Jury in at 2:46 p.m.)

19                  THE COURT:  You may be seated.  Welcome back, ladies

20    and gentlemen.  When we broke, we were just ready to start

21    cross-examination.

22          If you're ready to go, you may do so, Mr. Reiman.

23                          CROSS-EXAMINATION

24    BY MR. REIMAN:

25    Q.   Mr. Hoops, I want to start in and jump back to that '97
```

Hoops - Cross                                                    279

1    cooperation that you spoke about on direct.  Okay?

2    A.   Yes.

3    Q.   Okay.  So did I catch that right that you were sitting on

4    a burglary, theft, and forgery charge; is that right?

5    A.   Yes.

6    Q.   In Arizona?

7    A.   Correct.

8    Q.   And so that theft and forgery is indicative to me that you

9    must have lied or stolen from somebody; is that correct?  You

10   deceived people; correct?

11   A.   Yes, I did.

12   Q.   You deceived people for your own benefit; is that correct?

13   A.   Yes, that's --

14   Q.   And in that case, though, you agreed to help the police;

15   is that correct?

16   A.   Yes.

17   Q.   And you were hoping, again, by telling on other people, to

18   benefit yourself; is that correct?

19   A.   That is correct.

20   Q.   And then again in 2011, you're in Arizona, Maricopa

21   County; is that right?

22   A.   Correct.

23   Q.   And it sounds like you were in jail and somebody made a

24   threat and you went to the police; is that correct?

25   A.   That is correct.

```
 1   Q.    And you agreed to -- and did you have to actually testify

 2   at that case?

 3   A.    No, I did not.

 4   Q.    Okay.  And again, that's the case that they actually

 5   signed you up to a cooperation deal on; correct?

 6   A.    That's correct.

 7   Q.    So you're looking up -- in that case I believe you said

 8   you were looking at up to six years in prison prior to your

 9   cooperation; is that correct?

10   A.    Correct.

11   Q.    That was, like, the first plea offer to you; is that fair?

12   A.    That was the final plea offer.  It was three and a half to

13   six and a half.

14   Q.    Okay.  And then once you cooperated, that lowered that

15   cap, then; is that correct?

16   A.    Correct.

17   Q.    Is it day for day in Arizona?

18   A.    It is not.

19   Q.    What's the good time law there in Arizona?

20   A.    It's 85 percent plus another three months for early

21   release.

22   Q.    Okay.  Now, currently -- you talked about a host of cases

23   that you're currently sitting on; correct?

24   A.    Correct.

25   Q.    Now I want to talk to you about this Nebraska case.  When
```

1    did you -- the Nebraska case is the unlawful possession of a

2    firearm; is that right?

3    A.    Correct.

4    Q.    And when did you pick that up?

5    A.    That would have been April, I believe around the 22nd, of

6    2021.

7    Q.    Okay.  So the case -- and that's still pending; is that

8    right?

9    A.    That is correct.

10   Q.    All right.  So April of 2021, you get charged with

11   possession of a firearm by a prohibited person; is that right?

12   A.    Yes.

13   Q.    That's a 1D felony; correct?

14   A.    Correct.

15          MR. PACKARD:  Objection.  Motion in limine.  Move to

16   strike.  Improper impeachment.

17          THE COURT:  Approach.

18      (At sidebar)

19          THE COURT:  What's violating the motion in limine

20   here?

21          MR. PACKARD:  The government moved in limine to

22   prohibit the defendant from getting into actual sentences

23   because they're prejudicial.  He's allowed to ask whether he's

24   got charges that expose him to significant prison time, but if

25   he's going to ask about a 1D felony and talk about how much

1    that specifically is, that was the reason I filed it in the

2    first place.  It's character impeachment evidence, and I'm not

3    aware -- I mean I wouldn't be able to ask my witnesses -- well,

4    strike that.  You've heard my argument, Judge.

5            MR. REIMAN:  He's sitting on a ton of time right

6    here, and he has to do -- he's going to be doing his best song

7    and dance to try to get this cut down and --

8            THE COURT:  That's proper impeachment.  There was

9    nothing in the motion in limine or the order on the motion in

10   limine that prohibits somebody from impeaching an individual

11   that's facing significant time in prison.

12      I'm not going to let you get going into adding up 50 years

13   and -- 50 or 40.  You can talk about what time he's facing and

14   the purposes for the impeachment.  We do that all the time.

15           MR. REIMAN:  While we're up here, then, he also

16   posted $25,000 bond on this case, and he failed to appear, and

17   now there's a warrant out for his arrest or at least a motion

18   pending at this point of $5,000.  I would also like to get into

19   that, and I think that's fair impeachment as well.

20           THE COURT:  How is that -- what does that have to do

21   with --

22           MR. REIMAN:  The Court found --

23           THE COURT:  Wait, wait.  What does that have to do

24   with if he cooperates?

25           MR. REIMAN:  It goes to his honesty.  He swore to a

Hoops - Cross                                                    283

```
 1   court that he would show up for court, and then he promptly
 2   violated that with $25,000 on the line.
 3              THE COURT:  Okay.  I will -- I mean, if we go through
 4   it but you don't have --
 5       Go ahead.
 6              MR. PACKARD:  So I think he was arrested on a
 7   warrant, and then he couldn't show up on it.
 8              MR. REIMAN:  Okay.  But I'm not --
 9              MR. PACKARD:  It's a prior bad act that is not
10   probative of truthfulness.  Failing to show up on a court date
11   when you can't appear, that doesn't mean you're not truthful.
12              MR. REIMAN:  I apologize.
13              MR. PACKARD:  That's okay.
14              THE COURT:  Fair enough.
15              MR. PACKARD:  But I'm not 100 percent on that.  I
16   can't say I'm sure about why that is.
17              THE COURT:  We're not going to go into that if that's
18   the reason he missed court.  I know he can explain that, but
19   I'm not going to let you go into that.  Is that the reason he
20   missed it?
21              MR. REIMAN:  I don't know.  Can I ask him if he --
22              THE COURT:  No.
23              MR. REIMAN:  Why he failed to --
24              THE COURT:  No, you cannot.  Okay?  And if you find
25   out later on -- if you find out later on that he missed it for
```

1    some other reason, then we'll come back and address it.

2              MR. REIMAN:  Okay.

3              THE COURT:  Okay?

4              MR. PACKARD:  Thank you.

5              THE COURT:  Let's go.  Come on, guys.

6         (In open court)

7              THE COURT:  The objection is overruled.

8         And you may proceed.

9    BY MR. REIMAN:

10   Q.   All right.  Mr. Hoops, you are -- that case in Nebraska is

11   in Cheyenne County; is that correct?

12   A.   That is correct.

13   Q.   Not to confuse that with Cheyenne, Wyoming, but Cheyenne

14   County; correct?

15   A.   Yes.

16   Q.   And where is the county seat for Cheyenne County?  Where

17   do you have court at on that?

18   A.   Sidney.

19   Q.   Sidney?  Okay.  Now, you were charged on that, and you

20   said this on direct, I believe, with resisting arrest; is that

21   right?

22   A.   Correct.

23   Q.   Possession of a controlled substance; is that correct?

24   A.   Correct.

25   Q.   That's a felony; right?

Hoops - Cross                                                         285

1    A.    Yes.

2    Q.    And possession of a firearm by a prohibited person; is

3    that correct?

4    A.    Correct.

5    Q.    Did you say there was a DUI tagged to that one or --

6    A.    I did not.

7    Q.    Okay.  I apologize.  I wasn't trying to pull a fast one on

8    you.  But at the very least, with that possession of a firearm,

9    you're looking at some pretty significant time; is that

10   correct?

11   A.    It's a 3 to 50.

12   Q.    It's a 3 to 50.  It's a 1D felony; correct?

13   A.    Correct.

14   Q.    And that three is a hard three; correct?

15   A.    Would you repeat that, please.

16   Q.    That three is a hard three; correct?

17   A.    What does that mean?

18   Q.    It's a mandatory minimum three years.  You don't get good

19   time or parole off of that three.

20   A.    I believe so, yes.

21   Q.    And that's still pending; is that right?

22   A.    That's correct.

23   Q.    Now, you don't have a cooperation deal on this case;

24   correct?

25   A.    I do not.

1    Q.   But I believe you said on direct that you are hopeful that

2    a prosecutor or a judge will at least take into account your

3    willingness to come in and testify; is that correct?

4    A.   That is correct.

5    Q.   So you have a big incentive to please the prosecutors in

6    this case; is that fair?

7    A.   No.

8    Q.   It's not going to hurt your feelings one bit that the

9    United States Attorney's Office writes a letter to your counsel

10   or your judge to let them know you did a good job?

11   A.   Repeat that please.

12   Q.   It's not going to hurt your feelings if this U.S. Attorney

13   lets the judge in Cheyenne know you came in and testified to

14   him; is that correct?

15   A.   Absolutely, it will not hurt my feelings.

16   Q.   Okay.  You're not going to tell him, "Please don't do

17   that."  Is that correct?

18   A.   That is correct.

19   Q.   I'm not trying to insinuate that he promised you to do

20   that.  He didn't tell you he was going to do that, or did he?

21   A.   He did not at all, ever.

22   Q.   Okay.  When we took our break, we showed you a video of

23   your interview; correct?

24   A.   Audio of it, I believe.

25   Q.   Audio.  Thank you.  I'm sorry.

1    A.    Yes.

2    Q.    On direct examination you discussed -- you talked about

3    numerous occasions that Mr. Unocic talked about killing the

4    agent; is that correct?

5    A.    That is correct.

6    Q.    Okay.  And however, let's get the time frame straight

7    here.  You had a meeting with law enforcement -- the first one

8    was in March of 2022; is that right?

9    A.    That is correct.

10   Q.    And I believe, let's see, there was two ATF agents there;

11   is that right?  Maybe -- yeah.  Two?

12   A.    Yes.

13   Q.    And was your attorney there?

14   A.    My attorney was not.

15   Q.    Okay.  And that was the first time that you spoke to law

16   enforcement about the threats Mr. Unocic made; is that right?

17   A.    Yes, it was.

18   Q.    Okay.  And they recorded that interview; is that right?

19   A.    That's correct.

20   Q.    Okay.  And in that interview -- in that interview they

21   specifically asked you over -- over these two and a half

22   months, how many times did the statements -- about how many

23   times did the statements about him killing Agent Tubbs come up,

24   and you told -- back on March 21st of 2022, you told two

25   federal law enforcement officers, you told them there was

1    probably three or four separate occasions; correct?

2    A.    And I firmly stand by that, yes.

3    Q.    Okay.  So is it your testimony that Mr. Unocic talked

4    about killing Agent Tubbs multiple times, or is it the three or

5    four occasions that you told federal investigators on

6    March 21st of 2022?

7    A.    Can I answer that completely?

8    Q.    No.  Which one is it?  Is it the multiple times, or is it

9    the three to four?

10         THE COURT:  No.  The witness can answer it

11   completely.

12   A.    Originally, he did not give me the agent's name.  It was

13   just a man.  A guy that put him in here he was going to kill.

14   I didn't get the pleasure of knowing an agent's name until

15   later on.

16   BY MR. REIMAN:

17   Q.    Oh.  So you were confused because you thought you were

18   just talking about -- back on March 21st, when they asked you,

19   "How many times did Mr. Unocic talk about killing Tubbs," you

20   thought, oh, that -- just three to four with Tubbs; is that

21   right?

22   A.    I took it as specifically when he was talking about Agent

23   Tubbs by name.  Yes, that's exactly what I did.

24   Q.    Okay.  But you did -- so you thought -- so you thought

25   Mr. Unocic was talking about killing other agents during these

1    multiple occasions that he kept bringing this up.  Is that what

2    you're saying?

3    A.    Incorrect.

4    Q.    Because he only said the name Tubbs, you limited it to --

5    you limited it on March 21st to the times he only said the name

6    Tubbs.  Is that how you're differentiating it today?

7    A.    I limited it to exactly what they asked me relating to the

8    agent, yes.

9    Q.    Okay.  And so you didn't disclose to them the other dozens

10   and dozens of times that he talked about killing this agent

11   because he didn't specifically say the name Tubbs; is that what

12   you're saying?

13   A.    I -- asked and answered.  Yes.

14   Q.    Yes?  Okay.  Thank you.  You described Mr. Unocic as a

15   crazy guy; is that right?

16   A.    I originally said that I felt he was crazy based on what

17   he was saying, yes.  Specifically, I believe I said he was full

18   of shit.

19   Q.    Okay.  Thank you.  And I believe on direct you said that

20   you have -- you have experienced other inmates discuss harming

21   people outside also; is that correct?

22   A.    Repeat that, please.

23   Q.    Have you heard other inmates talking trash about what

24   they're going to do when they get out, harming people, or did I

25   misunderstand that on direct?

Hoops - Cross                                                              290

1    A.    In the last 28 years, yes, I've heard people make comments

2    about -- usually I'm going to beat the crap out of or I'm going

3    to -- something.  It's never been that type of detail, no.

4    Q.    Okay.  And the detail was, let's see, he talked about --

5    you said he had a plan; is that right?

6    A.    Correct.

7    Q.    Well, the plan sounds like it changed by whichever day you

8    were talking to him; is that fair?

9    A.    No.

10   Q.    Well, how was he going to blow him up?  Did he have a plan

11   how he was going to blow him up with a grenade, plant

12   explosives under his car, stab him with these knives?  What was

13   this grand plan he had, the specific plan he had to do all

14   three things to this agent?

15   A.    I don't believe it was all three things.  I think there's

16   a term called opportunity.  He was looking for the right

17   opportunity once he engaged on where he lived.

18   Q.    So what was the specific plan?  Which was the form of

19   death that he relied on, since you said it was a specific plan?

20   A.    I can only go off what he told me.  There were two or

21   three different types of ways he was going to kill the agent.

22   Q.    You also indicated that -- did you say that Mr. Unocic

23   told you that the agents had missed items in his home?

24   A.    Yes.

25   Q.    And you let the agents -- when you interviewed with law

1    enforcement, you let the agents know that; is that correct?

2    A.    Yes.

3    Q.    Did Mr. Unocic tell you that he still had -- he's told you

4    that he still had weapons in the home; is that right?

5    A.    He wanted me to store them in my shed behind my home, yes.

6    Q.    Okay.  You guys were friends, which brings up another

7    point, this motorcycle.  You guys almost entered into a

8    business type of transaction with this motorcycle; is that

9    right?

10   A.    That is correct.

11   Q.    Did he want you to sell that or -- you were going to use

12   that as a loan to get some money for your own bond.  Was that

13   the deal?

14   A.    No.  It was actually -- I got a civil suit on one of my

15   land development deals in Cheyenne, Wyoming, and because Tony's

16   mom could no longer put money on his account, he wanted to do

17   something with the motorcycle but still have an opportunity to

18   have the motorcycle when he was released.  We had talked at one

19   point -- and there should be on a video us shaking hands --

20   that I had somebody that would hold that in loan money not only

21   to him, but also to my civil lawsuit attorney, Robert

22   Spencer -- or sorry, Spence.

23   Q.    Okay.  So you were going -- so, I'm sorry, I didn't

24   follow.  You were going to use the motorcycle as collateral for

25   money?

1   A.   At one point, yes.

2   Q.   Okay.  And that fell through; is that correct?

3   A.   No.  When he wrote me, that was still the plan.  I

4   actually told my wife to stop communicat- -- or ex-wife,

5   sorry -- stop communicating with his friend Tina, that just

6   things were not good about him.

7   Q.   Okay.  So when did you call it off that you weren't going

8   to get into this business deal with him?

9   A.   I'm not sure.  It was somewhere along the lines of when --

10  after he got his thing from his attorney showing in detail the

11  stuff that he had told me in the past was factual.

12  Q.   Okay.  And it sounds -- from your direct testimony it

13  sounds like Mr. Unocic became more fervent about wanting to

14  harm the agent as time progressed; is that correct?

15  A.   That is correct.

16  Q.   And it sounds like he was getting police reports at that

17  time; is that correct?

18  A.   No.  It was not police reports that led that, and I

19  believe I stated that on direct.

20  Q.   I apologize.  I misstated it.  Something about a motion to

21  suppress?

22  A.   That is correct.

23  Q.   And so he was going through that; is that correct?

24  A.   That is correct.

25  Q.   And at the time you said he was get- -- Mr. Unocic was

Hoops - Cross                                                        293

1    getting -- he had a lot of rage and hate; is that right?

2    A.    Yes.

3    Q.    And at the time you were trying to stay busy writing

4    children's novels; is that correct?

5    A.    That is correct.

6    Q.    And so when you weren't writing children's books, you were

7    giving Mr. Unocic legal advice; is that correct?

8    A.    Some legal advice, absolutely.

9    Q.    You looked through his reports and encouraged him to take

10   a plea deal; is that correct?

11   A.    I looked at that singular suppression, and yes, I also --

12   if I can answer completely.

13   Q.    No.  That's okay.

14   A.    Okay.

15   Q.    So you advised him to take a plea deal after examining the

16   case on a motion to suppress; is that a fair statement?

17   A.    And based on conversations with him, absolutely.

18   Q.    Okay.  Now, do you have any -- did you receive any

19   training in the law when you weren't writing children's books?

20   A.    You know, I've been through enough stuff in my life

21   I've -- I guess I went through the school of hard knocks.

22   Q.    Okay.  And through this school of hard knocks and dealing

23   with the criminal justice system, you have learned about

24   cooperating, and people who cooperate oftentimes get a lower

25   sentence; is that correct?

Hoops - Cross                                                    294

1    A.    Not based on what happened in the past, absolutely not.

2    Q.    You -- based upon your experience, you've certainly seen

3    people who have agreed to cooperate get lower sentences; is

4    that a fair statement?

5    A.    It is.

6    Q.    Did you say -- was Rivera there?  You know Mr. Rivera;

7    correct?

8    A.    Yes.

9    Q.    Okay.  And was Mr. Rivera in the same pod as you and

10   Mr. Unocic during that January to April time frame?

11   A.    He was.

12   Q.    And did he also hang out with you guys often?

13   A.    I wouldn't say "often."  He was on the kiosk and watching

14   TV a lot.  But several times, I will say.

15   Q.    Okay.  Did Mr. Unocic -- you said he talked about his dog;

16   is that correct?

17   A.    That is correct.

18   Q.    Is it your understanding that was a service dog?

19   A.    It was -- I don't believe I said that anywhere.

20   Q.    Okay.  You said his anger grew -- we already talked about

21   that -- when this motion to suppress came up, but I think you

22   also indicated that that was about the same time he got -- did

23   he get a letter of termination from the VA or something along

24   those lines?

25   A.    He did.

1   Q.   Okay.  And after he got those letters, his anger became

2   more pronounced?

3   A.   That is correct.

4   Q.   Okay.  Now, do you know Agent Tubbs?

5   A.   I do not.

6   Q.   Have you ever met him?

7   A.   No.

8   Q.   Is Agent Tubbs on your case?

9   A.   No.

10  Q.   When Mr. Unocic is making these statements, did he ask you

11  to tell Agent Tubbs about these death threats?

12  A.   Obviously not, no.

13  Q.   Okay.  Did he in any way indicate to you that he wanted

14  Tubbs to learn about this threat?

15  A.   No, absolutely not.  That's generally not how it works.

16  Q.   Okay.  Well, okay.  Absolutely not.  So it's a fair

17  assessment based upon your answer that it was at least your

18  impression that Anthony Unocic didn't want you to tell anybody;

19  is that correct?

20  A.   Absolutely.

21  Q.   Okay.  So he wasn't saying this, at least from your

22  perspective, to try and scare an agent; is that correct?

23  A.   I don't understand the question.

24  Q.   Well, I mean, if he doesn't -- if he's not trying to get

25  word to Agent Tubbs, he's not saying these things to try and

1    intimidate somebody, then, is he?

2    A.    He's saying these things as the intimidator to go out

3    there and do it himself.

4    Q.    So you believe when he was saying this, he was sincere;

5    correct?

6    A.    Absolutely.

7    Q.    So he wasn't saying this to scare somebody.  He meant it

8    is what you're telling me.

9    A.    He was going to carry that out.

10   Q.    Okay.  So therefore, the last thing -- at least from your

11   perspective, the last thing Anthony Unocic wanted you to do was

12   convey these messages to the agent; is that fair?

13   A.    That is correct.

14          MR. REIMAN:  Okay.  May I have one second?

15          THE COURT:  You may.

16   BY MR. REIMAN:

17   Q.    From January 1st through April of 2022, did Anthony Unocic

18   ever ask in any way for you to help him carry out this plan?

19   A.    He did not.

20   Q.    Did you ever see Anthony Unocic or overhear Anthony Unocic

21   on the telephone to somebody talking about these threats with

22   anybody?

23   A.    I cannot say for sure.

24   Q.    Okay.  Did you ever see Anthony Unocic writing a letter to

25   Agent Tubbs letting him know what he was going to do to him?

```
1    A.    I know he was writing some dangerous letters.  I don't
2    know who they were addressed to.
3    Q.    Okay.  And you don't know Agent Tubbs; correct?
4    A.    I do not.
5    Q.    You've never spoken to Agent Tubbs?
6    A.    No.
7    Q.    And in your conversations with Mr. Unocic, you didn't lead
8    Mr. Unocic to believe that you had some way of contacting Agent
9    Tubbs, did you?
10   A.    I believe I answered that, but no, I did not.
11   Q.    Okay.  Thank you.  You're right.  I'm repeating myself so
12   I'll be quiet.  Thank you.
13            THE COURT:  Thank you.
14        Counsel, redirect.
15                        REDIRECT EXAMINATION
16   BY MR. PACKARD:
17   Q.    Mr. Hoops, you were asked about your initial interview
18   with ATF agents.  Do you remember those questions?
19   A.    Yes, I do.
20   Q.    And was that the very first time that you were interviewed
21   about what you had witnessed?
22   A.    It was.
23   Q.    And was that -- if I told you that it was March -- around
24   March 18 or March 21 that agents came to Scotts Bluff County,
25   would you have any reason to quarrel with that?
```

1    A.    No.

2    Q.    So within days or weeks of you hearing these things,

3    they're at the jail talking to you about them; is that right?

4    A.    Yes.

5    Q.    Did you have a chance to talk with your defense lawyers

6    about what you should say or how you should handle that?

7    A.    No.

8    Q.    Did anybody show you any materials, whether video or

9    reports, before they talked to you?

10   A.    Not at all.

11   Q.    And you didn't know they were coming?

12   A.    Like I -- I -- I literally thought I was going up front to

13   either get legal mail or a legal phone call, so it kind of --

14   it was a surprise.

15   Q.    So at most you knew that Rivera had given your name to his

16   defense lawyer?

17   A.    That's correct.

18   Q.    Right?  That's it.  Nothing else?

19   A.    No.

20   Q.    And it was during that interview that you say on three to

21   four separate occasions, Mr. Unocic had threatened to kill

22   Agent Tubbs; is that right?

23   A.    That is correct.

24   Q.    You didn't come forward to police; is that right?

25   A.    I did not.

1    Q.   So Mr. Reiman's asking you about you knowing about

2    cooperation and how you can come forward and get your deal.

3    You never came forward for your deal.  They came to you; is

4    that right?

5    A.   That is correct.

6    Q.   You could have said, "Sorry.  I'm not talking to you."

7    Right?

8    A.   That is correct.

9    Q.   You had no deal, no promise; right?

10   A.   No, and no lawyer either.

11   Q.   You have the -- is that right?

12   A.   Correct.  I didn't have my lawyer either.

13   Q.   And you have the experience from your lifetime of being in

14   prison, and you know what happens to snitches; right?

15   A.   There's -- yes, I do.

16   Q.   And in spite of all of that, you tell them what you tell

17   them; right?

18   A.   I did.

19   Q.   You were asked questions about encouraging Mr. Unocic to

20   take a plea agreement.  Who came to who for advice?

21   A.   He came to me.

22   Q.   And what exactly did you do when he asked you for advice?

23   A.   You know, I --

24   Q.   Just in short form, in summary.

25   A.   In short, I gave him advice based on my knowledge of life.

1    I mean, he had me look up some things about a solvent trap.

2    There were 11 cases, all of them were bad, and I gave him the

3    advice as I saw it.  Take the plea.  It's a good opportunity to

4    restart your life.

5            MR. PACKARD:  Thank you, Judge.  I don't have any

6    other questions.

7            THE COURT:  All right.  Very well.  May this witness

8    be excused?

9        From the government.

10           MR. PACKARD:  Yes, Your Honor.

11           THE COURT:  And from the defense.

12           MR. REIMAN:  Yes, Your Honor.  Thank you.

13           THE COURT:  All right.  Mr. Hoops, you are excused.

14    Thank you.

15        And the government may call its next witness.

16           MS. FLIAM:  It'll be Amanda Schweiner, Your Honor.

17           THE COURT:  Ladies and gentlemen, you may stand and

18    stretch, if you wish to for a moment, while the witness is

19    coming.

20        Ms. Schweiner, if you'd come forward.  Take a seat at the

21    witness stand.  Whoops.  Sorry.

22        You need to call your witness.

23           MR. PACKARD:  The government calls Amanda Schweiner.

24           THE COURT:  Now you can come forward.

25        If you'd have a seat at the witness stand, please.

Schweiner - Direct (Packard)                                                301

1          Take a seat and make yourself comfortable, and we'll have

2     you sworn as a witness.

3               THE WITNESS:  Thank you, Your Honor.

4               COURTROOM DEPUTY:  Please state and spell your name

5     for the record.

6               THE WITNESS:  Amanda Schweiner.  That's A-M-A-N-D-A,

7     S-C-H-W-E-I-N-E-R.

8               COURTROOM DEPUTY:  Please raise your right hand.

9          AMANDA SCHWEINER, PLAINTIFF'S WITNESS, SWORN

10              THE COURT:  Very well.  You may inquire, counsel.

11                         DIRECT EXAMINATION

12    BY MR. PACKARD:

13    Q.   How are you this afternoon, Ms. Schweiner?

14    A.   I'm doing good, thanks.

15    Q.   What's your role in this investigation?

16    A.   So I was the case agent on the case.

17    Q.   And are you familiar with Mr. Unocic?

18    A.   Yes, I am.

19    Q.   And have you met him in person before?

20    A.   Yes.

21    Q.   Could you identify him in court, please.

22    A.   He's sitting at the defense table.

23    Q.   How is he dressed?

24    A.   In a plaid shirt, blue and black.

25              MR. PACKARD:  I'll ask the record to reflect the

1    witness has identified the defendant.

2            THE COURT:  The record so reflects.

3        I want to go back.  She says she was the case agent on

4    this case.  We've talked about two or three different cases.

5            MR. PACKARD:  Yes, Your Honor.

6            THE COURT:  She was the case agent on which case?

7    Just a moment.  Okay.

8    BY MR. PACKARD:

9    Q.   All right.  Ms. Schweiner, which case were you the case

10   agent for?

11   A.   Yes.  Sorry.  To clarify, I was investigating the threats

12   case made against the agent.

13   Q.   Thank you.  And what field office were you working out of?

14   A.   I was in Denver, Colorado.

15   Q.   Were you considered a federal law enforcement officer at

16   the time?

17   A.   Yes.

18   Q.   And what were your duties?

19   A.   To investigate federal crimes.  Specifically, my agency

20   likes to focus on firearms investigations, explosives, arson,

21   firearms trafficking, things like that.

22   Q.   And had you received training to work in that role?

23   A.   Yes.

24   Q.   Were you called a special agent?

25   A.   Yes.

Schweiner - Direct (Packard)                                    303

1   Q.   And you'd gone through the academy?

2   A.   Correct.

3   Q.   And just give the jury a general brief idea of what

4   training you received.

5   A.   Yeah.  So our academy's about six months.  The first half

6   focuses on just federal criminal investigation, and then the

7   second half we focus on agency-specific training.  So ATF,

8   focusing on how to investigate firearms, arson, explosives,

9   things like that.

10  Q.   Have you worked at other ATF field offices other than

11  Denver?

12  A.   Yes, I have.

13  Q.   What others?

14  A.   I worked in New York City, and I worked on a Texas-Mexico

15  border town for a few years.

16  Q.   Have you assisted Wyoming before on cases?

17  A.   I have.

18  Q.   And they -- people from their office assisted you in cases

19  you have going on in Denver?

20  A.   Yes.

21  Q.   And is that common, for different field offices to pitch

22  in and help others?

23  A.   Yes.  Specifically, smaller offices might need extra

24  agents to carry out certain operations.

25  Q.   Have you since retired from the ATF?

Schweiner - Direct (Packard)                                        304

1    A.    I have.

2    Q.    And when was that?

3    A.    That was the end of February this year.

4    Q.    And what do you do now?

5    A.    I'm working on projects involving victims advocacy and

6    stuff like that.

7    Q.    Did you leave the ATF in good standing?

8    A.    I did.

9    Q.    And how long in total did you work for the ATF?

10   A.    About nine and a half years.

11   Q.    Were you a certified law enforcement officer during the

12   time that you worked for the ATF?

13   A.    Yes, I was.

14   Q.    All right.  Let's jump right into this case.  How did you

15   familiarize yourself with it?

16   A.    So my supervisor informed me about it, and so that's kind

17   of how the case came to me.

18   Q.    And about when was that?

19   A.    That was in March.

20   Q.    Of 2022?

21   A.    Of '22, yeah.

22   Q.    You don't have a specific day when somebody said,

23   "Ms. Schweiner, you're handling this"?

24   A.    I don't remember the exact date off the top of my head.  I

25   think it was towards the end of the month, though.

Schweiner - Direct (Packard)                                            305

1    Q.    And what information did you have?

2    A.    Basically that there was an agent in Wyoming who had

3    worked a case and that defendant was making threats against

4    them, and so I needed to investigate it.

5    Q.    Were you in the Denver office at the time?

6    A.    Yes.

7    Q.    And so your supervisor relays this to you verbally, which

8    triggers your involvement?

9    A.    Uh-huh.

10   Q.    Yes?

11   A.    Yes.

12   Q.    And is this kind of threats case something that you are

13   accustomed to investigating at the time?

14   A.    No.  This was actually my first.

15   Q.    So a lot of the cases you're working on involve firearms,

16   explosives, arson, things like that; is that right?

17   A.    Correct.

18   Q.    Why is it that you were assigned to investigate when

19   you're in Denver and the alleged threats happened in Nebraska?

20   A.    As far as I know, they -- you know, it all transpired up

21   in Wyoming/Nebraska, and it was determined, to investigate it,

22   they wanted kind of somebody who was removed from those offices

23   to start looking into it so....

24   Q.    Did you receive specific information about the nature of

25   the threat?

1    A.    Yes.

2    Q.    And what was specifically conveyed or said or

3    communicated?

4    A.    Basically that there --

5    Q.    Before you say --

6    A.    Sure.

7    Q.    The question is whether you received that.

8    A.    Oh, yes.

9    Q.    And was that information important for your investigative

10   steps?

11   A.    Yes, it was.

12   Q.    Did that help direct you or inform you as to what to do

13   next, who to talk to, what evidence to gather?

14   A.    It did.

15   Q.    And is it part of your training and experience to gather

16   as much information from the beginning that you can about the

17   allegation?

18   A.    Yes.

19   Q.    Did you do that here in this case?

20   A.    Yes.

21   Q.    And who did -- as far as names of individuals, who did you

22   receive information from?

23   A.    I received information starting with agents in the Wyoming

24   office, so Special Agent Kyle LaTulippe and Crystal -- I can't

25   remember her last name at the moment, but information started

Schweiner - Direct (Packard)                                    307

1    with them as well as Russell Sparks with the U.S. Secret

2    Service, and that's kind of where I received the beginning of

3    the information for this case.

4    Q.    Did you speak with each of those individuals in person?

5    A.    I spoke with Kyle and Crystal in person as well as Agent

6    Tubbs.  I forgot about him.  But Russell and I spoke on the

7    phone.

8    Q.    Could you spell LaTulippe?

9    A.    I can try.  L-A-T-U, I believe, like, L-I-P-P-I-E or E,

10   something like that.  It had a very French spelling.

11   Q.    And with respect to who these people are, Mr. LaTulippe

12   and Ms. Crystal, they're the ones that went out and interviewed

13   inmates right off the bat; right?

14   A.    Yeah.  They responded initially to this threats -- the

15   threats that were made.

16   Q.    Same thing with Russell Sparks, he goes out right away and

17   interviews Mr. Rivera?

18   A.    Yes.

19   Q.    And then Agent Tubbs, you had some communication with him?

20   A.    Yes.

21   Q.    Had you had any dealings with him before this

22   investigation?

23   A.    I met him once or twice just when our offices kind of

24   traded off agents who needed to help out on cases so...but,

25   yeah, I've met him before.

1    Q.   And did you learn about his underlying investigation in

2    Wyoming related to firearms crimes?

3    A.   Yes.  I played a role in that.

4    Q.   What was your role in that Wyoming investigation?

5    A.   Yeah.  So at the time I was injured.  I'd torn a bunch of

6    tendons in my ankle, so I was in this big boot.  So they just

7    kind of needed some manpower to help with the search warrant,

8    so I was present with the search warrant in kind of a limited

9    capacity so....

10   Q.   And the search warrant, what are you talking about?

11   A.   For the initial case that Agent Tubbs was working into the

12   defendant for the suppressor-type case.  Again, I wasn't really

13   involved in it.  Kind of just brought on day-of thing.  Hey,

14   we're going to do a search warrant, sit down and help take

15   inventory.  So I kind of wasn't super involved in knowing the

16   logistics of that.

17   Q.   Did you participate in execution of that search warrant of

18   Mr. Unocic's residence on November 2, 2021 --

19   A.   Yes.

20   Q.   -- in Cheyenne, Wyoming?

21   A.   Yes.

22   Q.   And your role was to inventory property?

23   A.   To just help.  I think all I did that day was take a log,

24   you know, when agents would bring stuff up, just kind of write

25   down what it was.

1      THE COURT:  I need to have you slow down a little bit

2   for my court reporter, please.

3      THE WITNESS:  Oh, sure thing.  I'm sorry.

4   BY MR. PACKARD:

5   Q.   So your job was to write down property that was seized?

6   A.   I'm sorry.  Can you say that again.

7   Q.   What was your job?  What were you doing?

8   A.   I was keeping a log of items that were brought forward

9   from a result of the search.

10  Q.   Okay.  And this, again, was a search at 709 Cleveland

11  Avenue?

12  A.   I don't recall the address off the top of my head but....

13  Q.   It was Agent Tubbs's silencer investigation; is that

14  right?

15  A.   Correct.

16  Q.   Did you become aware that inmates Tracy Hoops and Ryan

17  Rivera had been interviewed by Mr. Sparks and ATF agents?

18  A.   Yes.

19  Q.   And did you familiarize yourself with the content of those

20  interviews?

21  A.   I did.

22  Q.   Were those interviews audio recorded?

23  A.   Yes, they were.

24  Q.   Did you listen to those recordings?

25  A.   Yes.

Schweiner - Direct (Packard)                                310

1    Q.   With respect to Agent Tubbs, are you friends with him?

2    A.   Not -- I mean, we're friendly coworkers.  We had very

3    little interaction before and really after or since that case

4    so....

5    Q.   And at the time in March, April 2022, would you and he

6    ever socialize outside of work?

7    A.   No, we never have.

8    Q.   You were in the Denver office, he's in the Cheyenne

9    office?

10   A.   Yeah.

11   Q.   So after you get this information about inmates talking to

12   ATF agents, what do you decide to do?

13   A.   So my first thing was reading through the interviews that

14   had already happened that were conducted by Kyle and Crystal of

15   the inmates, Rivera and Hoops, so I read through those first.

16   Q.   And after that did you gather some evidence?

17   A.   Yes.

18   Q.   What evidence did you gather?

19   A.   I started out by reaching out to Scotts Bluff and asking

20   for logs of what inmates were in the same pod that were also

21   there with Rivera and Hoops.  I also asked if I could obtain

22   the video surveillance for the pod.

23   Q.   And how much video surveillance did you request, or, you

24   know, what kind of boundaries did you put on this?

25   A.   Yeah.  Well, based off what I had read through the

 1    interviews that were conducted by the first two agents, the

 2    information they got was that these threats were made within,

 3    like, the previous two weeks, so I asked for the previous two

 4    weeks of footage and started there.

 5    Q.    So the interviews of Rivera and Hoops by your coworkers

 6    happened March 21; is that right?

 7    A.    That sounds right.

 8    Q.    And the information that they received was that about two

 9    weeks previous is when maybe some of this threatening stuff

10    came up?

11    A.    Yes.

12    Q.    And so you go to the jail and say, "Can you give me video

13    footage that captures that general time frame?"

14    A.    Yeah.

15    Q.    Did you end up getting video between February -- video

16    that covered events between February 27 and March 14, or around

17    those time frames, of 2022?

18    A.    Yes.

19    Q.    And is that 24/7 video?

20    A.    It is.

21    Q.    And is that video that doesn't have audio with it?

22    A.    Correct.

23    Q.    Did you receive that from the Scotts Bluff County

24    Detention Center?

25    A.    Yes.

Schweiner - Direct (Packard)                                    312

1   Q.   Did you spend some time reviewing that video?

2   A.   Yes.

3   Q.   Okay.  About how much time did you spend hunting through

4   video?

5   A.   Well, I went through the entire two weeks which, as you

6   can imagine, a standard 40-hour workweek, you know, hours

7   versus the number of hours of video I had so, I mean, it took a

8   few months.  I'd say at least a month or two.

9   Q.   Were you able to look up the video based on the date and

10   time?

11   A.   Yeah.  There were individual, like, files to click on,

12   like, a 24-hour period and then go through it that way, if I

13   recall correctly.

14   Q.   So in other words, when the video came to you, you could

15   look up the day of March 3, 2022, for example?

16   A.   Yes.

17   Q.   And that would have a 24-hour period of footage?

18   A.   Yes.

19   Q.   And that's how you knew essentially the date and time of

20   the events depicted in there; is that right?

21   A.   Correct.

22   Q.   When you watched the video, did you -- did anything stand

23   out as you spent all this time watching video?

24   A.   There was one event in particular that, yeah, really stood

25   out.

Schweiner - Direct (Packard)                                    313

1    Q.   Okay.  And describe what you noticed or what you saw.

2    A.   Yeah.  Well, I mean, I knew kind of what I was looking for

3    based off of the interviews of Hoops.  He indicated that, you

4    know, in one of his conversations with the defendant, there

5    were hand gestures being made, and so I was looking out for

6    something like that, and I came across an event that took place

7    kind of exactly as Hoops had described it, sitting at a table

8    where they were having a discussion in which the defendant was

9    making all kinds of hand gestures.

10   Q.   You've seen that video prior to court today; is that

11   right?

12   A.   Yes.

13   Q.   Did you also notice in that video evidence times when

14   Mr. Unocic would show paperwork to Ryan Rivera?

15   A.   Yes.

16   Q.   And about what time frame did you notice that?

17   A.   That was in the beginning of March, the first few --

18   within the first week.

19   Q.   Of 2022?

20   A.   Of '22, yeah.

21   Q.   Were there times when you were watching video when you saw

22   Mr. Hoops show paperwork to Tracy -- excuse me, Mr. Unocic show

23   paperwork to Tracy Hoops?

24   A.   Yes.

25   Q.   Same question.  What was the time frame?

Schweiner - Direct (Packard)                              314

1    A.   It was the same -- within a day of being shown to Rivera,

2    so that first week of March.

3    Q.   After gathering that physical evidence, the jail records,

4    the jail video, did you then interview -- do some interviews?

5    A.   Yes.

6    Q.   Who did you interview?

7    A.   So I interviewed, like, six different people who were in

8    that pod.  Basically what I had was a list of people who I

9    went -- I drove out to Scotts Bluff, and I just said, "Hey,

10   who's still here that was in the pod during this period of

11   time?"  And so of those people there were about six that I was

12   able to interview.

13   Q.   You were able to rely on jail business records to see who

14   would have been potentially around Mr. Unocic --

15   A.   Yes.

16   Q.   -- around the time frame January to April 2022?

17   A.   Yes.

18   Q.   And that's how you narrowed down who to spend time talking

19   to?

20   A.   Correct.

21   Q.   How long does it take to drive from Denver to Gering?

22   A.   I don't remember.  It was -- I mean, it was a full day to

23   do the whole trip so....

24   Q.   And do you end up talking to some inmates there?

25   A.   Yes.

Schweiner - Direct (Packard)                                        315

1    Q.    And did you talk to Mr. Hoops that day?

2    A.    No.

3    Q.    Did you talk to Mr. Rivera that day?

4    A.    No.

5    Q.    Did you later schedule an interview with Mr. Hoops?

6    A.    Yes.

7    Q.    When was that?

8    A.    That interview took place October '22 as well, yeah, the

9    end of the year.

10   Q.    If I told you October 7, 2022, would you have any quarrel

11   with that?

12   A.    No.  That sounds right.

13   Q.    So why did it take so long, between April to October, to

14   set up this interview?

15   A.    I mean, there was a lot -- there was a few reasons.  One,

16   he had been transferred and then, I think, released, so just

17   trying to track him down.  And once we did, it was about

18   coordinating with his attorney, and there were, like, several

19   attempts made, and someone got COVID and it just -- there was a

20   lot of scheduling mishaps between, like, several different

21   parties who were trying to be present for the interview, so it

22   took a while.

23   Q.    So ultimately you did the interview with Mr. Hoops?

24   A.    Yes.

25   Q.    And where did that take place?

1    A.    We did that in the Cheyenne ATF office.

2    Q.    And who was present for the interview?

3    A.    It was myself, Hoops, and his attorney.

4    Q.    What's his attorney's name, if you know?

5    A.    I think it was Don Miller.

6    Q.    Did you have another ATF agent with you as well?

7    A.    No.

8    Q.    And did you record the interview?

9    A.    Yes.

10   Q.    And about how long did it last?

11   A.    The interview was about an hour and a half.

12   Q.    Did you make any promises in exchange for him to talk to

13   you?

14   A.    No.

15   Q.    Did you offer any benefits to him in exchange for the

16   interview?

17   A.    No.

18   Q.    During the interview did Mr. Hoops physically demonstrate

19   anything?

20   A.    Yes, he did.

21   Q.    And did you recognize what he was demonstrating?

22   A.    Yes.

23   Q.    What did you recognize?

24   A.    The same hand gestures I had seen in the jailhouse video

25   surveillance of the conversation between Hoops and the

1    defendant.

2    Q.   At the time that he did that demonstration, had you showed

3    him any video from the jail?

4    A.   No.

5    Q.   Had you showed him any police reports related to this

6    case?

7    A.   No.

8    Q.   Did Mr. Hoops draw a diagram for you?

9    A.   He did.

10   Q.   And did he draw that diagram before you showed him any

11   video?

12   A.   Yes.

13           MR. PACKARD:  I'd like to publish Exhibit 8A, please.

14           THE COURT:  You may.

15           MR. PACKARD:  It's been received.

16       And if we could rotate that, please, Kathy.

17   BY MR. PACKARD:

18   Q.   Is Exhibit 8A the diagram Mr. Hoops wrote for you prior to

19   him watching any video?

20   A.   Yes.

21           MR. PACKARD:  Let's look at Exhibit 9B, please.

22       Exhibit 9B has been received but only page 1 published, so

23   I'll just publish page 1 -- or ask permission to publish

24   page 1, Judge.

25           THE COURT:  Page 1 is the only thing that's been

Schweiner - Direct (Packard)                                    318

1    received, just to be clear.

2              MR. PACKARD:  Oh, is that right?  Okay.  All right.

3              THE COURT:  That was the only thing offered; right?

4    That's what I received, page 1.

5              MR. PACKARD:  May I approach your courtroom deputy to

6    grab that?

7              THE COURT:  Yes, you may.

8              MR. PACKARD:  May I approach the witness?

9              THE COURT:  You may.

10   BY MR. PACKARD:

11   Q.   Ms. Schweiner, have you had a chance to look at

12   Exhibit 9B?

13   A.   Yes.

14   Q.   And is that a 11-page exhibit containing photographs?

15   A.   Yes, it is.

16   Q.   Do you recognize the photographs?

17   A.   I do.

18   Q.   How do you recognize the photographs?

19   A.   They were still shots that I took from the video

20   surveillance that I had watched.

21   Q.   And why did you prepare those still shots?

22   A.   Because I wanted to -- after meeting with Hoops for the

23   first time and talking to him, I wanted to see if he could

24   fully recognize anything in the photo.  I mean, that's kind of

25   how I showed it to him.  I said, "Do you recognize anybody in

Schweiner - Direct (Packard)                                              319

1    the photo," at which point he identified himself and the

2    defendant in regards to the event that I witnessed on the

3    video.

4    Q.   And did you have him sign and date page 1?

5    A.   I did.

6              MR. PACKARD:  I'll offer Exhibit 9B, pages 1 through

7    11.

8              THE COURT:  All right.  Any objection?

9              MR. REIMAN:  I'll once again object.

10             THE COURT:  Pardon?  I can't hear.

11             MR. REIMAN:  I'll once again object as it being

12   cumulative.

13             THE COURT:  Okay.  And the objection is overruled.  I

14   will receive Exhibit 9B.

15        There were 11 photos.  Is it 1 through 11 as far as the

16   pages?  Do they correspond?

17             MR. PACKARD:  That's correct, Judge.  Each page is

18   sequentially numbered with page -- the last page being 11.

19             THE COURT:  All right.  Very well.  So Exhibit 9B,

20   pages 1 through 11, will be received.

21             MR. PACKARD:  All right.  I'd like to publish a few

22   parts of Exhibit 10B.  This is the video that we watched.  It's

23   about eight minutes in length.

24        (A portion of Exhibit 10B was played.)

25             MR. PACKARD:  All right.  You can stop it, Kathy.

Schweiner - Direct (Packard)                                           320

1    Thank you.

2    BY MR. PACKARD:

3    Q.   Ms. Schweiner, we're looking at video through a VLC

4    player, and we're stopped at four seconds.  Do you recognize

5    this video?

6    A.   Yes.

7    Q.   And is this video footage dated March 3rd, 2022, around

8    8:25 p.m. or thereabouts?

9    A.   Yes.

10   Q.   And is this the video that you ended up showing to

11   Mr. Hoops during that interview?

12   A.   It was.

13   Q.   And when you spoke previously about looking through hours

14   of video, was this, the events depicted in Exhibit 10B, what

15   you were referring to as far as the movements?

16   A.   Yes, it was.

17   Q.   Okay.  Thank you.  All right.  Let's talk about Mr. --

18   well, with Exhibit -- strike that.

19        Did you then interview Mr. Ryan Rivera?

20   A.   I did.

21   Q.   And when did that take place, about?

22   A.   That was January of this year, '23.

23   Q.   And why did you re-interview Mr. Rivera?

24   A.   Because now that I had found the video, I wanted to, you

25   know, kind of go in and question him more in detail.

Schweiner - Direct (Packard)                                              321

1   Q.   When you talk about the video, what are you talking about?

2   A.   Sorry.  The video that we just saw a little excerpt of,

3   but beyond that, I mean, I had done an investigation at that

4   point.  He originally had been interviewed before I was

5   involved, so I just wanted a chance to sit down and talk to him

6   and question him myself and kind of go through really

7   everything that I wanted to ask him personally before moving

8   forward.

9   Q.   And was he in custody in Colorado at the time serving a

10  sentence?

11  A.   Yes.

12  Q.   How did you arrange the interview?

13  A.   I called the jail and asked if they could make a room

14  available for me to come down and talk to him.

15  Q.   So this wasn't a deal where he's calling you saying, "Hey,

16  can I come talk to you," something like that?

17  A.   Yeah.  No.

18  Q.   Okay.  And about how long did the interview last?

19  A.   I think we spoke for about half an hour.

20  Q.   Did you make any promises to him in exchange for him to

21  talk to you?

22  A.   No.

23  Q.   Did you offer him any benefits in exchange?

24  A.   No.

25  Q.   Was the interview audio recorded?

Schweiner - Direct (Packard)                                        322

1    A.    It was.

2    Q.    Do you remember showing him any video?

3    A.    I did show the video to him.

4    Q.    And when were -- again, the video.  Are we talking about

5    Exhibit 10B, the one that we just looked at a little bit of?

6    A.    Correct.

7    Q.    And was he able to identify -- well, strike that.

8          Did you capture video of Mr. Rivera that you showed him,

9    or was it just the video showing Mr. Hoops and Mr. Unocic?

10   A.    It was just this video, but from what I recall, you can

11   see Rivera in the footage.

12   Q.    And where can you see him?

13   A.    He's up on the top visitor center, like, on the phone.

14   That's where they made their phone calls, I believe.

15          MR. PACKARD:  Could we publish that again, 10B,

16   please?

17       (A portion of Exhibit 10B was played.)

18          THE WITNESS:  I think --

19          MR. PACKARD:  All right.  If we could stop it one

20   second there.

21   BY MR. PACKARD:

22   Q.    Can you identify Mr. Rivera in this picture?

23   A.    Yeah.  That should be him up there answering -- or just

24   picking up the phone when you froze it.

25   Q.    All right.  So as you look at the screen, top right?

 1    A.    Yeah, top right.

 2    Q.    Individual is sitting down; is that correct?

 3    A.    Yes.

 4    Q.    All right.  Thank you.  Mr. Tubbs was a federal agent

 5    between January and April of 2022; is that right?

 6    A.    Yes.

 7    Q.    He was also a federal agent when he worked the silencer or

 8    suppressor case in the fall of 2021; correct?

 9    A.    Correct.

10    Q.    Was his investigation of Mr. Unocic for the firearms

11    offenses in Wyoming part of his official duties working for the

12    ATF?

13    A.    Yes.

14          MR. PACKARD:  May I have just a moment, Judge?

15          THE COURT:  You may.

16          MR. PACKARD:  Thank you, Judge.  I don't have any

17    other questions.

18          THE COURT:  Very well.  Cross-examination.

19                    CROSS-EXAMINATION

20    BY MR. REIMAN:

21    Q.    Ms. Schweiner, did I say your last name correct?

22    A.    Yes, yeah.

23    Q.    Okay.  As you -- early on in the investigation did you

24    become aware that Mr. Unocic was claiming that the agents

25    didn't get all the weapons out of the house?

Schweiner - Cross                                                        324

1   A.    No.

2   Q.    Okay.  You watched all of these -- or you interviewed some

3   of these individuals; is that correct?

4   A.    Correct.

5   Q.    Did you interview Hoops?

6   A.    I did.

7   Q.    Did you interview Rivera?

8   A.    Yes.

9   Q.    Okay.  Rivera, you didn't do the initial interview; is

10  that correct?

11  A.    Correct.

12  Q.    But I'm assuming you at least, as the case agent, read the

13  interviews that other agents did; is that correct?

14  A.    Yes.

15  Q.    Okay.  You were involved in the search warrant of

16  Mr. Unocic's residence in November of 2022?

17  A.    Yes.

18  Q.    After -- let's see.  You opened this case in -- was it

19  March of 2022?

20  A.    That sounds right, yeah.

21  Q.    I messed up.  The search warrant was 2021; right?

22  A.    It's hard to keep the -- yeah.

23  Q.    Okay.  Thank you.  So this case was opened.  After you

24  opened this case on the threats, did you attempt to go back and

25  search Mr. Unocic's old residence again?

1    A.    No.

2    Q.    Okay.  Did you or any agents that you're aware of go back

3    to speak to his roommates about whether they'd missed any

4    weapons, as far as you know?

5    A.    I didn't, and I never heard about anything like that.

6    Q.    Okay.  Did you -- after you learned about this threat, did

7    you then begin to monitor Mr. Unocic's phone calls out of the

8    jail?

9    A.    Yeah.  I -- I personally didn't.  I don't think I've

10   listened to a single one of his jail calls, no.

11   Q.    Okay.  So when he's in custody, all those phone calls are

12   recorded; is that right?

13   A.    Yes.

14   Q.    And I'm assuming you can probably go to the jail and

15   listen to phone calls that happened earlier in the day from an

16   inmate?

17   A.    I've never done that.  Usually they have a department that

18   kind of spends time putting it together for you, yeah.

19   Q.    Okay.  But at least as far as you were concerned, you did

20   nothing to -- you did nothing to monitor phone calls of

21   Mr. Unocic after you learned of this threat; is that correct?

22   A.    I did not, yeah.

23   Q.    At any point in time; is that fair?

24   A.    No.  But as you said this, I do remember hearing that the

25   Cheyenne, Wyoming, office did before they -- before I got

Schweiner - Cross                                                              326

1    involved and that they hadn't heard -- they had gone back.

2    They hadn't heard anything.

3    Q.    Okay.

4    A.    So....

5    Q.    And after you got that, you didn't --

6    A.    So I didn't pursue that, no.

7    Q.    Okay.  You didn't start listening?

8    A.    I did not.

9    Q.    Okay.  And did you take any effort to monitor Mr. Unocic's

10   mail that was being sent out of any corrections facilities?

11   A.    No, I didn't.

12            MR. REIMAN:  That's all I have.  Thank you.

13            THE COURT:  All right.  Very well.  Any redirect?

14            MR. PACKARD:  May I have just a moment, Judge?

15            THE COURT:  You may.

16        We're going to take just a very brief break, ladies and

17   gentlemen, and the same instructions I've given before will

18   occur.

19        So actually, if the jurors want to remain, if you want to

20   stand up and stretch, I'll just let the other jurors stand and

21   stretch for a little bit.  Okay?  Let's just take a couple or

22   three minutes' break at this point in time, ladies and

23   gentlemen.  So we'll have you come back, and we'll finish up at

24   4:30.  All right?  Thank you.

25            (Jury out at 3:49 p.m.)

```
 1            (Jury in at 3:51 p.m.)

 2            THE COURT:  You may be seated.  Welcome back, ladies

 3    and gentlemen.  All right.  You wanted a moment to see if there

 4    was any redirect?

 5            MR. PACKARD:  That's right.  No redirect.  No other

 6    questions.  Thank you.

 7            THE COURT:  All right.  And may this witness be

 8    excused?

 9            MR. PACKARD:  Yes, Your Honor.

10            MR. REIMAN:  Yes.

11            THE COURT:  All right.  Very well.  Then,

12    Ms. Schweiner, you are excused from these proceedings.

13            THE WITNESS:  Thank you, Your Honor.

14            THE COURT:  And the government may call its next

15    witness.

16            MR. PACKARD:  Thank you, Judge.  The government

17    rests.

18            THE COURT:  All right.  Very well.  Ladies and

19    gentlemen of the jury, the government has rested its case.  I'm

20    not going to let you go yet today, but we have a couple of

21    matters to take care of.  I'm sorry to bring you back in and

22    send you back out here for a few moments, but that's what we're

23    going to do.

24          So I will advise you that until this case -- until you've

25    heard all of the evidence, until this case is completely
```

 1    submitted to you and I've instructed you on the law, you're not

 2    to discuss the case with anybody, including each other.

 3         So we're going to take a few minutes' break at this point

 4    in time before I release you for the day or -- and/or that we

 5    have any other evidence.  Okay?  Thank you.

 6         (Jury out at 3:53 p.m.)

 7              THE COURT:  You may be seated.  And I think at this

 8    point in time what we'll do is take a brief break.  Shall we

 9    reconvene at 4:00?  And I'll ask what evidence, if any, that

10    the defense wishes to present before we move on.

11              MR. REIMAN:  I need to make my motion to dismiss.

12              THE COURT:  Let's do all of that.  Okay?  When we

13    come back and do the colloquy, we'll do the motion.

14         Okay.  So let's take about a five-minute break, and we'll

15    reconvene at 4:00 p.m.  Thank you.

16         (Recess taken at 3:54 p.m.)

17         (At 3:59 p.m. on September 26, 2023; with counsel for the

18    parties and the defendant present; WITHOUT the jury:)

19              THE COURT:  All right.  Very well.  You may be

20    seated.  We are outside of the presence of the jury.

21         And, counsel, we have a couple of matters to take up.

22    Defense has indicated there will be a motion, and so I'll hear

23    that first, and then we can get into the second part of what we

24    need to do.

25              MR. REIMAN:  Yes, Your Honor.  I am moving for a

1    judgment of acquittal on this case.  I'm not going to belabor

2    the point because I know the Court has looked at this pretty

3    hard and you know my position, and I've already provided the

4    cases.

5           THE COURT:  Yeah.  Why don't you go ahead and remain

6    seated so we can hear you.  That's fine.

7           MR. REIMAN:  I know the Court has looked at this

8    issue.  I've provided the law that I believe is the law.  If

9    I'm correct about the law, I think it's clear that this case

10   should be dismissed.  There was absolutely no evidence of

11   Mr. Unocic's intent to convey his words to the agent;

12   therefore, it should be dismissed.

13       I would also submit that this is -- there was insufficient

14   evidence that this was a true threat, and that's another basis

15   that the case should be tossed.

16       Thank you.

17          THE COURT:  All right.  Very well.  I'll hear briefly

18   from the government.

19          MR. PACKARD:  Thank you, Judge.

20       I would ask the Court to overrule the motion.  The

21   evidence includes two witnesses that overheard the defendant

22   making threats to kill Mr. Tubbs.  The government's position is

23   that there is no requirement that it present evidence of the

24   defendant's intent to convey the threat to the agent.

25       Thank you.

330

1          THE COURT:  All right.  Very well.  And, Mr. Reiman,

2     you are correct.  I have taken a look at this issue, and the

3     Circuit, quite frankly, may have to look at it and provide

4     guidance.  The statute is 18 U.S.C. Section 115(a)(1)(B), and

5     the statute provides two different things.

6          First of all, whoever threatens to assault a federal law

7     enforcement officer with the intent to -- okay.  I'm going to

8     do the two different things.  -- with the intent to impede,

9     intimidate, or interfere with such law enforcement officer

10    while engaged in his -- in the performance of his official

11    duties, there are cases that do conclude that there must be at

12    least some expectation that that threat would be communicated

13    to that official if that's what was charged, if the charge was

14    with the intent to impede, intimidate, or interfere with his

15    official duties.

16         In this case, the statute also provides that whoever

17    threatens to assault a federal law enforcement officer with the

18    intent to retaliate against such officer on account of the

19    performance of his official duties, that's covered by the

20    statute, and that's what's charged in this particular case.

21    There are cases that conclude and I would say the plain

22    language of the statute concludes -- and that's what I'm going

23    by is the plain language of the statute as well as the cases --

24    it is not required that the defendant charged with the intent

25    to retaliate, that the subject must be aware of the threat.

1      There is an intent to retaliate, period, within the words.

2           And so the motion to dismiss under Rule 29 is dismissed,

3      number one, by the reading of the statute.

4           Number two, there is sufficient evidence, if believed by

5      the jury.  It's going to be up to the jury to determine whether

6      or not this was a true threat.  There was certainly evidence

7      offered by both Mr. Rivera and Mr. Hoops that would be

8      sufficient to establish that this was a true threat and so --

9      but that's a jury question.  I'm going to let you argue until

10     the cows come home on that one from both sides, but there is

11     sufficient evidence, if believed by the jury, under Count I of

12     the indictment to find the defendant guilty, once again, if the

13     facts are believed by the jury.

14          So the Rule 29 motion is overruled.

15          Okay.  With that, we will move forward with the

16     defendant's case, and I'll bring the jury back in in just a few

17     moments.

18          I will ask Mr. Reiman:  Did you have an opportunity to

19     discuss with Mr. Unocic whether he intends to testify as part

20     of the defense?

21               MR. REIMAN:  I have and he does not.

22               THE COURT:  Okay.  And Mr. -- and you've had

23     sufficient time to discuss that with him not only today, but,

24     I'm sure, prior to --

25               MR. REIMAN:  Yes.

1          THE COURT:  -- prior to today?

2          MR. REIMAN:  Yes.

3          THE COURT:  Mr. Unocic, I did just want to confirm

4    with you that you understand that you have an absolute right

5    under the United States Constitution to testify on your behalf.

6    There are obviously certain risks to do that and certainly not

7    doing that, but if you choose not to testify, I will instruct

8    the jury that that is not to be considered by the jury and it's

9    not to be held against you in any way.  So I just want to be

10   sure, number one, that you've had sufficient time to discuss

11   whether or not to testify with your lawyer.  Have you had

12   sufficient time to discuss that?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  And it is your decision not to testify

15   and to exercise your right to remain silent and to have me

16   instruct the jury with respect to that?

17         THE DEFENDANT:  That's correct, Your Honor.

18         THE COURT:  Okay.  All right.  Very well.  Anything

19   further that you want to raise, Mr. Reiman?

20         MR. REIMAN:  No, sir.

21         THE COURT:  All right.  From the government's sake?

22         MR. PACKARD:  No, Your Honor.

23         THE COURT:  All right.  Very well.  I do find that

24   certainly you've been informed and fully knowledgeable of your

25   rights under the United States Constitution, and this Court

1    accepts that.  Now we'll bring the jury back in.

2        Is it your intent to -- are you going to be calling any

3    witnesses, or will the defense rest?

4            MR. REIMAN:  We'll rest.

5            THE COURT:  All right.  Then let me ask both

6    counsel -- I will get the instructions out to you right away.

7    I mean, I probably need 10 or 15 minutes just to prepare some

8    final things that were dependent on who testified and what was

9    testified in this particular case, so give me until about 4:30,

10   and you'll have instructions in your hands.

11       I would plan to do both the informal instruction

12   conference in -- I guess I'm offering you one of two things.

13   If you want to do the informal instruction conference, we can

14   do it yet today, let's say, at 5:00 or 5:15, or we can do it

15   right away in the morning at 8:30.  I want you to have

16   sufficient time to be able to look at the instructions and do

17   your own research.  What's your preference there?

18           MR. REIMAN:  My preference is tomorrow morning.

19           MR. PACKARD:  Same here, Judge.

20           THE COURT:  Okay.  And 8:30 tomorrow morning should

21   give you sufficient time to prepare for the informal

22   instruction conference.  I'll get you instructions yet this

23   afternoon.

24           MR. REIMAN:  Yes.

25           THE COURT:  And then I'm going to have the jury come

```
 1    in.  By the time we do the informal -- it's not going to take a

 2    lengthy period of time, but by the time we do the informal and

 3    the formal -- I'm going to have the jury come back at

 4    9:40 a.m., and that way we'll have time to do both the informal

 5    and the formal instruction conference.  We can do that on the

 6    record, and then we'll be ready to commence closing arguments

 7    at about 9:40 a.m.  Does that sound reasonable?

 8                MR. REIMAN:  Yes, sir.

 9                MR. PACKARD:  Yes, Your Honor.

10                THE COURT:  Okay.  All right.  So that's what we will

11    plan to do.  Is there anything else that we need to take up

12    before we bring the jury?

13                MR. REIMAN:  No, sir.

14                MR. PACKARD:  No, Your Honor.

15                THE COURT:  All right.  Otherwise, I'll bring the

16    jury back in.  The defense will rest in front of the jury, and

17    then we will excuse the jury until 9:40 tomorrow.  Thank you.

18          (Jury in at 4:07 p.m.)

19                THE COURT:  You may be seated.  All right.  Welcome

20    back, ladies and gentlemen of the jury.  The government has

21    rested.

22          Mr. Reiman, are you ready to proceed?

23                MR. REIMAN:  The defense rests.

24                THE COURT:  And the defense rests at this point in

25    time.
```

1          All right.  Very well.  Obviously there will be no

2     rebuttal, I take it, from the government?

3              MR. PACKARD:  That's right.

4              THE COURT:  Okay.  Very well.  Then, ladies and

5     gentlemen of the jury, the lawyers have advised me that both

6     the government has rested and the defense has rested, so this

7     case will be ready to be submitted to you tomorrow.  There's

8     some work that I have to do to prepare -- or to finish the jury

9     instructions and discuss those matters with the lawyers, so I'm

10    going to excuse you for the day.

11         I'm going to ask you to come back at 9:40 tomorrow

12    morning.  We will start just a little bit later tomorrow

13    morning.  When you come back at 9:40 tomorrow morning, I will

14    give you your final instructions.  The lawyers will have an

15    opportunity to present their closing arguments.  Then it will

16    be time for you to deliberate.

17         Now, as I've instructed you before that until you're back

18    tomorrow and until you've heard the final instructions and

19    closing arguments of the lawyers, you're not to discuss this

20    case with anyone, including each other, with family members, or

21    anybody else that you would see.

22         You're not to do any investigation on your own.  You're

23    not to Google any names of lawyers, witnesses, terms that you

24    may have heard.  It's important -- it's remained important

25    throughout the case, but it's particularly important now that

336

1    this case be decided by the evidence that's been adduced in

2    this courtroom and the instructions that I give you.

3        So I want you to get a good rest this evening.  No

4    investigation, no discussion with anybody, no reading of any

5    newspaper articles or news reports, if there are any.  And if

6    you get a -- get a good rest and a fresh mind.  We'll see you

7    tomorrow morning at 9:40 a.m.  All right?  Thank you.

8        (Jury out at 4:10 p.m.)

9        THE COURT:  All right.  You may be seated.  So for

10   planning tomorrow morning, for the marshals, if Mr. Unocic is

11   here -- I would say by 9:00, somewhere between 9:00 and ten

12   minutes after 9:00 or so, we'll be doing the formal instruction

13   conference.  I'd want Mr. Unocic here for that, and then after

14   the formal instruction conference, we'll get ready to go into

15   closing arguments, but we'll plan at about 9:40.

16       For the lawyers, let's plan on meeting in my conference

17   room at 8:30 tomorrow morning, and I'll get you instructions

18   yet this afternoon.  We haven't had the informal instruction

19   conference yet, but you can -- whatever instructions I'm

20   sending out, you can count on them.  Okay?  But if there's a

21   minor change or -- but I mean if you want to utilize any of

22   those instructions for display purposes, you may do so.

23       Okay.  All right.  Is there anything that we need to --

24   anything else that we need to take up before we break today?

25       From the government.

```
 1              MR. PACKARD:  No, Your Honor.

 2              THE COURT:  Or from you, Mr. Reiman?

 3              MR. REIMAN:  No, sir.  Thank you.

 4              THE COURT:  All right.  Very well.  We will stand in

 5    recess until tomorrow morning.  I'll see -- informal at 8:30.

 6    I'll see everybody else at 9:00 or shortly after.  Thank you.

 7          (Evening recess at 4:11 p.m.)

 8

 9                        *  *  *  *  *  *  *  *

10

11       I certify that the foregoing is a correct transcript from

12    the record of proceedings in the above-entitled matter.

13

14

15          /s/Lisa G. Grimminger          February 6, 2024
            Lisa G. Grimminger, RDR, CRR, CRC    Date
16

17

18

19

20

21

22

23

24

25
```

```
 1                              I-N-D-E-X

 2

 3                                   Direct   Cross   Redirect

 4

 5   WITNESSES:

 6   FOR THE PLAINTIFF:

 7   David Tubbs                      96      131      154

 8   Russell Sparks                  163      175      179

 9   Ryan Rivera                     181      206      218

10   Tracy D. Hoops                  223      278      297

11   Amanda Schweiner                301      323      ---

12

                                                        Ruled
13   MOTION:                                   Made      On

14   Defendant's Rule 29 motion                328      331

15
                                                        Ruled
16   EXHIBITS:                              Offered      On

17   1. Copy of 21CR121 from the District of
        Wyoming, United States of America v.
18      Anthony Pierce Unocic                  115      115

19   2. Booking photo of the defendant from
        Platte County, Wyoming, Detention Center 128     130
20
     8A. Hoops' diagram of layout of pod at
21       SBCDC from October 7, 2022            263      263

22   8B. Hoops' diagram of layout of pod at
         SBCDC dated August 14, 2023          266      266
23
     9B. Photo stills shown to Hoops        271,319  271,319
24
     10B. CD containing excerpt of video
25        surveillance from SBCDC dated 3/3/22  268     268
```