1     IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF NEBRASKA

2

3 UNITED STATES OF AMERICA,  )  Case No. 4:23CR3019
           )

4     Plaintiff,   )
           )

5 vs.         )
           )

6 ANTHONY UNOCIC,    )
           )  Lincoln, Nebraska

7     Defendant.  )  January 4, 2024

8

9

     TRANSCRIPT OF SENTENCING PROCEEDINGS

10    BEFORE THE HONORABLE JOHN M. GERRARD
     SENIOR UNITED STATES DISTRICT JUDGE

11

12      A-P-P-E-A-R-A-N-C-E-S

13 FOR THE PLAINTIFF:    Mr. Daniel D. Packard
           U.S. Attorney's Office

14          100 Centennial Mall North
           Suite 487

15          Lincoln, NE 68508-3865

16 FOR THE DEFENDANT:    Mr. Korey L. Reiman
           Federal Public Defender's Office

17          100 Centennial Mall North
           112 Federal Building

18          Lincoln, NE 68508

19

20  COURT REPORTER:     Ms. Lisa Grimminger, RDR, CRR, CRC

21          100 Centennial Mall North
           Room 587

22          Lincoln, NE 68508
           (402) 437-1908

23

24

  Proceedings recorded by mechanical stenography, transcript

25 produced with computer.

1          (At 8:59 a.m. on January 4, 2024; with counsel and the

2     defendant present:)

3          THE COURT:  Good morning, everyone.  We are on the

4     record in United States of America versus Anthony Unocic.  This

5     is Case Number 4:23CR3019, and this matter comes on for

6     sentencing this morning with respect to Count I, influencing

7     and retaliating against a federal official by threat.

8          Counsel, would you please enter your appearance.

9          MR. PACKARD:  Dan Packard and Case Agent Lee Burkett

10    for the government.

11         THE COURT:  All right.

12         MR. REIMAN:  Korey Reiman for Mr. Unocic.

13         THE COURT:  All right.  Mr. Unocic is present in the

14    courtroom, and the probation officer, Craig Ford, also appears

15    personally this morning.

16         Mr. Reiman, may I confirm with you that you have received

17    the Revised Presentence Investigation Report dated November 30

18    of 2023 and you've gone over the report and the Sentencing

19    Recommendation with your client?

20         MR. REIMAN:  I have.

21         THE COURT:  All right.  Very well.  This matter was

22    tried to a jury so there was no plea agreement in this case.

23         So that takes us to the presentence report itself, and

24    there were three -- I don't know if we want to call them

25    objections, but notations to the PSR, and I think those can be

1    fixed.

2        The first one was in paragraph 25, which was simply the

3    AUSA statement or background statement.  Paragraph 25, the

4    first line -- and I'll be talking to the probation officer

5    here -- says, "As a result of the investigation in 2016, Unocic

6    pled guilty to a felony possession of explosive," and it should

7    be attempted, felony attempted, yeah.  And I know you were just

8    quoting what the AUSA gave you.

9            PROBATION OFFICER:  Right.

10           THE COURT:  I'm presuming with the AUSA's consent

11   that that can be corrected?

12           MR. PACKARD:  Yes, Your Honor.

13           THE COURT:  And that's consistent with paragraph 61.

14       Paragraph 83, that's on page 21.  The second line said,

15   "The defendant does not have any tattoos."  The defendant has

16   indicated that he has multiple tattoos, so we should probably

17   put that in there.  I don't think that's going to make any

18   difference to anyone, but we will make sure it's corrected.

19       Paragraph 89, which is at page 22, the first line says,

20   "The defendant admitted he has been suicidal at times in his

21   life.  In 2015, he attempted suicide by cop."  The defendant is

22   stating that that was in 2019.

23           MR. REIMAN:  Yes.

24           THE COURT:  Okay.  And so that should be corrected.

25   And that's noted later in that paragraph, but that should be

1    corrected in line one.

2         Okay.  So I will note those three corrections, and they

3    shall be made.  Are there any other objections to the PSR?

4         From the government.

5              MR. PACKARD:  No, Your Honor.

6              THE COURT:  Okay.  Or from the defense.

7              MR. REIMAN:  No, sir.

8              THE COURT:  All right.  And I believe there are no

9    motions pending except for the motions for -- there's a motion

10   for upward variance and a motion for downward variance, and

11   I'll take those up at the time of allocution.

12        But with that I take it, then, that both parties would

13   like me to adopt the revised PSR with the changes that were

14   made?

15             MR. PACKARD:  Yes, Your Honor.

16             MR. REIMAN:  Yes, sir.

17             THE COURT:  All right.  And I will do so.

18        And have each of you received the Sentencing

19   Recommendation dated December 28?

20             MR. PACKARD:  Yes, Your Honor.

21             MR. REIMAN:  Yes, sir.

22             THE COURT:  Mr. Unocic, let me go over the guideline

23   calculations with you.  I'm sure your lawyer has.

24        The total offense level in your case is 20, and the

25   criminal history category is IV, so the guideline custody range

1  is 51 to 63 months.  The guideline provision for supervised

2  release is one to three years.  You're not eligible for

3  probation under the guidelines.  The fine range is 15,000 to

4  $150,000, and a special assessment of $100 is to be assessed.

5      Counsel, have I accurately stated the sentencing guideline

6  provisions?

7          MR. PACKARD:  Yes, Your Honor.

8          MR. REIMAN:  Yes, sir.

9          THE COURT:  Okay.  And I believe there's been no

10  request for restitution; is that right?

11          MR. PACKARD:  That's right.

12          THE COURT:  Okay.  All right.  Very well.  Are you

13  both now prepared to proceed to sentencing?

14          MR. PACKARD:  Yes, Your Honor.

15          MR. REIMAN:  Yes, sir.

16          THE COURT:  Okay.  We'll proceed in the normal order.

17  I'll hear from the government first.  There's a motion for

18  upward variance as well as allocution.  I'll take both of those

19  up, and then I'll hear from the defense with their motion for

20  downward variance and allocution so....

21      Mr. Packard.

22          MR. PACKARD:  Thank you, Judge.  With respect to my

23  comments, I'd like to offer some evidence, then make some

24  comments on my motion, then defendant's motion, and give a

25  short conclusion.

1    So with that I would ask you to consider Mr. Tubbs's

2    victim impact letter for purposes of evidence on the

3    government's motion for upward variance.

4            THE COURT:  And that has been filed, and the Court

5    will take judicial notice of that.  I assume there's no

6    objection to that?

7            MR. REIMAN:  Correct.

8            THE COURT:  Or it will be filed.  It should be filed

9    sealed so....

10           MR. PACKARD:  Thank you, Judge.  I'll ask you to

11   consider --

12           THE COURT:  But you have seen it?  I mean the defense

13   has seen it.

14           MR. REIMAN:  Yeah.

15           THE COURT:  Thank you.

16       Go ahead.

17           MR. PACKARD:  I'll ask you to take notice of filing

18   83-1.  That's a transcript of the defendant's July 5, 2022,

19   sentencing in the District of Wyoming.

20           THE COURT:  All right.  Any objection to that?

21           MR. REIMAN:  No.

22           THE COURT:  All right.  I will take judicial notice

23   of that filing.

24           MR. PACKARD:  I'll ask you to take judicial notice of

25   the Revised Presentence Investigation Report that the Court has

 1    accepted this morning.

 2            THE COURT:  I will take judicial notice of that.

 3            MR. PACKARD:  And then, lastly, I would ask you to

 4    consider the evidence which includes both testimony and

 5    exhibits adduced at trial between September 25 and

 6    September 28, 2023, in this court.

 7            THE COURT:  I was the trial judge, and I will take

 8    judicial notice of that and certainly will utilize those facts.

 9            MR. PACKARD:  Thank you, Judge.

10            THE COURT:  Okay.

11            MR. PACKARD:  I have to admit from the beginning that

12    my comments are biased.  I'm biased in favor of Tubbs because,

13    you know, just in my conversations with him, I understand just

14    generally what things he's done and what law enforcement

15    generally has to do, so you have to understand that my comments

16    come with that bias.  That's probably understood and I don't

17    need to say it, but I think that's something to consider when

18    I -- when the government moves for an upward variance.

19        It's really here I think the combination of the conduct

20    with the defendant's circumstances and background which

21    justifies the upward variance.  The conduct in and of itself is

22    mostly verbal stuff that happened, you know, before he even had

23    a Wyoming sentencing, so this isn't a case where, you know, he

24    was sentenced and then, after having that sentence, he engaged

25    in further conduct.

1    So the government understands that this is conduct that

2    his previous sentencing judge was already aware of, but it's a

3    little different in that here you have a defendant who has the

4    physical ability, the training, and the unique circumstances

5    that place him in a dangerous position, and ultimately the

6    Court can rely on protection of the public to incarcerate, and

7    David Tubbs is a member of the public.

8    So with those general comments, the defendant's conduct

9    was to threaten to kill Agent Tubbs on multiple occasions.  And

10   the statute 115, in that statute Congress ascribed a different

11   penalty to threats to kill and threats to assault.  Well, this

12   was charged as a threats to assault.  Not suggesting that

13   defendant should be sentenced more seriously because it was a

14   threat to kill, but it's an acknowledgement that the

15   legislature does deem a threat to kill more seriously than a

16   threat to assault, and I think that's part of the general

17   sentencing factors the Court can consider.

18   And so in terms of the charging and the conviction

19   compared to the factual basis, defendant has already somewhat

20   received a favorable charging decision.  Now, whether the

21   guideline would have been different, probably not, but I think

22   it's important to note that.  The purpose of the statute is to

23   hold people who threaten federal employees accountable but also

24   to protect the David Tubbses of the world, and that's a valid

25   consideration here in this case.

 1          The victim impact statement, you kind of read between the

 2     lines, but there are some, you know, significant things that

 3     Mr. Tubbs will have to -- has had to deal with and will

 4     continue to have to deal with because of the defendant's

 5     conduct, and he may not have -- defendant may not have intended

 6     that, but that's where we are, and that's the result, and Tubbs

 7     will have to look over his shoulder.  You can't change that,

 8     and that's a significant consideration.

 9          I think also you look at these few -- we'll call them

10     few -- verbal comments that was the defendant's conduct in

11     context of his larger criminal history, and what we know is he

12     was coming off a 2015 incident that was litigated for several

13     years, and ultimately, I think in 2017, he was convicted.  And

14     we corrected it.  It was a possession of -- attempted

15     possession of explosive or incendiary parts out of Colorado.

16          But the factual basis there is concerning, because in his

17     home he had firearms, ammunition, narcotics, a bomb-making

18     manual, and explosive devices, and it was a reckless enough

19     decision to where he was willing to, you know, put on gear and

20     essentially goad police into shooting him, and that fortunately

21     didn't happen, but that's kind of where he was mentally.

22          And then as soon as he gets out on that, he's ordering a

23     suppressor from China, and he's hung up on whether the ATF

24     pulled the trigger too soon on their investigation.  You know,

25     it's not, well, I messed up and that was stupid, I shouldn't

1    have done that.  I mean, he's hung up on that.  He ultimately

2    ends up pleading in that case, but those are two felony

3    convictions that are significant.

4        And so the question is:  What's changed since then?  And

5    what we know from the PSR is that there are some significant

6    mental health diagnoses as recently as 2021.  There's also some

7    relatively recent suicidal behavior.  There's also evidence of

8    narcotics addiction.  So you throw all those things in the mix,

9    and you see Mr. Unocic saying, at least in Wyoming a couple

10   years ago, "I don't feel the need to have mental health

11   treatment."  That's a package or a combination of factors that

12   makes the defendant, in the government's view, a dangerous

13   individual, and it's worthy of consideration.

14       Not only do you have that recent history, but if you look

15   at the PSR and you go back in time a bit, there's some pattern

16   to this.  And it appears as though, you know, he served his

17   country well.  He was a CO for about 12 years, and then things

18   changed.  So he's got a record of, you know, accomplishment,

19   and he's able to study.  He's a smart individual.  But then

20   things just kind of fell apart, and that's shown in the PSR.

21       You look at, for example, a drunk drive in 2004.  Now,

22   ultimately, that wasn't a conviction.  2006, plea withdrawn,

23   successful completion of probation.  But you look at the facts

24   summary of that, and one of the comments is defendant was

25   uncooperative and unwilling to participate in sobriety

1    maneuvers.  BAC of .33.

2        Okay.  Then you fast-forward three years.  DWI, weapons

3    possession.  Ends up getting 60 days jail, probation.  Part of

4    the factual basis, defendant failed to cooperate with verbal

5    commands, eventually arrested.  Inside his car deputies located

6    a .357 revolver, a loaded .22-caliber pistol, a second loaded

7    magazine for the pistol, nine knives.  That's 2007.

8        Fast-forward to 2010, you've got resisting arrest, you've

9    got -- and then you've also got another resisting arrest, two

10   within a month.  He received 90 days for those.  Factual basis:

11   Police go to the residence.  Diane, the mother, reports her

12   son's out of control.  Refuses to comply with verbal commands,

13   puts his arms in the air, tells deputies he's armed.  He's

14   taken into custody.  They locate a .22-caliber pistol and two

15   additional magazines with Power-Point ammunition on his person.

16       Then, 2011, about eight months later, defendant crashes

17   his bike.  Police tried to help him, refuses multiple verbal

18   commands.  Ultimately detained after officers deploy OC spray.

19       So there hasn't been any sort of abatement in what appears

20   to be dangerous behavior by the defendant which is

21   characterized by an inability to follow court orders or orders

22   from people trying to help keep the community safe, a

23   possession of weapons continually, and when that isn't -- can't

24   be done legally, possession illegally through the possession of

25   ghost guns.  And so it's that combination of his background and

1    the 3553(a) factors that the government believes makes the

2    defendant a danger to the public and to Mr. Tubbs specifically.

3         The Wyoming sentence in 20- -- it's escaping me when that

4    was, but I provided the transcript of that, and I largely

5    provided that to the Court and the parties to show that the

6    defendant did not receive any sort of separate penalty for his

7    conduct that formed the basis of his conviction here and

8    therefore --

9              THE COURT:  You're talking the July 2022 sentence?

10             MR. PACKARD:  That's right.  I'm sorry.  The

11   July 2022.

12        And so for that reason we're asking for a sentence that's

13   consecutive to the Wyoming sentence.  I think he has -- I think

14   I calculated it till sometime in 2025, maybe, when he's

15   finished with that, but we are asking for a consecutive

16   sentence of six years, three years of supervised release that

17   is consecutive to that Wyoming sentence.  And on behalf of

18   Mr. Tubbs, we would ask the Court to consider his victim impact

19   statement.

20        With respect to defendant's motion for variance, the

21   government would object to that.  Mr. Reiman cited a couple

22   cases which seem persuasive because it's time served on both of

23   them and it looks like the conduct was, you know, equal to or

24   more threatening than here.  For example, *U.S. v. Cessor,*

25   26-year-old takes a handgun, gets in a truck, heads to D.C. to

1    shoot the President.  He's convicted at trial.  Guidelines, 51

2    to 63 months.  He gets time served, which amounts to about

3    20 months.

4        You know, as the opposing party does, we look for

5    distinguishing factors, and those are that he was 26, he had

6    second thoughts several hours after leaving home, there was no

7    evidence that he thought out a plan that would have in reality

8    put the President in harm's way.  That was from the opinion.

9        Here, defendant is 54.  He has training.  He's been in the

10   Army, the National Guard.  He's been a CO for 12 years, a

11   correctional officer.  He knows what it means when he says, "My

12   retirement plan is prison."  I mean, that has a special

13   significance 'cause he's been there.  He's seen what that life

14   is like.  He's grown up -- defendant's grown up with firearms.

15   He has experience with ghost guns, silencers, and explosives.

16   He's a drug user.  He suffers mental illness that's untreated.

17       There's no evidence that he's abandoned his plan.  The

18   timeline in this case was the videos where he's making the

19   stabbing motions.  That's March 3 to March 5, 2022.  He pleads

20   March 10.  That's about a week later, and that kind of happened

21   after he got his paperwork.  March 18 is when the email to

22   Agent Sparks and Mike Elmore happened, and then March 21 is

23   when Rivera does his first proffer.  So you have the video, the

24   plea, then the email.

25       And since that time there's really never been a retraction

1  like, "I'm not going to do that.  I won't do that.  That was a

2  mistake.  That was -- I was off my -- my mental illness."  Now,

3  that -- the defendant -- the counsel for defendant may say

4  that, but what matters is what actual evidence is of that, and

5  there's none of it.  There's no evidence of retraction of that

6  initial threat, so this case is distinguishable from *Cessor*.

7      Second case cited was *U.S. v. Wynn*, W-Y-N-N.  A VA

8  housekeeping aide makes multiple calls to the VA hotline

9  threatening to kill or shoot a supervisor.  He's mad about not

10  getting overtime shifts.  He's convicted of the same thing

11  defendant has been in this case, and he's sentenced to time

12  served.

13      Again, some notable differences.  No suicide by cop

14  behavior, no evidence of firearms or explosives experience, no

15  information about the defendant's work in that case or

16  background as a soldier or a correctional officer.  He was not

17  in custody in that case for ordering suppressors or putting

18  together ghost guns or using methamphetamine.  There was no

19  history, at least noted in the opinion, of resisting or

20  obstructing.  The threats stopped after the defendant pled in

21  that case, and there were none after sentencing.  Excuse me.

22      As applied to this case, the argument goes the threats

23  stopped after he pled and there have been none further after he

24  was sentenced.  Well, that shows he knows he was wrong.  You

25  know, this is not somebody who's just kind of off his rocker

1    just casually making threats.  I mean, you can spin it both

2    ways, but the government would suggest that, yes, he hasn't

3    engaged in further threats, but by the same token, now it's

4    time to keep quiet.  He knows it's not okay to threaten Agent

5    Tubbs.

6         So I think it's important to consider the flip side of the

7    fact that there are no threats.  The topic came up at the

8    defendant's own sentencing on July 5th.  So I hope that he's

9    remorseful today, but he has an incentive to say, you know

10   what, I made a mistake.  I shouldn't have done it.  There's an

11   incentive now that he was convicted of it.  He's incentivized

12   to show good behavior.

13        So for those reasons we would object to the defendant's

14   motion for variance.  Thank you.

15             THE COURT:  All right.  Very well.  Thank you,

16   counsel.

17        Mr. Reiman, I will hear from you.

18             MR. REIMAN:  Thank you, Your Honor.  Regarding the

19   nature and circumstances of the --

20             THE COURT:  I'm going to have you pull the microphone

21   just a little closer.

22        Thank you.

23             MR. REIMAN:  Regarding the nature and circumstances

24   of the offense, Mr. Unocic, as many defendants are when they

25   are faced with the evidence and the time that they are looking

1    at, become upset and work through those things, and I think

2    that fits with the timing in this.  Whether right or wrong,

3    there was a warrant issued.  You can say it was wrong, but

4    upset with the warrant being issued that some of the facts

5    about that -- whatever you call it, suppressor, solvent trap --

6    were told to the judge.

7        Again, I don't know that that matters, but he was working

8    through this.  Defendant was working through his emotions and

9    maybe said a few things that were over the top to other people

10   in that jail cell, but what happens is, as every defendant --

11   not every defendant, but a lot of defendants do, is they calm

12   down.  They're in jail.  They come to grips with that.  Entered

13   a plea on that case.  I mean, he also -- he also said in some

14   of those statements he's going to trial no matter what on that

15   case.

16       Well, what happens?  The emotions calm down.  You listen

17   to your attorney, you listen to your friends, and he ends up

18   pleading and gets sentenced on that conduct out there, and

19   that's what happened here.

20       As I put in my brief, the guideline in this case

21   acknowledges that this is -- it's a unique guideline in that

22   they couldn't account for all the circumstances and facts of

23   that, and in fact, it seems like the guideline encourages the

24   Court to consider those factors 'cause the commission knows

25   that they can't write a guideline very well for this type of

1    behavior.

2         THE COURT:  And the Court -- I want both parties to

3    know the Court understands that there's a wide variety.  That's

4    why, when we cite to *Wynn* and *Ivers* and other cases -- I mean

5    I've considered all of those, and I will, but there's a whole

6    continuum here --

7         MR. REIMAN:  There is.

8         THE COURT:  -- of what the retaliatory threats are,

9    and I just want you to know the Court is very clear-eyed what

10   the threats are in this case and so...but I agree with you

11   so....

12        MR. REIMAN:  The biggest factor that is not accounted

13   for in that guideline is the lack of intent by Mr. Unocic to

14   convey these threats to the actual victim.  Certainly, you got

15   that guideline.  I would say -- a mine-run case, I think, is

16   the term they use of when you're applying the guidelines would

17   be somebody who is calling their victim, trying to instill fear

18   in them, trying to mess with their life, repeatedly doing that.

19   That's the type of behavior I think that that guideline is

20   generally thinking of.  What you have here is a person who had

21   zero intent to convey or cause fear into the victim in this

22   case.

23        Now, regarding the circumstances of the offense, the

24   victim impact letter, I don't mean -- well, I am going to

25   diminish.  Maybe I do mean to diminish the angst that Agent

1    Tubbs has felt.  But Mr. Unocic is in prison for three years,

2    and this agent has this level of fear over someone who is

3    sitting in prison?  Maybe he got into the wrong line of work if

4    he has that much fear of somebody who's sitting in prison for

5    three years that it's affecting his daily life.

6         And maybe I'm -- maybe I'm too jaded because I was down

7    the road for so long, but I compare -- but I think of domestic

8    assaults and some of the violence that women have went through

9    and the threats that they have, and I don't see this -- it just

10   seems this is not more egregious than any other type of

11   assault.  I mean, there was no actual hands-on, you know?  This

12   is not any more egregious than the other type of threats.

13   Again, I keep going back to domestic assault or a domestic

14   where the guy is screaming at the woman that he's going to kill

15   her.  That happens all the time, and this certainly isn't any

16   more egregious than that.  Agent Tubbs certainly can -- I mean,

17   he has the training too.  He has more than protection.

18        So history and circumstances of Mr. Unocic.  You know,

19   there is actually a lack of actual violence in his criminal

20   record.  There's not assaults in here.  There's not assaults of

21   an officer in here.  He doesn't put his hands up when he's

22   supposed to and disobeys the police when he's been arrested on

23   this, but he's not assaulting the police officers.  He's not

24   assaulting other people.  The violation of the protection order

25   had to do with his father, who he sent a birthday card to.

1    Again, that's wrong, but it's not assaultive behavior.

2        The incident in Weld County, Colorado, he obviously had

3    some type of mental break during that but -- and he wasn't

4    charged with shooting at police officers, and I know they kind

5    of made a deal about some bullets might have been in that

6    general direction.  He wasn't found guilty of that, and it just

7    seems -- I don't know how you would be able to shoot at a

8    police officer in a basement from a window well unless the

9    police officer was standing directly over the window well and

10   shooting up that, 'cause that's the way that house was laid

11   out.

12       Mr. Unocic had come to terms with what he was facing after

13   he was sentenced out there in Colorado.  His plans were to care

14   for his elderly mother, get a job, stay away from law

15   enforcement, not to have any contact with law enforcement, lay

16   low, get a job, and rebuild his life, and that's what he still

17   wants to do.  But in regards to unwarranted sentencing

18   disparities -- and I do understand these cases are a wide

19   variety, but there was no overt act to actually carry out this.

20   It was just words said in a jail cell to other inmates.  There

21   was no intent to convey these threats or to cause fear within

22   that officer.

23       And regarding the -- Mr. Packard brought up the statute

24   and how this was charged.  I always have had a problem with

25   this, not that that matters, but it just seems odd that if --

1    if Mr. Unocic's words were, "I'm going to kill that agent so he

2    doesn't testify," there would have been no crime in this

3    because he would have lacked the intent, which just seems odd

4    to me.  But because it was charged as a threat with the intent

5    to retaliate -- if the threat would have been so he doesn't

6    testify, there's no crime there, 'cause there's a lack of

7    intent there.  But since it was charged as I'm going to harm

8    this agent in retaliation, then all of a sudden it becomes a

9    federal crime, which just seems kind of odd, odd to me that

10   somebody -- you go from no crime to somebody who the government

11   thinks should be sent to prison for six years.

12        THE COURT:  And I'm sure you'll have that discussion

13   in St. Louis or St. Paul or wherever the Eighth Circuit sits.

14   We've gone through that one.

15        MR. REIMAN:  But I do think that just to send

16   somebody to prison for five, six years for words said in a jail

17   cell in the heat of the moment with no intent to cause fear in

18   the actual victim just seems crazy.

19        As I stated in my brief, we are asking for a sentence

20   below a year in this case.  We would ask the Court also to

21   consider running supervised release concurrent with the three

22   years that he already has on that Wyoming case.  Thank you.

23        THE COURT:  And somebody tell -- either you or the

24   government, what is the status of the Wyoming sentence?  Is

25   there a release --

```
 1              MR. REIMAN:  It's March....

 2              THE DEFENDANT:  March 7th.

 3              MR. REIMAN:  March 7th, March 7.

 4              THE COURT:  Pardon?

 5              MR. REIMAN:  March 7th of 2024.

 6              THE COURT:  March 7th of this year?

 7              MR. REIMAN:  Yes.

 8              THE COURT:  Okay.

 9              MR. REIMAN:  Yeah.

10              THE COURT:  I'm just going to note that.  I mean,

11      it'll be whatever it is --

12              MR. REIMAN:  Yeah.

13              THE COURT:  -- but as far as credit for time served,

14      I want to note that.

15          All right.  Okay.  Anything further, Mr. Reiman?

16              MR. REIMAN:  No, sir.  Thank you.

17              THE COURT:  All right.  Anything further from the

18      government in response?

19              MR. PACKARD:  Well, just that Mr. Reiman's point

20      about the nature and the continuum of the threat is well taken,

21      you know.  Sometimes in county court here, worse words are

22      said, and you get a disturbing the peace, $500 fine and so --

23      you know, and what makes a federal agent different from the

24      average person on the street?  Well, the statute makes it a

25      special situation, but also it was that combination of
```

```
 1    Mr. Unocic's background and that Colorado explosives background
 2    that really changes the nexus here and makes it different from
 3    the usual situation.
 4        And so I understand what Mr. Reiman is saying about
 5    whether Tubbs has thin skin, but truly from the git-go it was
 6    that history that really tuned law enforcement into this is
 7    some -- something different here, and that's a valid sentencing
 8    consideration.  What is the defendant's background?  You pair
 9    that up with what he said, and it's a dangerous combination, so
10    that's where we're coming from.  And it's important to
11    acknowledge that there are threats every day that are just as
12    serious on common citizens that get a $500 fine, but, you know,
13    this is a different situation from that.  Thank you.
14        THE COURT:  All right.  Very well.  Okay.
15    Mr. Unocic, at this time you do not have to speak.  You don't
16    have to say anything if you wish, but now is the time for you
17    to address the Court if you wish to say anything to me before I
18    pronounce sentence.  Is there anything that you wish to say?
19        THE DEFENDANT:  Yes, sir.
20        THE COURT:  All right.  You may do so.
21        THE DEFENDANT:  There's just a few things that I'd
22    like to talk about or explain.  When the -- when I was arrested
23    initially in 2021, I believe, in November, I was taken to the
24    jail, and I was on several medications for depression,
25    antipsychotics, medication for ADHD, things of that nature.  I
```

1    did not receive any of those medications when I went to jail,

2    so I went cold turkey off of all of my medications.

3        Then when I did arrive at Scotts Bluff, they had to give

4    me a couple of the medications.  Some of them they wouldn't,

5    and they substituted it with a different medication that I've

6    had bad reactions to in the past, including hallucinations, and

7    this was in Weld County Jail in 2016.

8        Part of the reason that I was so angry and blowing off

9    steam is because of my mother.  My mother, she's 78 now, in

10   very poor health.  From the time I was arrested and during my

11   current incarceration, she has fallen and broken an arm twice,

12   and so she was able to use her Life Alert to get assistance,

13   but now she no longer has a personal assistant.  She had to

14   move to a new apartment because she could not pay the rent, and

15   currently right now they're about to kick her out of her

16   current apartment because she can't pay the rent or pay her

17   bills.  In addition, she says the doctor wants her to go onto

18   dialysis and things of this nature.

19       But anyways, I was very upset because my father had passed

20   away when I was incarcerated, and my mother, she has no other

21   family.  Essentially it's just me and her, and I'm the one who

22   helped her out and take care of her, and the thought of her

23   passing away alone while I was incarcerated, just like I wasn't

24   there to support her when my father passed away, was too much,

25   and the roller-coaster ride of being on medications was

1    overwhelming.

2        I admit that, yes, I probably said some very bad things.

3    I don't agree with Mr. Hoops's version of what happened, but

4    I'm not here to argue that or discuss that.  But as soon as I

5    was sentenced and got to prison, I kind of settled down with

6    what medications that I had available.  I had completely

7    forgotten about Mr. Tubbs.  All I focused on was getting out so

8    I could take care of my mother and help her out in her time of

9    need and be there for her when her time came to pass away, and

10   things were looking up, and then I get brought here and

11   blindsided by this indictment.

12       And, you know, now, you know, I never -- I -- Mr. Reiman

13   reviewed the impact statement, victim's impact statement from

14   Mr. Tubbs, and that was absolutely -- I had no intentions of

15   anything like that occurring.  You know, my circumstances when

16   I made certain statements in jail, as Mr. Reiman pointed out,

17   was I was not properly medicated.  It was heat of the moment.

18   I was concerned about not being there for my mother.  When I

19   received this, you know, I was looking at -- my initial

20   indictment said that I had four charges and I was looking at

21   zero to ten for each one with a maximum of 40 years.  They

22   dropped it down to two charges, which still was a zero to 20,

23   and I was just overwhelmed with the stress of not being able to

24   take care of my mother.

25       But when I was sentenced -- and I was sentenced to, you

 1    know, more than I had pled to.  I had agreed to 15 months.

 2    They gave me 33, but that was fine.  It was still within the

 3    realm of possibility for me to get out, get my life back

 4    together, and help my mom.  And like we -- we just discussed,

 5    my out date is March 7th, and that's the only thing that I've

 6    been looking forward to and planning on is being able to assist

 7    my mother, and it just seems that this was just all -- it

 8    was -- I never intended for anything to get out of hand or come

 9    to this level.  That was, you know -- you know, I feel bad

10    about what happened, but I just want to let you know that there

11    were other things going on that nobody seemed to be aware of

12    that was affecting me mentally while I was in jail, but that's

13    probably about all I have to say.  Thank you, sir.

14         THE COURT:  All right.  Very well.  I will take all

15    of that into consideration.

16      Counsel, is there any reason that sentence should not now

17    be pronounced?

18         MR. PACKARD:  No, Your Honor.

19         MR. REIMAN:  No, sir.

20         THE COURT:  All right.  Very well.  Well, Mr. Unocic,

21    I was, as you know, the trial judge in this particular case.  I

22    heard all of the witnesses and assessed their credibility.  In

23    particular I assessed the credibility of Inmates Rivera and

24    Hoops, which the Court and the jury found to be credible.

25      Now, for sentencing purposes, I have considered all of the

1    Section 3553(a) factors.  That means I've considered the nature

2    and circumstances of this offense.  That means the exact type

3    of threats that were had in this case.  They were verbal.  They

4    were increasing.  There was physical enactment.  In other

5    words, they were very specific.  So this Court is very

6    clear-eyed about what type of threats were involved in this

7    case.

8         I've also noted, as your lawyer has argued, the fact that

9    the threat was not made directly to the victim, and that plays

10    a part in the sentencing in this case, but it certainly did get

11    conveyed to the victim and very directly affected the victim,

12    you know, and I understand the victim impact statement as it

13    is.  We all -- you know, everybody in this courtroom, whether

14    they wear a robe or a badge or sitting at that table, are

15    subject to offhand remarks.  I don't think we'd want to go over

16    to the Saline County Jail and see what people are saying about

17    us, okay, but those are those type of remarks and that type of

18    nature.  This one went beyond that.

19         You know, and the two inmates that testified, Rivera and

20    Hoops, they weren't looking for anything.  In fact, this all

21    started when Rivera talked to his lawyer, you know.  There were

22    very specific threats that were being discussed with Rivera and

23    other inmates, and he was worried about the safety of this

24    officer.  That's the only reason he went to his lawyer.  He

25    wasn't looking for anything.  That's how it began.

1    The ATF came and interviewed Hoops.  Hoops wasn't looking

2    for anything at that point in time, and Hoops very frankly said

3    he thought that Mr. Unocic was full of crap in the beginning, I

4    mean, didn't give the threats a lot of credence, and then they

5    progressed and they -- I think he used the word they became

6    scary.  The defendant was obsessed.  He was very serious.  And

7    so that's how the charges were brought in this case.

8        And as I noted in detail at the instruction conference,

9    this was an intent to retaliate against officer case, so those

10   threats need not be intended or be made directly to the

11   officer.  And I know you'll take that to the Circuit, and you

12   can argue it at that point in time, but that's the law as I

13   believe it to be.  So I've considered what type of threats

14   these were.  These were not offhand remarks.

15       Now, I am going to sentence Mr. Unocic based on the

16   threats and the remarks regardless of whether it was to a

17   federal officer or anybody else.  I mean, we've tossed around

18   the term there are threats and people get $500 fines.  There

19   aren't threats like this that get $500 fines.  But anyway, I've

20   considered all of that as far as the nature and the

21   circumstances of the crime.

22       I've considered Mr. Unocic's personal history, his work

23   history, military history, his mental health history, and I'm

24   going to order some mental health evaluation if he wants it.

25   We'll talk about that in a minute, but I've considered all of

that.  I have considered his criminal history, and that means all of it, but in particular I've considered at paragraph 61 the conviction in Weld County, Colorado, the attempted possession of explosive, incendiary parts, and then, of course, the federal conviction out of Wyoming for possession and felon in possession of a firearm, so I've considered all of that.

I've considered unwarranted sentencing disparities, and I very specifically considered the *Wynn* case and the *Ivers* case and others.  These circumstances are not the same.  This was not a one-off remark.  The government's witnesses were very specific about the incendiary nature of the remarks, the obsessing on this officer, the danger that it presented.  And I've also considered Mr. Unocic's prior criminal history, and that is different than the others that were involved in the *Wynn* and the *Ivers* case.

So when I consider all of the Section 3553(a) factors, including the need to have the sentence reflect the serious nature of the offense, to promote respect for the law, to -- and to provide protection to the public in this instance and to provide just punishment for this particular offense, I will be pronouncing a 33-month sentence to be served consecutive to the very separate conviction that was imposed in the District of Wyoming.

So now to the sentence.  Recognizing that the guidelines are advisory in nature and considering all of the

Section 3553(a) factors that I've just set forth, I hereby
sentence the defendant, Anthony Unocic, to a term of 33 months
in prison to be served consecutive to the sentence imposed out
of the United States District Court of Wyoming, Docket
Number 1:21CR-121-01J.

I am going to recommend -- if counsel wishes, I'm going to
recommend RDAP.

THE DEFENDANT:  Yes.  Yes, Your Honor.

THE COURT:  All right.  I will -- because of your
history of drug abuse, I am going to recommend to the Bureau of
Prisons that the defendant participate in the 500-hour
intensive drug treatment program or any similar and available
drug treatment program, and that should commence relatively
soon if you qualify for it.  I'm not sure with the prior record
whether you will or not, but I am going to strongly recommend
that you participate in that.

I will further recommend to the Bureau of Prisons that
you -- again, if counsel wishes -- receive a mental health -- a
full mental health evaluation and that the Bureau of Prisons
follow the recommendations of that mental health evaluation,
whether it be medications or whatever the case may be, so I am
going to recommend that.

I'm also recommending to the Bureau of Prisons that
Mr. Unocic be provided an opportunity to obtain further
education or vocational training appropriate to his current

1    education and skill level.  You're 54 years old.  You've got a

2    lot of life to live yet.  The employment has not -- I think

3    that's been part of the issue, so I want you to get education

4    or vocational training while you're there and come out

5    productive again.

6        Counsel, is there a recommendation as to a federal

7    facility?  Do you want it as close to somewhere in Colorado or

8    what?

9        MR. REIMAN:  We had a long discussion about that.

10   He's probably going back to Hazelton.  That's where he was at.

11   He's not a big fan of Hazelton 'cause apparently they don't

12   have -- he was hop- -- Mr. Unocic, he's got a curious mind, and

13   he actually was looking forward to all the vocational training.

14   The problem is Hazelton doesn't have squat, apparently.

15       THE COURT:  Well, then, let's recommend somewhere

16   that -- I mean, the Bureau of Prisons is going to classify him

17   and place him as appropriate but --

18       MR. REIMAN:  Yeah.  His only other concern was he

19   does not want to go to --

20       THE DEFENDANT:  Florence.

21       MR. REIMAN:  -- Florence, because he's concerned he's

22   going to run into some of the same people he was a guard over

23   years ago, so he doesn't want to go there.

24       THE COURT:  Yeah.  Okay.

25       THE DEFENDANT:  Maybe Sheridan.

1          THE COURT:  I may make no -- other than not go to

2    Florence, I mean, I may make no recommendation.

3          MR. REIMAN:  Would -- is Sheridan a medium security?

4          THE COURT:  What's that?

5          MR. REIMAN:  Sheridan, Oregon, is a medium security,

6    and that's what he is right now, I suspect.

7          THE COURT:  That's a solid -- I've not had anybody

8    go.  I know right where it's at, and that would be appropriate.

9    All right.  So I will recommend to the Bureau of Prisons that

10   the defendant be incarcerated in a federal facility as close to

11   Sheridan, Oregon.

12       I don't know if it's Sheridan FCI or what.  Kathy, you'll

13   look that up, but it's Sheridan, Oregon.

14         MR. REIMAN:  Yes.

15         THE COURT:  So I will recommend that, and I will also

16   specifically recommend that he not be incarcerated in Florence,

17   Colorado.  I will make that specific recommendation.  Again,

18   the Bureau of Prisons will classify you and place you as

19   appropriate, but they oftentimes will follow that

20   recommendation, and so I will make that recommendation.

21       Mr. Unocic shall be placed on three years of supervised

22   release once he's released from prison, and that will be served

23   concurrently with the sentence of -- you're going to be

24   getting -- you're not going to be getting out until after this

25   sentence is served, so it'll be a three-year supervised release

1    to be served concurrently with that supervised release that was

2    imposed in Docket 1:21CR-121, but I do intend to follow the

3    special conditions of supervised release set out at the end of

4    the revised PSR in this case.

5        Do the parties have any objection to any of those special

6    conditions?

7            MR. PACKARD:  No, Your Honor.

8            MR. REIMAN:  No.  Mr. Unocic and I went over those.

9            THE COURT:  What's that?

10           MR. REIMAN:  Mr. Unocic and I did go over those.

11           THE COURT:  So the special conditions of supervised

12   release set out in the revised PSR are imposed, and the

13   standard conditions in the Court's judgment will also apply.

14       I'm not going to impose a fine because the defendant could

15   not pay one and is not expected to be able to pay one in the

16   foreseeable future.

17       A $100 special assessment will be imposed.

18       And the defendant normally would be given credit for time

19   served.  There is no credit.  I should probably note that the

20   consecutive sentence will commence at the end of the Wyoming

21   term, which is anticipated to be March 7 of 2024, but I'll just

22   note that in the JCC, but it is whatever it is and so....

23       And if he's not already done so, the defendant shall

24   cooperate in the collection of a DNA sample at the direction of

25   the Bureau of Prisons.

1          Now, in crafting this order I have considered all factors

2     in determining this sentence should be sufficient but not

3     greater than necessary to comply with the purposes of

4     Section 3553(a).

5          So that is my judgment and sentence.

6          Counsel, do either one of you have any questions or would

7     like any further elaboration of either my sentence or statement

8     of reasons?

9               MR. PACKARD:  No, Your Honor.

10              MR. REIMAN:  No, sir.  Thank you.

11              THE COURT:  Pardon?

12              MR. REIMAN:  No, sir.  Thank you.

13              THE COURT:  All right.  Very well.  Mr. Unocic, you

14    do have a right to appeal this matter to a higher court, and

15    you have 14 days in which to file an appeal, and if you wish to

16    do so, you should talk with Mr. Reiman.

17         In just a few moments, my courtroom deputy is going to

18    give you a sheet of paper -- or it may be there now -- that

19    sets forth your appeal rights.  They're essentially what I just

20    told you, you have 14 days in which to file an appeal.

21         Do you have any questions about your right to appeal or

22    the procedures involved?

23              THE DEFENDANT:  No, sir.

24              THE COURT:  All right.  Very well.  Anything else

25    that we need to take up from the government?

1            MR. PACKARD:  No, Your Honor.

2            THE COURT:  Or from you, Mr. Reiman?

3            MR. REIMAN:  No, sir.  Thank you.

4            THE COURT:  All right.  Mr. Unocic, good luck to you.

5    Stay away from weapons, stay away from others, and we likely

6    won't see each other again.  All right?

7            THE DEFENDANT:  (Nods head.)

8            THE COURT:  Thank you.  We stand adjourned.

9        (Adjourned at 9:48 a.m.)

10

11                    * * * * * * * *

12

13        I certify that the foregoing is a correct transcript from

14    the record of proceedings in the above-entitled matter.

15

16

17        */s/Lisa G. Grimminger*          February 6, 2024
         Lisa G. Grimminger, RDR, CRR, CRC    Date
18

19

20

21

22

23

24

25